# EXHIBIT B

AFM:AAS/RP
F. #2021R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AND DESCRIBED AS LEIVINE WINE & SPIRITS, 3370 FARRINGTON STREET, QUEENS, NEW YORK 11354 | **FILED UNDER SEAL**<br><br>APPLICATION FOR SEARCH WARRANT<br><br>Case No. 24 MC 3106 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR WARRANT TO SEARCH AND SEIZE

I, Devin Perry, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known and described as Leivine Wine & Spirits, 3370 Farrington Street, Queens, New York 11354, as further described in Attachment A and below, for the property to be seized in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). Since becoming a Special Agent, I have participated in numerous investigations into organized criminal activity, during which I have, among other things: (a) conducted physical and electronic surveillance, (b) reviewed search warrant returns, (c) reviewed and analyzed recorded conversations and records, and (d) debriefed cooperating witnesses and informants.

3.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law

**SUBJECT TO PROTECTIVE ORDER**                                                        **EDNY_008363**

enforcement authorities, and (c) review of other records and reports, including public records and reports created by news agencies.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Statements attributed to individuals in this affidavit are set forth in sum, substance, and in part, unless otherwise indicated.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1956 (money laundering) and 1001 (false statements), and 26 U.S.C. § 7201 (attempt to evade or defeat tax), and conspiracies to commit the same have been committed by LINDA SUN, CHRIS HU, MEIPING SUN, GUOXIAN SUN, and others known and unknown (the "Subject Crimes").  There is also probable cause to search the location described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes, further described in Attachment B.

## DESCRIPTION OF THE PREMISES

6.      The property to be searched comprises the premises known and described as Leivine Wine & Spirits, 3370 Farrington Street, Queens, New York 11354 (the "SUBJECT PREMISES"), depicted below.

SUBJECT TO PROTECTIVE ORDER                                                                      EDNY_008364



**PROBABLE CAUSE**

7.      On or about July 18, 2024, the Honorable Lois Bloom, U.S. Magistrate Judge for the Eastern District of New York, authorized search warrants as to multiple premises, including two residences and numerous safe deposit boxes controlled by LINDA SUN and her husband CHRIS HU, as well as SUN's parents MEIPING SUN and GUOXIAN SUN (the "search warrants").  (24-MC-2841).  The affidavit in support of the search warrant application (the "Affidavit"), including all defined terms, is attached as Exhibit A and incorporated by reference.

8.      LINDA SUN worked for the New York State ("NYS") government for over a decade, including in high-ranking posts for Governors Andrew Cuomo and Kathy Hochul and in multiple state agencies.  During that time, SUN also worked as an undisclosed agent of the

3

Government of the People's Republic of China ("PRC") and its single ruling political party, the Chinese Communist Party ("CCP"). Acting at the request of PRC government officials and CCP representatives, SUN engaged in numerous political activities in the interests of the PRC and CCP, including blocking representatives of the Taiwanese government from having access to the NYS governor's office; changing the NYS governor's and lieutenant governor's messaging regarding issues of importance to the PRC and CCP; obtaining official NYS governor proclamations for PRC government representatives without proper authorization; attempting to facilitate a trip to the PRC by then-Lieutenant Governor Hochul; and arranging meetings for visiting delegations from the PRC government with NYS government officials.

9.      Additionally, LINDA SUN repeatedly violated internal rules and protocols within the NYS governor's office to provide improper benefits to PRC and CCP representatives, including by providing unauthorized invitation letters from the office of the NYS governor that were used to facilitate travel by PRC government officials into the United States for meetings with NYS government officials. SUN's unauthorized invitation letters for the PRC government delegation constituted false statements made in connection with immigration documents and induced the foreign citizens into unlawfully entering the United States.

10.     In return for these and other actions, LINDA SUN received substantial economic and other benefits from representatives of the PRC government and the CCP, including the facilitation of millions of dollars in transactions for the PRC-based business activities of SUN's husband CHRIS HU; travel benefits; tickets to events; promotion of a close family friend's business; employment for SUN's cousin in the PRC; and Nanjing-style salted ducks prepared by a PRC government official's personal chef that were delivered to the residence of SUN's parents. SUN and HU used the monetary proceeds of this scheme to purchase, among other items, real

SUBJECT TO PROTECTIVE ORDER                                                      EDNY_008366

estate property in Manhasset, New York currently valued at $4.05 million, a condominium in Honolulu, Hawaii currently valued at $2.1 million, and various luxury automobiles, including a 2024 Ferrari. SUN never disclosed any benefits she received from representatives of the PRC government and the CCP to the NYS government, as she was required to do as a NYS government employee.

11.    LINDA SUN never registered as a foreign agent with the Attorney General, and in fact actively concealed that she took actions at the request of PRC government and CCP representatives. Thus, neither the NYS government nor the greater New York and American public had the opportunity to evaluate her conduct considering her long-standing relationships with the PRC government and the CCP and her status as their agent.

The Coconspirators

12.    LINDA SUN is a naturalized U.S. citizen who was born in the PRC and resided in the Eastern District of New York. From in or about 2012 until 2023, SUN worked for the NYS government, in positions that included: (a) Director of Asian American Affairs and Queens Regional Representative for then-Governor Andrew Cuomo from in or about August 2012 to February 2015; (b) Director of External Affairs of Global NY for Empire State Development, the economic development arm of the NYS government, from in or about April 2015 to February 2018; (c) Deputy Chief Diversity Officer for then-Governor Cuomo from in or about February 2018 to July 2020; (d) Superintendent for Intergovernmental Affairs and Chief Diversity Officer at the NYS Department of Financial Services from in or about July 2020 to September 2021; (e) Deputy Chief of Staff for the NYS Executive Chamber (the "Executive Chamber"), working as an advisor for Governor Kathy Hochul, from in or about September 2021 until September 2022; and

5

(f) Deputy Commissioner for Strategic Business Development for the NYS Department of Labor from in or about September 2022 until March 2023.

13.    CHRIS HU is a U.S. citizen who resides in the Eastern District of New York with LINDA SUN.  HU operated business ventures that benefited economically from SUN's activities on behalf of the PRC government and CCP, described below.  These business ventures included: (a) Foodie Fisherman, a seafood exporter based in Queens that was organized in March 2016 (the "Seafood Company"); (b) Golden Capital, a purported financial consultancy based in Queens organized in February 2016 (the "Financial Consultancy"); and (c) Leivine Wine & Spirits, a wine and liquor business based in Queens organized in June 2021 ("Leivine").  SUN filed the articles of incorporation for the Seafood Company with the NYS Department of State. Additionally, HU frequently used the services of Air City, a carrier business with U.S. headquarters in Queens that was an authorized freight agent by the PRC government ("Company-1").  The proprietor of Company-1 is HU's close friend.

14.    ██████████ ("CC-1") is a PRC national who became a naturalized U.S. citizen.  CC-1 served as the president of an association of persons from Henan Province, PRC located in the New York metropolitan area ("Association-1").  Association-1 is a nonprofit 501(c)(3) organization closely associated with the United Front Work Department ("UFWD") and the CCP.  The UFWD is a CCP department that attempts to manage relationships with and generate support for the CCP among elite individuals inside and outside the PRC, including by gathering human intelligence.  After 2018, the UFWD has reported directly to the CCP's Central Committee, a national party organization that helped drive political decision-making in the PRC.  In his role as president of Association-1, CC-1 maintained contact with PRC government officials and frequently traveled to the PRC for UFWD-sponsored events.

6

EDNY_008368

15.     ███████████    ("CC-2") is a U.S. legal permanent resident who maintained active business interests in Shandong Province, PRC.  CC-2 also served as principal of numerous U.S.-based Chinese organizations, including an economic interest group for persons of Chinese origin ("Association-2").

### CC-1 and CC-2 Assist HU's PRC-Based Economic Activities

16.     As described in the Affidavit, LINDA SUN engaged in various political activities on behalf of CC-1 and CC-2.  SUN knew that CC-1 and CC-2 were themselves acting as agents of the PRC government and CCP when they made requests of SUN.  The goal of the political activities on behalf was to arrange for New York State and Henan Province to enter into a memorandum of understanding with respect to contemplated economic exchange, including the construction of satellite campuses for New York-based universities in Henan Province.  The political activities included sponsoring delegations from Henan Province to travel to the United States to visit with NYS officials, including then-Governor Hochul, and attempting to arrange for then-Governor Hochul to travel to Henan Province for analogous meetings with Henan provincial government officials.  The illicit means of SUN's political activities included falsifying invitation letters purportedly signed by then-Governor Hochul to sponsor the Henan Province delegations' visa applications.

17.     In return for LINDA SUN's political activities on behalf of Henan Province, CC-1 and CC-2 aided the defendant CHRIS HU's PRC-based commercial activities.

18.     As early as 2016, CC-1 and LINDA SUN discussed how to expand the defendant CHRIS HU's seafood exporting business into the PRC.  In or about May 2016, CC-1 shared a news article with SUN about the first shipment of live lobsters from a United States city to Zhengzhou, a city in Henan Province, PRC.  In response, SUN asked CC-1 if "we [SUN and

SUBJECT TO PROTECTIVE ORDER                                    EDNY_008369

CHRIS HU] still have the chance to do [this business]." CC-1 replied that [SUN and HU] surely have the opportunity of [selling live seafood to the PRC]." In June 2016, CC-1 sent SUN a message indicating that he was in Henan Province and reiterated that "[his associates] hope that [SUN and HU] can export [live] lobsters to [Henan]."

19.     In or about February and March 2017, CC-1 arranged for LINDA SUN to attend and speak at the "China Henan International Investment & Trade Fair," taking place in Zhengzhou, Henan Province at the end of March 2017. As noted above, in March 2017, SUN was employed by Global NY. CC-1 asked SUN to speak on behalf of New York State regarding economic trade relations between the PRC and New York State, in the context of the Henan Province Free Trade Zone. In response, SUN forwarded CC-1 an official Global NY PowerPoint presentation that she planned to deliver. However, SUN did not have authorization to speak on behalf of Global NY at that event. CC-1's organization handled SUN's registration for the event. CC-1 also agreed to make local travel arrangements, including hotel accommodations, for SUN and her family, HU's PRC-based business partner (the "Business Partner"), and several representatives—including the principal—of Company-1.

20.     LINDA SUN was aware that the PRC government had organized and partially funded the trip. A close associate of CC-1 (the "Associate") wrote to SUN that the Overseas Chinese Affairs Office—a PRC government body which, after 2018, became directly managed by the UFWD—had booked two rooms for SUN's party. On or about February 1, 2017, amid planning discussions, SUN wrote that representatives of the Henan provincial government had given a red envelope containing $200 to SUN's young son. Later, in written communications with the principal of Company-1, SUN wrote that "main dinner is set by the Henan government" and clarified that "the Henan government is setting up a special itinerary for you and Chris [HU]."

8

21.     While coordinating travel logistics, CC-1 and LINDA SUN discussed CC-1's efforts to help CHRIS HU's business in the PRC, including discussing the viability of importing frozen seafood from the United States to Henan Province.  In messages to SUN, CC-1 agreed to make efforts to personally intervene as to PRC customs issues and arranged a business meeting for HU with an entity SUN referred to as the "Commercial Department" to discuss the importation of lobsters into the PRC.  According to written correspondence, CC-1 ultimately arranged multiple business meetings for HU in Henan Province.  In or about March 2017, the Associate wrote that "several appointments" had been scheduled between HU and "officials from the Airport Free Trade Zone and the Wholesale Market" during HU's visit to Henan Province.  Writing to the principal of Company-1, SUN commented, "[CC-1] wants to make sure he sets up special meetings" for the principal of Company-1 and HU.  In response, the principal of Company-1 agreed that Association-1 (of which CC-1 was president) "is somewhat useful to do business in [C]hina."

22.     On or about March 26, 2017, LINDA SUN and her parents flew from JFK Airport in Queens, New York to Shanghai Pudong International Airport, with an ultimate destination of Zhengzhou Xinzheng International Airport in Zhengzhou, Henan Province.   HU arrived in Zhengzhou on or about March 29, 2017 on a trip that originated from JFK Airport.  After their arrival, CC-1 agreed to arrange for HU and the representatives from Company-1 to attend the fair's symposium on e-commerce.

23.     Later in 2017, CC-1 and CC-2—who was the principal of Association-2 and a close contact of CC-1—continued to help CHRIS HU cultivate business in the PRC.  In communications from November 2017, CC-1 and CC-2 discussed a business proposal by HU, apparently for a project in the PRC.  CC-1 and CC-2 discussed ways to improve the proposal,

9

EDNY_008371

including by adding the construction of an ocean park to procure more land, as well as the possibility of traveling to Shandong, PRC with HU.    In a follow up message, CC-1 "recommend[ed]" that "[CC-2] try to finalize [HU]'s project" before leaving the PRC; CC-2 responded, "Ok."   Later, in December 2017, CC-2 invited HU to visit Qingdao, Weihai, and Yantai—three cities in Shandong Province, PRC.   CC-2 stated that the vice president of one of CC-2's organizations would accompany HU in Qingdao, and CC-2 would meet HU in Yantai. CC-2 further indicated that he had contacted government leaders in Qingdao, Weihai, and Yantai on behalf of HU.

24.    On January 5, 2018, CHRIS HU flew from JFK Airport in Queens, New York to Guangzhou Baiyun International Airport in Guangzhou, PRC.

25.    In early 2018, CC-1 and CC-2 helped arrange for LINDA SUN to travel to the PRC in 2018 to speak at a conference sponsored by the All-China Federation of Returned Overseas Chinese ("ACFROC"), which was a UFWD agency.   As contemplated, SUN would be accompanied by CC-2 and representatives from the Overseas Chinese Affairs Office.   In written correspondence, CC-1 indicated that CC-2 would book SUN's hotel in the PRC and asked for SUN's resume.   SUN sent CC-1 English- and Chinese-language versions of the resume, and CC-1 asked her to make sure to include her current position in the resume.   SUN asked CC-1 to help the defendant CHRIS HU, indicating that it would be HU's first investment in the PRC and that HU did not understand much.   She further indicated that the "loan" would be HU's first.   CC-1 agreed to help and indicated that CC-2 would give a maximum effort.

26.    LINDA SUN traveled between New York City and Beijing, PRC, leaving from JFK Airport in Queens, New York on January 30, 2018 and returning on February 3, 2018. According to written correspondence, CC-2 made travel arrangements for SUN, including

SUBJECT TO PROTECTIVE ORDER                                      EDNY_008372

reserving a presidential suite previously used by First Lady Michelle Obama during her stay in Beijing.

27.    A February 2018 press clipping from a PRC news agency reported on a meeting between a delegation of Association-2 members and ACFROC members.  The article featured a photograph of LINDA SUN (fourth from left) and CC-2 (third from left) standing together with various ACFROC members, including the Chairman and CCP Party Secretary of ACFROC.  Notably, in an electronic communication from February 2018, SUN sent a link to a news article to her parents about a delegation of the U.S. Federation of Chinese-American Entrepreneurs visiting the Deputy Director of the Overseas Chinese Affairs Office.



28.    In written correspondence from 2018, CC-1 and CC-2 continued to assist CHRIS HU's PRC business affairs, as SUN had requested in return for her participation in the ACFROC meeting conference.  In May 2018, in response to a solicitation from CC-2 to HU and

11

the Business Partner for an update on the project's progress, HU provided a document titled "The Lobster Project Entry Agreement."

29.    Between mid-2016 and late 2019 – during which time LINDA SUN traveled to the PRC on multiple trips organized and partially funded by CC-1, CC-2, and associated organizations; issued two fraudulent invitation letters to CC-1 with the knowledge that they would be disseminated to PRC government delegations from Henan Province; and granted a New York State title to CC-1 – CHRIS HU's Seafood Company generated millions of dollars of business from the PRC.  Between November 2016 and December 2019, the Seafood Company's account received approximately $13.9 million in disbursements from a PRC-based company associated with the Business Partner: approximately $660,000 in November and December 2016; $4.6 million in 2017; $4.6 million in 2018; and $3.9 million in 2019.  The account also received an additional $2 million from the Business Partner's PRC-based personal account between November 2016 and December 2019.

30.    Though LINDA SUN and CHRIS HU live an opulent lifestyle—for example, real estate in Manhasset, Long Island currently valued at $4.05 million and a condominium in Honolulu, Hawaii currently valued at $2.1 million, both of which they paid for without a mortgage loan, and a new 2024 Ferrari vehicle—their personal and business tax returns reflect little to no income earned.  Notably, aside from the Seafood Company and Leivine, HU appears to operate no other businesses that generate significant business income.

| Gross or Qualified Business Income by Year | Joint Return | Seafood Company | Leivine |
|---|---|---|---|
| **2020** | -$665,483 | $45,451 | N/A |
| **2021** | -$3,921 | -$53,983 | N/A |

12

    EDNY_008374

| | | | |
|---|---|---|---|
| **2022** | $87,339 | $123,427 | $5,410 |
| **2023** | $124,326 | $50,734 | $9,342 |

<u>2022 Opening of Leivine</u>

31.    Leivine is a wine and liquor store in Flushing, Queens, that describes itself as catering to the "connoisseur & casual imbiber alike."  The owner of Leivine is CHRIS HU.  Leivine is a tenant in a building development called the Farrington which features condominiums, a hotel, and retail space.  The development was spearheaded by George Xu, who is a prominent businessman in Queens, New York.  Notably, Xu is President of the New York Chinese Business Association, and he co-hosted a fundraising event with CC-1 for New York Governor Kathy Hochul on October 21, 2021.  According to news clippings, LINDA SUN attended the event.  A picture of the event is below, with SUN shown seated sixth from the right and Governor Hochul seated seventh from the right.  CC-1 is seated fifth from the right**.**



32.    In or about October and November 2022, HU's wife, LINDA SUN used her New York State Department of Labor email account to prepare the "Run of Show" document for

**SUBJECT TO PROTECTIVE ORDER**                    **EDNY_008375**

the opening gala for the storefront for Leivine.  According to LINDA SUN's "Run of Show" document for the opening gala for Leivine's storefront, the guests of honor included "Congresswoman Grace Meng, State Senator Toby Stavisky, City Councilwomen Sandra Ung & Linda Lee, New York State's Commissioner at the Department of Labor Roberta Reardon, and George Xu, President of New York Chinese Business Association."  George Xu's LinkedIn page includes numerous photographs from the event, including SUN standing together with these political figures.

33.    Based on a review of LINDA SUN's work email account, SUN also attempted to provide constituent services for Xu's development at the Farrington without disclosing her business interests in the Farrington or her dealings with Xu.  For example, on May 8, 2020, SUN wrote to Richard Newman of Empire State Development for assistance stating, "Please find the attached documents related to DOB shutting down this work site even after ESD classified them as an essential business."

Evidence of Money Laundering and Tax Evasion is Discovered at Premises Controlled by LINDA SUN, CHRIS HU, MEIPING SUN and GUOXIAN SUN

34.    During execution of the search warrants on July 22 and 23, 2024 – which authorized law enforcement agents to search the homes of LINDA SUN and CHRIS HU, MEIPING SUN and GUOXIAN SUN, and safe deposit boxes controlled by the same – FBI agents uncovered evidence of money laundering.  More specifically, agents discovered hundreds of thousands of dollars of cash of unknown provenance.  Based on my knowledge of the investigation and the information summarized below, I assess that the bulk cash may constitute fruits of LINDA SUN's pay-to-play scheme that is being laundered through Leivine in the guise of cash deposits from revenue.

SUBJECT TO PROTECTIVE ORDER                EDNY_008376

35.    The execution of the search warrants on July 23 and 23, 2024 uncovered the following:

a.    As depicted below, approximately $10,000 in cash was found in a safe in the house of LINDA SUN and CHRIS HU.



b.    Approximately $265,000 in cash was found in a safe in the house of MEIPING SUN and GUOXIAN SUN.  In an interview with the FBI, GUOXIAN SUN claimed, in sum and substance, that the money represented his and his wife's life savings.  Much of the cash, as depicted below, in increments of approximately $10,000, is wrapped in paper featuring the handwritten date "7-16-2021," which I believe corresponds to July 16, 2021.

15



c.  Approximately $130,000 in cash was found in a safe deposit box registered to LINDA SUN and MEIPING SUN. The cash, depicted below, in increments of approximately $10,000, is wrapped in paper featuring the handwritten date "10-6-2021," which I believe corresponds to October 6, 2021. Notably, Leivine did not hold its Grand Opening until in or about November 2022.

16

SUBJECT TO PROTECTIVE ORDER



36.     During execution of the search at his house, HU volunteered the following statements regarding his finances:

a. HU indicated that he owned Leivine, a business located at the SUBJECT PREMISES. HU stated his hope that the FBI would not seize money from his home safe, as it was revenue from Leivine, and would need to be deposited at the bank. According to HU, Leivine generated millions of dollars in (cash) revenue a year, and HU would deposit the funds into the bank, often multiple times a day. As noted above, agents recovered hundreds of thousands of dollars in cash from the safe in the home of MEIPING SUN and GUOXIAN SUN and from a safe deposit box registered to LINDA SUN and MEIPING SUN, both of which included stacks of $10,000 wrapped in paper bands featuring handwritten dates from 2021. As noted above, Leivine opened in 2022, and, therefore, any stacks of cash wrapped with markings from 2021 found at Leivine would be inconsistent with actual cash revenue for Leivine.

17

b.  HU stated that the only money he received from the People's Republic of China ("PRC") came from his uncle, a person he identified as Chen Xiaoshi (identified in herein and in the Affidavit as the "Business Partner"), and that the money constituted his inheritance from his grandmother.  HU claimed that his accountant Adam Baruch told him that he did not need to file any paperwork, including but not limited to tax returns, associated with the inheritance.  Between 2016 and 2023, accounts controlled by HU received approximately $4.8 million in wire transfers from accounts in the name of the Business Partner (Chen Xiaoshi).  Approximately half of these funds were transferred to business accounts held by the Seafood Company.  The facts that approximately half of these funds were transferred to business accounts—rather than personal accounts—and that forensic evidence discussed above reveals that Chen Xiaoshi was, in fact, HU's PRC-based business partner, undermines HU's assertion that the funds from Chen Xiaoshi constituted an inheritance.  Notably, law enforcement personnel recently interviewed Baruch, who confirmed that HU had advised him that HU had received an inheritance from the PRC, but only remembered that occurring on one occasion.  As noted herein, there were multiple disbursements over a period of years from accounts associated with Chen Xiaoshi.

37.     Based on my knowledge of the investigation and the information summarized above, I assess that the bulk cash may constitute fruits of LINDA SUN's pay-to-play scheme that is being laundered through Leivine in the guise of cash deposits from revenue.

38.     Analysis of banking records for accounts held by Leivine shows that, between June 2021 and February 2024, accounts held by Leivine received over $1.49 million of cash deposits,

18

averaging around $77,000 of cash deposits every month during the period August 2022 to February 2024.  The cash deposits are represented by blue bars in the below table.



39.    Approximately $200,000 of cash was deposited to accounts held by Leivine before Leivine held its Grand Opening in or around November 5, 2022. Based on my training and experience and my knowledge of the investigation, I assess that cash deposits into accounts held by Leivine may constitute an attempt to launder the proceeds of LINDA SUN's pay-to-play scheme, which proceeds likely include the cash found during the execution of the search warrants.

## THE SUBJECT PREMISES

40.    I assess that it is likely that a search of the SUBJECT PREMISES will contain fruits and instrumentalities of violations of the Subject Crimes.

19

41.    As illustrated below, the cash deposits appear to be pooled in Leivine's account with Bank of America ending in 6999 (the "BOA 6999 Account") through inter-account additions:

a.    Between in or about November 6, 2023 and February 29, 2024, there were 3 cash deposits totaling $10,000 into Leivine's Bank of America account ending in 4392, and 2 disbursements totaling $10,000 to the BOA 6999 Account.

b.    Between in or about November 6, 2023 and February 29, 2024, there were 3 cash deposits totaling $10,000 into Leivine's Bank of America account ending in 4415, and 2 disbursements totaling $10,000 to the BOA 6999 Account.

c.    Between in or about October 6, 2022 and February 29, 2024, there were 45 cash deposits totaling $299,997.51 into Leivine's Bank of America account ending in 4970, and 27 disbursements totaling $301,428.12 to the BOA 6999 Account.  This account activity constituted approximately 98% percent of the account's total additions and disbursements.

d.    Between in or about November 14, 2022 and February 29, 2024, there were 17 cash deposits totaling $89,585 into Leivine's Bank of America account ending in 4996, and 14 disbursements totaling $89,585.03 to the BOA 6999 Account.  This account activity constituted approximately 100% percent of the account's total additions and disbursements.

e.    Between in or about October 17, 2022 and February 29, 2024, there were 43 cash deposits totaling $238,782 into Leivine's Bank of America account ending in 5018, and 23 disbursements totaling $231,554.70 to the BOA 6999 Account.  This

20

account activity constituted approximately 100% percent of the account's total additions and 97% of the account's total disbursements.

f.   Between in or about October 24, 2022 and February 29, 2024, there were 42 cash deposits totaling $239,230 into Leivine's Bank of America account ending in 5021, and 17 disbursements totaling $239,230 to the BOA 6999 Account. This account activity constituted 100% percent of the account's total additions and disbursements.

g.   Between in or about November 6, 2023 and February 29, 2024, there were 4 cash deposits totaling $15,000 into Leivine's Bank of America account ending in 8825, and 3 disbursements totaling $15,000 to the BOA 6999 Account.

h.   There were approximately $1.123 million in inter-account additions from personal bank accounts held in CHRIS HU's name to the BOA 6999 Account, which also benefitted from 52 cash deposits totaling $336,239.33, between in or about September 21, 2022 and February 29, 2024.

42.     Between in or about October 2022 and February 2024, Leivine accounts received approximately $1.84 million in disbursements from Shopify. Shopify is a Canadian e-commerce company that offers retail customers access to its proprietary e-commerce platform for online stores and retail point-of-sale systems. Between in or about October 2022 and February 2024, Leivine accounts also received approximately $424,000 from Paysafe, an e-commerce company based in the United Kingdom that offers retail customers access to its proprietary e-commerce platform for online payments. I assess that the combined approximately $2.26 million in disbursements constitutes Leivine's credit card and online sales during the period between in or about October 2022 and February 2024.

SUBJECT TO PROTECTIVE ORDER                                                    EDNY_008383

43.     Considering the similar manner of wrapping for cash found at the home of MEIPING SUN and GUOXIAN SUN and a safe deposit box used by MEIPING SUN and LINDA SUN, as well as HU's claims that (1) the cash found in his home safe constituted Leivine's revenue and (2) Leivine generated millions of dollars in (cash) revenue every year that HU would deposit into banks, I assess that the cash found at the home of MEIPING SUN and GUOXIAN SUN and in the safe deposit box constitutes evidence of tax evasion and potentially money laundering. Further, I am aware that wine and liquor stores, such as Leivine, generally conduct primarily cashless transactions.  Given Leivine's location in a high-end development in Flushing, I assess it is unlikely that the large volume of cash HU has been depositing in Leivine accounts constitutes Leivine's actual income.

44.     In sum, there is probable cause to believe that cash found in any safes found at the SUBJECT PREMISES, particularly if the cash is similarly wrapped to other cash seized in the investigation to date, constitutes evidence of the Subject Crimes.  There is further probable cause to believe that surveillance footage from the SUBJECT PREMISES depicting the manner in which HU receives, bundles, and stores cash, as well as Leivine's books and records in which HU documents Leivine's purported expenditures, constitutes evidence of the Subject Crimes.

## **TECHNICAL TERMS**

45.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22

b. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

46.    As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

47.    *Probable cause.* I submit that if a computer or storage medium is found on the Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition,

23

a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

48.  *Forensic evidence.*  As further described in Attachments B1 and B2, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail

24

programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations,

25

EDNY_008387

computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

26

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrants.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

49. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the Premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or

27

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

28

 EDNY_008390

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

50.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

51.    Additionally, because the search warrants for the SUBJECT PREMISES authorize the search for multiple electronic devices and media, some of which may belong to individuals who may not be involved in the Subject Crimes, reasonable efforts will be taken by the agents conducting the search to avoid the seizure of electronic devices and media – if any – that can be readily identified as belonging to any other individual working at the SUBJECT PREMISES.

## CONCLUSION

52.    I submit that this affidavit supports probable cause for a warrant to search the items, locations, or persons described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

53.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and resulting search warrant.  I believe that sealing these documents is necessary because the

SUBJECT TO PROTECTIVE ORDER

EDNY_008391

affidavit and warrant are relevant to an ongoing covert investigation, and the subjects of the investigation are at large and unaware of the full scope of the investigation. Premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving subjects an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates. Some of the evidence in this investigation is stored electronically and can be completely and permanently erased. Some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process). If alerted to the existence of the search warrant, there is reason to believe that the subjects under investigation will destroy that evidence and change their patterns of behavior.

Respectfully submitted,

DEVIN PERRY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on August 8 , 2024:

_Lara K. Eshkenazi_

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

30

## ATTACHMENT A

### Property to Be Searched

The property to be searched is a business located at 3370 Farrington Street, Queens, New York 11354 (the SUBJECT PREMISES), depicted below.



The property to be searched includes (a) all closed and locked containers found therein and (b) all electronic devices and digital media present at the SUBJECT PREMISES, whether or not they are on someone's physical person, with the exception of those that can be readily identified as belonging exclusively to persons not involved in the Subject Crimes (defined in Attachment B).

SUBJECT TO PROTECTIVE ORDER

**ATTACHMENT B**

**Particular Things to be Seized**

1.      All records, including all records on the Devices described in Attachment A that relate to 18 U.S.C. §§ 1956 (money laundering) and 1001 (false statements), and 26 U.S.C. § 7201 (attempt to evade or defeat tax) and conspiracies to commit the same (the "Subject Crimes") involving LINDA SUN, CHRIS HU, MEIPING SUN, and GUOXIAN SUN, among others, since January 1, 2021, including:

  a.  Storage of bulk cash;

  b.  Surveillance video showing areas where cash may have been received, packaged, or stored;

  c.  Documents and records related to the Subject Crimes, including cash, bank statements and other financial records, correspondence, payment records, and photos regarding the Subject Crimes;

  d.  All communications with any coconspirators regarding the Subject Crimes;

2.      Records on the Devices including:

  a.  Financial records relating to the receipt or deposit of cash in the name of Leivine Wine & Spirits;

  b.  Communications relating to the receipt or deposit of cash;

  c.  Records of Internet Protocol addresses used;

  d.  Location information;

  e.  Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3