# EXHIBIT H

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>SILVER MACBOOK PRO LAPTOP WITH SERIAL NUMBER<br>C02T89XXGTFL, CURRENTLY LOCATED AT AN EVIDENCE<br>LOCKER IN THE EASTERN DISTRICT OF NEW YORK | )<br>)<br>)  Case No.    25 MC 728<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 6, 2025_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      2/20/25          4:10 pm               *Cheryl Pollak*
                                                        *Judge's signature*

City and state:      Brooklyn, New York               Hon. Cheryl L. Pollak          U.S.M.J.
                                                                *Printed name and title*

SUBJECT TO PROTECTIVE ORDER                                        EDNY_052784

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>    25 MC 728 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Print    Save As...    Reset

SUBJECT TO PROTECTIVE ORDER                              EDNY_052785

AFM:AAS/RMP
F. #2021R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE SEARCH OF A
SILVER MACBOOK PRO LAPTOP WITH
SERIAL NUMBER C02T89XXGTFL,
CURRENTLY LOCATED AT AN
EVIDENCE LOCKER IN THE EASTERN
DISTRICT OF NEW YORK
.

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A
SEARCH WARRANT FOR AN
ELECTRONIC DEVICE**

Case No. 25 MC 728

---

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Devin Perry, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a search warrant authorizing the examination of
property—an electronic device—which is currently in law enforcement possession, and the
extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI").
Since becoming a Special Agent, I have participated in numerous investigations into organized
criminal activity, during which I have, among other things: (a) conducted physical and electronic
surveillance, (b) executed search warrants, (c) reviewed and analyzed recorded conversations
and records, and (d) debriefed cooperating witnesses and informants.  I am familiar with the facts

and circumstances set forth below from my participation in the investigation; my review of the investigative file; and reports of other law enforcement officers involved in the investigation.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is a silver Macbook Pro laptop with serial number S/N C02T89XXGTFL, hereinafter the "Device."  The Device is currently located at an evidence locker located in the Eastern District of New York.

5.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.     On February 4, 2025, a grand jury in the Eastern District of New York returned a superseding indictment (the "Superseding Indictment") charging LINDA SUN with conspiracy to violate the Foreign Agents Registration Act; failure to register under the Foreign Agents Registration Act ("FARA"); visa fraud; bringing in aliens; and money laundering conspiracy.  (See 24-CR-346).  The Superseding Indictment also charges SUN's husband CHRIS HU with conspiracy to commit bank fraud; misuse of means of identification; money laundering conspiracy; and money laundering.  The Superseding Indictment is attached hereto as Exhibit A and incorporated by reference, including all definitions and terms.

2

7.      The Device was seized from SUN and HU's home in Manhasset, Long Island in July 2024, incident to a judicially authorized search.  A forensic image of the Device was first made available for agents' review on November 20, 2024, but the forensic image has been unavailable for further review since on or about January 6, 2025.  In an abundance of caution, the government seeking authorization to create and search a new forensic image of the Device.

I.      <u>The Coconspirators</u>

8.      LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," is a naturalized U.S. citizen who was born in the People's Republic of China ("PRC") and resides in the Eastern District of New York.  From in or about 2012 until 2023, SUN worked for the New York State ("NYS") government in various high-ranking roles, including as Deputy Chief of Staff for New York Governor Kathy Hochul.

9.      CHRIS HU, a U.S. citizen, is married to LINDA SUN.  Together with SUN, HU has operated business ventures that benefited economically from SUN's illegal activities as an agent of the PRC government and Chinese Communist Party ("CCP"), as described in the Indictment.  These business ventures included: (a) a seafood exporter based in Queens that was organized in March 2016 (the "Seafood Company"); (b) a purported financial consultancy based in Queens organized in February 2016 (the "Financial Consultancy"); and (c) Leivine Wine & Spirits ("Leivine"), a wine and liquor store in Flushing, Queens organized in June 2021.

II.      <u>Summary of the Criminal Schemes</u>

10.      As detailed in the Superseding Indictment, while working for the NYS government, LINDA SUN also acted as an agent of the PRC government and the CCP without registering under FARA, as required by law.  While acting at the request of PRC government

5

officials and CCP representatives, SUN engaged in numerous political activities in the interests of the PRC and the CCP, including blocking representatives of the Taiwanese government from having access to the NYS governor's office; changing NYS executives' messaging regarding issues of importance to the PRC and the CCP; obtaining official NYS governor proclamations for PRC government representatives without proper authorization; attempting to facilitate a trip to the PRC by NYS executives; and arranging meetings for visiting delegations from the PRC government with NYS government officials.  Additionally, SUN repeatedly violated internal rules and protocols within the NYS governor's office to provide improper benefits to PRC and CCP representatives, including by providing unauthorized invitation letters from the office of the NYS governor that were used to facilitate travel by PRC government officials into the United States for meetings with NYS government officials.  SUN's unauthorized invitation letters for the PRC government delegation constituted false statements made in connection with immigration documents and induced the foreign citizens into unlawfully entering the United States.

11.    In return for these and other actions, SUN received substantial economic and other benefits from representatives of the PRC government and the CCP, including the facilitation of millions of dollars in transactions for the PRC-based business activities of CHRIS HU, cash and travel benefits, tickets to events, employment for SUN's cousin in the PRC, and Nanjing-style salted ducks prepared by a PRC government official's personal chef that were delivered to the residence of SUN's parents.

12.    HU laundered the monetary proceeds to purchase, among other items, a real estate property in Manhasset, New York currently valued at $4.05 million, a condominium in Honolulu, Hawaii currently valued at $2.1 million, and various luxury automobiles, including a

4

2024 Ferrari.  LINDA SUN never disclosed these benefits from the PRC government and its representatives to the NYS government, as she was required to do as a NYS employee.

13.    As detailed in the Superseding Indictment, HU repatriated the proceeds of his PRC-based businesses to the United States by, among other measures, (1) having payments made directly from the PRC to U.S. accounts created by HU in the name of SUN's mother, which HU then transferred to a Financial Consultancy account, (2) structuring cash payments into multiple accounts associated with HU's family and businesses, and (3) conducting layering activities, that is, moving funds between multiple family and business accounts, to conceal the original provenance of the funds.

14.    Though LINDA SUN and CHRIS HU live an opulent lifestyle—for example, they own a new 2024 Ferrari vehicle, and they paid for the house on Long Island and condominium in Hawaii without obtaining a mortgage loan—their personal and business tax returns reflect little to no income earned.  Notably, aside from the Seafood Company and Leivine, HU appears to operate no businesses that generate significant business income.

15.    On July 19, 2024, the Honorable Lois Bloom authorized a search warrant as to SUN and HU's residence in Manhasset, Long Island.  A copy of the underlying affidavit (24 MC 2841) is attached hereto and incorporated by reference.

16.    During the search of the residence on or about July 23, 2024, agents seized the Device, which appears to be a personal computer shared by HU and SUN.  The Device was submitted to the FBI's computer analysis and response team on or about July 24, 2024.  On or about November 20, 2024, agents received electronic access to a forensic image of the Device. During review of the forensic image between in or about November 20, 2024 and January 3,

5

2025, agents identified numerous documents related to the money laundering scheme, including Excel spreadsheets created by HU documenting the flow of funds from the PRC to the United States through one or more money brokers.  I assess that the money involved in these transfers represents proceeds of SUN's pay-to-play scheme with the PRC government and the CCP. These documents have already been produced to the defense in the pending prosecution of SUN and HU.  Further, an initial cursory review of the contents of the laptop uncovered documents pertaining to SUN's purchase of personal protective equipment during the COVID-19 pandemic in 2020, an activity SUN closely coordinated with the PRC Consulate.  (See Sup. Ind. ¶¶ 26-29).

17.    Beginning on or about January 6, 2025, agents were unable to further access the forensic image through FBI systems.  The FBI has been unable to remedy this technological problem.

18.    The Device is currently in the lawful possession of the FBI in an evidence locker in the Eastern District of New York.  Therefore, while the FBI might already have all necessary authority to further examine the Device, I seek this additional warrant out of an abundance of caution to be certain that further examination of the Device will comply with the Fourth Amendment and other applicable laws.  This application seeks authorization to create and review a new forensic image of the Device.

19.    In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

6

**TECHNICAL TERMS**

20.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by

7

connecting the removable storage medium to a separate reader. Removable
storage media include various types of flash memory cards or miniature hard
drives. Most digital cameras also include a screen for viewing the stored images.
This storage media can contain any digital data, including data unrelated to
photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio, video,
or photographic files.  However, a portable media player can also store other
digital data.  Some portable media players can use removable storage media.
Removable storage media include various types of flash memory cards or
miniature hard drives.  This removable storage media can also store any digital
data.  Depending on the model, a portable media player may have the ability to
store very large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite
contains an extremely accurate clock.  Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special

8

SUBJECT TO PROTECTIVE ORDER                                          EDNY_052793

sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal

9

computer, perform different functions and save data associated with those

functions. Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an

individual through an alert, or a numeric or text message sent over a

telecommunications network. Some pagers enable the user to send, as well as

receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination. Most Internet service providers control

a range of IP addresses. Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

i. Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

10

SUBJECT TO PROTECTIVE ORDER                                    EDNY_052795

21.      In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

23.      There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In

11

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

24.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage

12

medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

13

SUBJECT TO PROTECTIVE ORDER                                      EDNY_052798

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

14

SUBJECT TO PROTECTIVE ORDER                                   EDNY_052799

## CONCLUSION

27.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Devin Perry
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on February 20, 2025:

*Cheryl Pollak*

HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

15

**ATTACHMENT A**

The property to be searched is a silver Macbook Pro laptop with serial number S/N C02T89XXGTFL, hereinafter the "Device."  The Device is currently located at an evidence locker located in the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

SUBJECT TO PROTECTIVE ORDER                                                          EDNY_052801

## ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of 8 U.S.C. § 1324 (alien smuggling), 22 U.S.C. § 618(a)(1) (failure to register as an agent of a foreign principal), 18 U.S.C. § 1349 (visa fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), and conspiracies to commit the same by LINDA SUN, CHRIS HU, and others known and unknown, since January 1, 2020 (the "Subject Crimes"), including, for each account or identifier listed on Attachment A, information pertaining to the following matters, including:

   a.  Evidence regarding the laundering of funds by LINDA SUN, CHRIS HU, and others known and unknown, through HONG's unlicensed money remitting business;

   b.  Evidence indicating the state of mind as it relates to the Subject Crimes of LINDA SUN, CHRIS HU, and others known and unknown; and

   c.  Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

   d.  all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     Records evidencing the use of the Internet, including:

    a.   records of Internet Protocol addresses used;

    b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

SUBJECT TO PROTECTIVE ORDER                EDNY_052803