**U.S. Department of Justice**
United States Marshals Service

## PROCESS RECEIPT AND RETURN
*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF United States | COURT CASE NUMBER 24-CR-346 |
|---|---|
| DEFENDANT Chris Hu | TYPE OF PROCESS Superseding Indictment |

**SERVE AT** {

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
United States Marshals Service

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*
225 Cadman Plaza East, Brooklyn, New York 11201

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | |
|---|---|
| JOSEPH NOCELLA, JR. United States Attorney - Eastern District of New York 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201 Attn: Laura D. Mantell | Number of process to be served with this Form 285 |
| | Number of parties to be served in this case |
| | Check for service on U.S.A. |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

Pursuant to the Second Superseding Indictment, please deposit funds into the SADF.
Merrill Lynch check no. 1132005816 ($1.98)

CATS ID #: 24-FBI-005969

| Signature of Attorney other Originator requesting service on behalf of: *Laura D. Mantell by JL* | ☒ PLAINTIFF ☐ DEFENDANT | TELEPHONE NUMBER (718) 254-254-6253 | DATE 8/1/2025 |
|---|---|---|---|

### SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. 53 | District to Serve No. 53 | Signature of Authorized USMS Deputy or Clerk *Teresa K* | Date 8/1/2025 |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☑ have legal evidence of service, ☑ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | Date 8/4/25 | Time | ☐ am ☐ pm |
|---|---|---|---|
| Address *(complete only different than shown above)* | | Signature of U.S. Marshal or Deputy | |

*Costs shown on attached USMS Cost Sheet >>*

REMARKS

$1.98 deposited into SADF on 8/4/2025

1:2024-CR-00346-1

Form USM-285
Rev. 03/21

AFM:AAS/RMP/AS
F. #2021R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

LINDA SUN,
        also known as "Wen Sun," "Ling Da
        Sun," and "Linda Hu," and
CHRIS HU,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| |
|---|
| S U P E R S E D I N G<br>I N D I C T M E N T |
| Cr. No. <u>24-346 (S-2) (BMC)</u> |
| (T. 8, U.S.C., §§ 1324(a)(1)(A)(iv),<br>1324(a)(1)(B)(i) and 1324(b); T. 18,<br>U.S.C., §§ 371, 666(a)(1)(B),<br>981(a)(1)(C), 982(a)(1), 982(a)(2)(A),<br>982(a)(2)(B), 982(a)(6)(A), 982(b)(1),<br>1028(a)(7), 1028(b)(2)(B), 1028(b)(5),<br>1028(c)(3)(A), 1343, 1346, 1349,<br>1546(a), 1956(h), 1957(a), 1957(b),<br>1957(d)(1), 2 and 3551 <u>et seq.</u>; T. 21,<br>U.S.C., § 853(p); T. 22, U.S.C., §§<br>612(a) and 618(a)(1); T. 26 U.S.C.,<br>§ 7201; T. 28, U.S.C., § 2461(c)) |

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

    At all times relevant to this Superseding Indictment, unless otherwise stated:

**I.**   **The Defendants and Coconspirators**

       1.     The defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun,"

and "Linda Hu," was a naturalized U.S. citizen who was born in the People's Republic of China

("PRC") and resided in the Eastern District of New York. From in or about 2012 until 2023, SUN

worked for the New York State ("NYS") government, in positions that included: (a) Director of

Asian American Affairs and Queens Regional Representative for a then-executive head

("Politician-1," an individual whose identity is known to the Grand Jury), from in or about August

2012 to February 2015; (b) Director of External Affairs of Global NY for Empire State

Development, the economic development arm of the NYS government, from in or about April 2015 to February 2018; (c) Deputy Chief Diversity Officer for Politician-1 from in or about February 2018 to July 2020; (d) Superintendent for Intergovernmental Affairs and Chief Diversity Officer at the NYS Department of Financial Services from in or about July 2020 to September 2021; (e) Deputy Chief of Staff for the NYS Executive Chamber (the "Executive Chamber"), working as an advisor for a then-executive head ("Politician-2," an individual whose identity is known to the Grand Jury), from in or about September 2021 until September 2022; and (f) Deputy Commissioner for Strategic Business Development for the NYS Department of Labor from in or about September 2022 until March 2023.  During the COVID-19 pandemic, SUN was a member of a team of NYS government employees responsible for procuring personal protective equipment ("PPE") from around the world.

2.      The defendant CHRIS HU was a U.S. citizen who resided in the Eastern District of New York with the defendant LINDA SUN, who was HU's wife.  HU operated business ventures that included: (a) a seafood exporter based in Queens, New York, that was organized in March 2016 (the "Seafood Company," an entity the identity of which is known to the Grand Jury); (b) a purported financial consultancy based in Queens, New York, organized in February 2016 (the "Financial Consultancy," an entity the identity of which is known to the Grand Jury); (c) a wine and liquor business based in Queens, New York, organized in June 2021 (the "Wine Store," an entity the identity of which is known to the Grand Jury); and (d) a vendor of PPE based in Queens, New York, organized in April 2020 as an S corporation (the "Vendor Company," an entity the identity of which is known to the Grand Jury).  HU held an approximately 66.6% ownership stake in the Vendor Company.  An S Corporation was a corporation that elected to pass corporate income, losses, deductions, and credits to the shareholders for federal tax purposes.

2

3.      Additionally, the defendant CHRIS HU frequently used the services of a carrier business with U.S. headquarters in Queens, New York ("Company-1," an entity the identity of which is known to the Grand Jury). Company-1 was an authorized freight agent by the PRC government. The proprietor of Company-1 ("Company-1 Owner," an individual whose identity is known to the Grand Jury) was a close friend of HU's.

4.      CC-1, an individual whose identity is known to the Grand Jury, was a PRC national who became a naturalized U.S. citizen. CC-1 served as the president of an association of persons from Henan Province, PRC located in the New York metropolitan area ("Association-1," an entity whose identity is known to the Grand Jury). Association-1 was a nonprofit 501(c)(3) organization closely associated with the United Front Work Department ("UFWD") and the Chinese Communist Party ("CCP"). The UFWD was a CCP department that attempted to manage relationships with and generate support for the CCP among elite individuals inside and outside the PRC, including by gathering human intelligence. After 2018, the UFWD reported directly to the CCP's Central Committee, a national party organization that helped drive political decision-making in the PRC. In his role as president of Association-1, CC-1 maintained contact with PRC government officials and frequently traveled to the PRC for UFWD-sponsored events.

5.      CC-2, an individual whose identity is known to the Grand Jury, was a U.S. legal permanent resident who maintained active business interests in Shandong Province, PRC. CC-2 also served as principal of numerous U.S.-based Chinese organizations, including an economic interest group for persons of Chinese origin ("Association-2," an entity whose identity is known to the Grand Jury).

3

6.      PRC Official-1, an individual whose identity is known to the Grand Jury, was a high-ranking government official at the Consulate of the People's Republic of China in New York ("PRC Consulate").

7.      PRC Official-2, an individual whose identity is known to the Grand Jury, was a high-ranking PRC government official at the PRC Consulate.

8.      PRC Official-3, an individual whose identity is known to the Grand Jury, was a PRC government official assigned to the Political Section of the PRC Consulate.

9.      PRC Official-4, an individual whose identity is known to the Grand Jury, was a PRC government official assigned to the Political Section of the PRC Consulate.

## II.    The Internal Revenue Service

10.     The Internal Revenue Service ("IRS") was an agency of the U.S. Department of the Treasury responsible for enforcing and administering the tax laws of the U.S. and collecting taxes owed to the U.S. Department of the Treasury.

11.     IRS Form 1120-S, U.S. Income Tax Return for an S Corporation ("Form 1120-S") was used by businesses that elected to be treated as an S Corporation to file an annual business tax return.

12.     IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040") was used by some U.S. taxpayers to file an annual personal income tax return.

13.     Schedule E, Supplemental Income and Loss ("Schedule E") was an IRS form that was attached to a Form 1040, when applicable, and was used by taxpayers to report income or loss generated from certain businesses, including S Corporations.

4

### III.    Summary of the Defendants' Criminal Conduct

14.    While working for the NYS government, including in high-ranking posts for Politician-1 and Politician-2 and in multiple state agencies, the defendant LINDA SUN also acted as an undisclosed agent of the Government of the PRC and the CCP. Acting at the request of PRC government officials and CCP representatives, SUN engaged in numerous political activities in the interests of the PRC and the CCP, including blocking representatives of the Taiwanese government from having access to the NYS governor's office; changing Politician-1 and Politician-2's messaging regarding issues of importance to the PRC and the CCP; obtaining official NYS governor proclamations for PRC government representatives without proper authorization; attempting to facilitate a trip to the PRC by Politician-2; and arranging meetings for visiting delegations from the PRC government with NYS government officials.

15.    Additionally, the defendant LINDA SUN repeatedly violated internal rules and protocols within the NYS governor's office to provide improper benefits to PRC and CCP representatives, including by providing unauthorized invitation letters from the office of the NYS governor that were used to facilitate travel by PRC government officials into the United States for meetings with NYS government officials. SUN's unauthorized invitation letters for the PRC government delegation constituted false statements made in connection with immigration documents and induced the foreign citizens into unlawfully entering the United States.

16.    While taking these and other actions, the defendant LINDA SUN received substantial economic and other benefits from representatives of the PRC government and the CCP, including the facilitation of millions of dollars in transactions for the PRC-based business activities of SUN's husband, the defendant CHRIS HU; travel benefits; tickets to events; promotion of a close family friend's business; employment for SUN's cousin in the PRC; and Nanjing-style salted

ducks prepared by PRC Official-1's personal chef that were delivered to the residence of SUN's parents. SUN and HU laundered the monetary proceeds of this scheme to purchase, among other items, real estate property in Manhasset, New York for $3.6 million, a condominium in Honolulu, Hawaii for $1.9 million, and various luxury automobiles, including a 2024 Ferrari. SUN never disclosed any benefits she received from representatives of the PRC government and the CCP to the NYS government, as she was required to do as a NYS government employee.

17.     The defendant LINDA SUN never registered as a foreign agent with the Attorney General, and in fact actively concealed that she took actions at the order, request, or direction of PRC government and CCP representatives. Thus, neither the NYS government nor the greater New York and American public had the opportunity to evaluate her conduct, considering her long-standing relationships with the PRC government and the CCP and her status as their agent.

18.     In a voluntary interview with agents from the Federal Bureau of Investigation ("FBI") in July 2020, the defendant LINDA SUN misrepresented the purpose of one of her trips to the PRC, and concealed the fact that it was arranged and funded by coconspirators representing the PRC government and the CCP.

19.     In a voluntary interview with the NYS Office of the Inspector General in February 2023, the defendant LINDA SUN claimed to attend Asian community events in her personal capacity and not in her new capacity at the Department of Labor. She falsely claimed that she had not requested any official gubernatorial proclamations since transferring to the Department of Labor. In fact, she had procured and presented an official gubernatorial proclamation for PRC Official-1.

20.     During the COVID-19 pandemic, the defendants LINDA SUN and CHRIS

HU perpetrated a fraud on the NYS government.  SUN facilitated contracts between the NYS

government and two businesses— a company (the "Cousin Company," an entity the identity of

which is known to the Grand Jury) operated by one of SUN's second cousins (the "Cousin," an

individual whose identity is known to the Grand Jury), and a company (the "Associate Company,"

an entity the identity of which is known to the Grand Jury) that was operated by HU and a business

associate of HU, with whom HU also co-owned the Wine Store—that resulted in the Cousin

Company and the Associate Company selling millions of dollars' worth of PPE sourced in the

PRC to the NYS government.  SUN, the Cousin Company, and the Associate Company failed to

disclose the businesses' associations with SUN's family to the NYS government.  In addition to

directly benefiting from the profits that the Associate Company reaped from these contracts, SUN

and HU received a portion of the profits from the contracts with the Cousin Company as kickbacks,

which constituted taxable income.  HU did not report this taxable income in the IRS Forms 1040

that he filed.

21.     The defendant CHRIS HU laundered the unlawful proceeds from the

Cousin Company through two bank accounts opened in the name of a close relative (the "Relative,"

an individual whose identity is known to the Grand Jury) that were actually for HU's exclusive

use.  To open these accounts, HU unlawfully used an image of the Relative's driver's license.

## IV.     Background on the Foreign Agents Registration Act

22.     The Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611 et seq.,

was a registration and disclosure statute that required any person acting in the United States as "an

agent of a foreign principal" to register with the Attorney General if he or she engaged, directly or

through another person, in certain types of conduct, such as political activities, political consulting,

public relations, or publicity activities, for or in the interest of the foreign principal. FARA registrations were made to the Foreign Agents Registration Act Unit ("FARA Unit") of the Department of Justice's National Security Division. It was a crime to knowingly and willfully fail to register when required under FARA.

23.    The purpose of FARA was to prevent covert influence by foreign principals, which included, as relevant here, the government of a foreign country or a foreign political party. Proper registration under FARA allowed the U.S. government and the public to evaluate the statements and activities of individuals who were serving as agents of foreign principals in light of their status as foreign agents. Among other things, FARA registration revealed the identity of the foreign principal on whose behalf the registrant performed services, the type of services the registrant provided the foreign principal, the source and amount of compensation the registrant received from the foreign principal, and any political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal. FARA registration statements were publicly accessible on the website of the FARA Unit.

24.    Public and private audiences relied on the truthful disclosure of foreign agents under FARA. For example, both the public and those who had business before a state government employee relied on FARA disclosures to know whether such state government employee who made statements, acted, or appeared on the behalf of the state was operating at the order, direction, or request of a foreign government or foreign principal while executing their duties.

25.    As set forth below, the defendant LINDA SUN concealed the fact that she was acting as a foreign agent. By not registering with the Attorney General and not disclosing her status as a foreign agent, SUN portrayed herself as independent and acting in the interests of New

York State, preventing the public from fairly evaluating her actions as an agent of the PRC government and the CCP.

## V.     SUN's Unregistered Activities for the PRC Government and the CCP

26.     The defendant LINDA SUN acted at the order, direction, or request of representatives of the PRC government and the CCP to engage in political activities intended to influence the public, including the NYS government, with respect to the political or public interests of the PRC government and the CCP.  In particular, SUN worked to prevent representatives of the Taiwanese government from meeting with high-ranking NYS officials, because she knew the PRC government was opposed to such diplomacy, and PRC officials asked SUN to take action to prevent it.  Additionally, SUN worked at the request of PRC government officials to shape the public statements of Politician-1 and Politician-2 to align with the PRC government's political priorities.  SUN also obtained and publicly presented an official NYS proclamation for PRC Official-1 without authorization from her employer.  Finally, SUN attempted to arrange visits by Henan provincial officials to the United States to meet with NYS officials, as well as a visit by Politician-2 to the PRC, both at the request of representatives of the PRC government and the CCP.

### A.     SUN Prevents Taiwanese Representatives from Meeting High-Level NYS Officials

27.     The PRC government claimed the islands of Taiwan (officially known as the Republic of China) as PRC territory, though the PRC had not controlled these areas.  The PRC government did not accept the legitimacy of the Taiwanese government—including the official name Republic of China—and mandated the non-recognition of Taiwan as a prerequisite for conducting formal diplomatic relations with the PRC.  Since in or about the 1970s, the PRC and Taiwan competed for diplomatic recognition worldwide, with most countries allowing Taiwan to

Case 1:24-cr-00346-BMC     Document 143     Filed 08/04/25     Page 11 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 116933Filed 06/25/25     Page 10 of 79 PageID #:
1617

establish representative offices to conduct bilateral relations without formal diplomatic recognition.

28.     The position of the United States was to acknowledge that the PRC government claimed sovereignty over Taiwan and to not have formal official diplomatic relations with Taiwan, while maintaining a robust unofficial relationship.  As a result, the Taipei Economic and Cultural Representative Office in the United States ("TECRO") in Washington, D.C., served as the de facto, but unofficial, embassy of Taiwan, and TECRO representatives regularly met with high-ranking officials from the U.S. government.  Taiwan also maintained representative economic and culture offices ("TECOs") providing consular and other services in various U.S. cities, including in New York City.

29.     Neither Politician-1 nor Politician-2 had a policy regarding whether to formally recognize Taiwan; accordingly, neither office had a policy regarding whether to communicate or meet with Taiwanese representatives.  Beginning no later than 2016, however, the defendant LINDA SUN acted at the request of the PRC Consulate to minimize contact between Taiwanese government officials and the governor's office.  For example, in repeated written communications[1] with PRC Consular representatives, including PRC Official-1 and PRC Official-3, SUN bragged that she had successfully prevented TECO from meeting with Politician-1 and Politician-2.  In return for these and other acts, the PRC Consulate provided SUN and her family with gifts, including tickets to shows, concerts, and events, as well as salted ducks prepared by PRC Official-1's personal chef.  During the relevant period, SUN and PRC Consular personnel repeatedly agreed to meet in person or to speak by phone or by WeChat.  The following are

---

[1]     For communications that occurred in a language other than English, all translations referenced or quoted herein are in draft form and are subject to revision.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 12 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116934Filed 06/25/25    Page 11 of 79 PageID #:
1618

examples of SUN's work to influence NYS government officials and the public regarding policy with respect to Taiwan at the request of PRC government officials:

      a.      On or about June 9, 2016, the defendant LINDA SUN wrote a PRC Consular official, "Just FYI for you, the Taipei economic office is trying to secure [Politician-2] for an event in DC during SelectUSA. They sent the invitation to another colleague trying to bypass me. I am working on it right now to resolve the issue." After the PRC Consular official responded, "Thank you [f]or letting me know," SUN wrote, "It's all been taken care of satisfactorily." Notably, on or about June 21, 2016, Politician-2 attended the 2016 SelectUSA Reception in Washington, D.C. hosted by the PRC Embassy and the China General Chamber of Commerce – U.S.A., rather than an event hosted by Taiwan.

      b.      In January 2019, the defendant LINDA SUN wrote to PRC Official-3, "I very much value my relationship with the consulate and have done many things to make the relationship between the state and the consulate flourish during my tenure with [Politician-1]. Certainly I have managed to stop all relationships between the TECO and the state. I have denied all [r]equests from their office." PRC Official-3 responded, "I know and do appreciate your help." PRC Official-3 also indicated, "[W]ith us now in the political section, you are the most important hub connecting us with [Politician-1] and his team."

      c.      In or about January 2019, Politician-1's chief of staff circulated an email listing representatives of several organizations, including two TECO representatives, and asking for any "flags." The email was forwarded to the defendant LINDA SUN, who flagged the TECO representatives as "[n]ot friends of us." When asked if they would disrupt the event at issue, SUN responded, "It's more a political issue because it's a China vs. Taiwan thing. If they

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 13 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118935 Filed 06/25/25    Page 12 of 79 PageID #:
1619

come, they are likely to send out a political statement saying that [Politician-1] invited them hence giving the Taiwanese government recognition."

        d.      On or about February 27, 2019, the defendant LINDA SUN directed a member of Politician-1's staff to decline a request for a meeting between a mayor of a Taiwanese city and Politician-1. SUN instructed the staff member, "No to the request. Explain in person."

        e.      On or about July 5, 2019, the TECO deputy consul wrote the defendant LINDA SUN that the Taiwanese President would be visiting New York City on July 12, 2019, and invited SUN and Politician-1 to attend a banquet in Manhattan. Several minutes later, SUN forwarded the email to PRC Official-4, writing "FYI." Contemporaneously, SUN texted PRC Official-4, "I sent you an email / Just an FYI / I already blocked it." PRC Official-4 responded, "Got [i]t / Thanks." On July 6, 2019, SUN replied to the TECO deputy consul, declining the invitation because "[Politician-1] is hosting summer activity day for staff in the Catskills on that day." In fact, the summer activity day, which SUN attended, occurred on July 11, 2019, not July 12, 2019. Before SUN declined the invitation on Politician-1's behalf, there is no record of SUN either forwarding the TECO deputy consul's invitation to the Executive Chamber's invitations office or checking Politician-1's schedule for July 12, 2019.

        f.      On or about July 10, 2019, there was a telephone call lasting approximately nine minutes between the cellular phones of the defendant LINDA SUN and PRC Official-4, and a later call that day lasting approximately two and a half minutes between the cellular phones of SUN and PRC Official-1. Later that day, SUN sent the following email message to a staff member in the Executive Chamber: "I wanted to check if there's a particular event in the system." In a follow-up email, she clarified that the event was a "dinner banquet hosted by . . . [the] President of Taiwan. It's on Friday I believe." As reflected by the email from the TECO

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 14 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 11 1936 Filed 06/25/25    Page 13 of 79 PageID #:
1620

deputy consul, the event for the Taiwanese President was scheduled for Friday, July 12, 2019. The following day, another staff member in the Executive Chamber wrote, "I am not seeing that we have anything for tomorrow (or at all)." SUN responded, "Perfect!"

g.    As reflected in open-source materials and photographs found in one of her electronic accounts, on or about July 12, 2019—the date of the scheduled event for the Taiwanese President—the defendant LINDA SUN and various leaders of local Chinese associations participated in a protest in Manhattan against the Taiwanese President's visit to New York City. The photograph below, depicting SUN at the protest, is from a news publication.



h.    On or about August 6, 2019, the new TECO director of political affairs invited the defendant LINDA SUN to coffee or to a meeting at SUN's office to introduce him- or herself. The next day, on or about August 7, 2019, SUN wrote to PRC Official-1, "As you know, I have successfully blocked all formal and informal meetings between [Politician-1, Politician-2] and TECO. I myself have maintained a bare minimum of a relationship with them." Further, SUN asked for direction as to how to handle a TECO request—likely referencing the previous day's email invitation from TECO: "With regard to their current request," she continued,

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 15 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116937 Filed 06/25/25    Page 14 of 79 PageID #:
1621

"I would assume that a visit to the Governor's office is probably best avoided lest it leads to ramifications of them claiming that [we] are recognizing them? But wanted to make sure we are on the same page."

   i. Almost a week later, on or about August 13, 2019, the defendant LINDA SUN responded to the August 6, 2019 email from the TECO director of political affairs, offering to "meet at [a chain takeout restaurant] near our office if you want." According to internal correspondence, SUN and her office's Director of Asian American Affairs met with the TECO representative on or about August 20, 2019.

   j. On or about August 21, 2019, the defendant LINDA SUN messaged PRC Official-4 that "one area that TECO is better than you guys," referring to representatives of the PRC Consulate, was "outreaching." SUN continued, "[T]hey regularly reach out to me to have coffee. Same with all other reps in other electeds [sic] offices. Not that we need to have coffee because we are in regular contact." SUN continued, "It might be helpful to building a better relationship. Not everyone is like me :)"

   k. In late August 2019, the defendant LINDA SUN provided an edit to a draft statement by Politician-1 in order to avoid any state recognition of Taiwan. The draft statement commemorated soldiers and veterans of the U.S. and Taiwanese armed forces. SUN's sole proposed edit to the statement was the following: "Politically can we refrain from using the phrase 'Republic of China' so as to avoid creating an international incident by recognizing Taiwan." In an internal email, SUN eventually indicated her approval of a draft statement that removed all references to the "Republic of China."

   l. On or about September 5, 2019, the TECO director of political affairs wrote the defendant LINDA SUN to invite Politician-1 to attend Taiwan's national day

14

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 16 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116938Filed 06/25/25    Page 15 of 79 PageID #:
1622

event on October 7, 2019 at a hotel in Manhattan. After various members of the governor's office asked SUN to weigh in regarding the appropriate response, SUN advised against attending the event. On or about September 12, 2019, SUN instructed the office's Director of Asian American Affairs, "No message and no rep." On or about October 2, 2019, the TECO director of political affairs wrote SUN again to ascertain her office's availability for the event—suggesting that the governor's office had not responded to the initial invitation. There is no record of an email response by SUN to the TECO director of political affairs.

m.    On January 13, 2020, the TECO Ambassador wrote a letter to Politician-1 informing him of the latest presidential election results in Taiwan and writing, "I will be honored to forward your congratulatory message to Taipei." An employee in the governor's office forwarded the letter to the defendant LINDA SUN and asked for her input. SUN responded, "No letter; would set off political firestorm."

n.    On or about April 17, 2020, the Taiwanese government donated 200,000 masks to the NYS government in a shipment routed through TECO in New York, following onset of the COVID-19 pandemic. After the donation was finalized, a TECO staff member wrote in an email to the defendant LINDA SUN, copying two other NYS employees, that "it would be great if you could let me know the details of arranging a phone call between [Politician-2]" and the Director-General of TECO. On or about April 21, 2020, the TECO staff member followed up with SUN, copying the two other NYS employees about arranging a call with Politician-2, noting that "members of the Taiwanese American community have been asking our office whether the Taiwanese government made donations to the hardest hit New York, and how come they don't see any public announcement by State government." SUN did not respond to the email. On or about May 6, 2020, the TECO staff member again followed up with SUN, copying

15

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 17 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118939Filed 06/25/25    Page 16 of 79 PageID #:
1623

the two other NYS employees, about arranging the phone call with Politician-2. The next day, on or about May 7, 2020, SUN wrote PRC Official-1, "Taipei economic and cultural office donated 200,000 surgical masks. No formal acknowledgment but I will be arranging for [Politician-2] to call their office to thank them. Just wanted to update you." PRC Official-1 thanked her for the update.

        o.      On or about October 25, 2020, after PRC Official-2 praised Politician-1's pandemic efforts in a text message, the defendant LINDA SUN responded, "I'm still in charge of all Asian affairs. A few weeks [ago] when we released a press release for international travel—I almost had a heart attack when we referred to Taiwan as a country. Thankfully I had the press team correct it immediately." PRC Official-2 responded, "Thank you for your every effort to improve understanding and cooperation between the two great peoples of China and the United States. Keep in touch."

        p.      On or about December 22, 2021, TECO requested a meeting between the TECO Ambassador and the new Lieutenant Governor. In response to the request, the defendant LINDA SUN advised a colleague in an internal email message, "We've generally not taken these meetings. [Politician-2] did not [in her previous capacity] and I would recommend [the colleague] does not take this meeting. It is a very sensitive subject." In a later email, SUN further recommended that "any engagement" with TECO "needs to be kept at staff level."

        q.      On or about April 21, 2022, an employee in the governor's office wrote the defendant LINDA SUN, indicating receipt of an invitation to recognize May 8 to 15 as "Taiwanese American Heritage Week." After the employee asked how the governor's office should respond, SUN wrote, "Please do not issue. Thank you."

Case 1:24-cr-00346-BMC     Document 143     Filed 08/04/25     Page 18 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 116-4  Filed 06/25/25     Page 17 of 79 PageID #:
1624

r.      On or about May 2, 2022, a member of the NYS Assembly invited Politician-2 to attend a meeting with the TECO Ambassador.  When asked whether Politician-2 should attend such a meeting, the defendant LINDA SUN wrote, "No meeting please.  Kindly decline.  Do not want her to wade into this China/Taiwan sensitivity."

B.      SUN's Other Political Activities on Behalf of the PRC Consulate

30.     In addition to preventing TECO representatives from meeting or developing ties with the NYS government, the defendant LINDA SUN engaged in other activities at the request of PRC officials that were intended to influence the U.S. public with respect to political interests of the PRC government.  In particular, SUN helped shape the NYS governor's private phone calls and official public statements to conform with the expectations of representatives of the PRC Consulate.

i.      *SUN Coordinates Telephone Call Between Politician-1 and PRC Consular Official Regarding COVID Assistance*

31.     As the pandemic started to spread to the United States in early 2020, the defendant LINDA SUN found ways for PRC Consular officials to gain access to NYS leaders addressing the pandemic.  For example, on or about March 16, 2020, the defendant LINDA SUN surreptitiously added PRC Official-4 to a private New York State government conference call concerning the health response to the COVID-19 pandemic and the administration's response to rising hate crimes against Asian Americans.  Speakers on the conference call included the then-New York State Commissioner for the Division of Human Rights and the then-Director of the Office of Public Health Practice at the New York State Department of Health.  The call was not open to the public, and PRC Official-4's name did not appear on the invitation list.  During the call, SUN repeatedly admonished PRC Official-4 in writing to "keep your phone muted."  At the close of the call, PRC Official-4 commented that the call was "[v]ery useful."  According to phone

17

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 19 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118941Filed 06/25/25    Page 18 of 79 PageID #:
1625

records, there was a call lasting approximately 36 minutes between the cellular phones of SUN and PRC Official-4 beginning at approximately 6:30 p.m. on March 16, 2020. The private New York State government conference call was also scheduled to begin at 6:30 p.m. and lasted for approximately 32 minutes.

32.     Similarly, on or about April 3, 2020, PRC Official-1 wrote to the defendant LINDA SUN that several Chinese foundations would donate 1,000 ventilators to the Greater New York Hospital Association. SUN informed PRC Official-1 that Politician-1 would call PRC Official-1 to thank PRC Official-1. After waiting two hours for the call, PRC Official-1 complained that he had not yet heard from Politician-1. SUN indicated that Politician-1 was in a meeting with the Commissioner of the Department of Health and apologized for wasting PRC Official-1's time. SUN further indicated that Politician-1 would call the following day. PRC Official-1 instructed SUN to remind Politician-1 to thank the PRC government for facilitating the donation. On April 4, 2020, Politician-1 publicly thanked PRC Official-1, both in public remarks and in a post on Twitter, for helping arrange the donation, which was scheduled to arrive at JFK Airport in Queens, New York that day.

33.     On or about April 4, 2020, Company-1 Owner wrote the defendant LINDA SUN the following message: "See if you can get [Company-1] name out there." Later that day, SUN asked PRC Official-1 to promote Company-1, which had provided the logistics for the donation of ventilators. Notably, Company-1 ultimately billed the NYS government more than $700,000 for providing logistics services during the spring and summer of 2020. PRC Official-1 agreed and asked SUN to take photographs when the goods were delivered to various hospitals. The following day, SUN thanked PRC Official-1 for complimenting SUN's work to Politician-1,

18

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 20 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 116942Filed 06/25/25   Page 19 of 79 PageID #:
1626

which SUN stated would empower her to do more for the PRC.  PRC Official-1 responded that he was compelled to compliment SUN's work, which he characterized as phenomenal.

    *ii.   SUN Provides PRC Consular Officials with Opportunity to Influence Politician-2's Public Remarks on Issue of Political Importance to PRC Government*

34.    In or about early 2021, the defendant LINDA SUN provided the PRC Consulate with access to shape the content of Politician-2's public remarks, including by providing a PRC government official with an advance preview of content.  Based on feedback from a PRC government official, SUN took action to ensure that Politician-2 did not publicly address the detention of Uyghurs in PRC state-run camps in Xinjiang Province.

35.    On or about January 12, 2021, PRC Official-4 wrote the defendant LINDA SUN to inquire if Politician-1would like to make a short video commemorating the Lunar New Year.  The following day, SUN replied, "Let me ask but likely [Politician-2] can [probably] do it." SUN solicited direction from PRC Official-4: "Can you share with me some talking points of things you want her to mention[?]  I can make sure to include it in her remarks."  PRC Official-4 responded, "Mostly wishes for the Lunar new year.  [C]ould also mention 2020 has been challenging for people all around the world, how we fought the virus together. / Doesn't need to be long[.]"  Later in the text exchange, SUN asked, "Do you have time for a call later?"  PRC Official-4 replied that he was available and set a time to speak with SUN on the phone.  That morning, there was a telephone call lasting approximately ten minutes between the cellular phones of the defendant LINDA SUN and PRC Official-4.

36.    On or about January 19, 2021, the defendant LINDA SUN confirmed with PRC Official-4 that Politician-2 had agreed to deliver the speech.  SUN reiterated her request for any themes or topics Politician-2 should include in the speech.  PRC Official-4 replied, "Mostly

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 21 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 118943Filed 06/25/25   Page 20 of 79 PageID #:
1627

holiday wishes and hope for friendship and cooperation / Nothing too political." SUN responded, "Ok."

37.     On or about January 25, 2021, the defendant LINDA SUN corresponded with PRC Official-1 about Politician-2's Lunar New Year message. SUN sent PRC Official-1 the link to a file-sharing platform with a video file called "[Politician-2] Lunar New Year.mov." In response, PRC Official-1 wrote SUN "it is very good." PRC Official-1 continued that he "sincerely appreciate[d]" SUN for sending the message. SUN responded that it was unnecessary to thank her, adding that Politician-2 listened to her advice more than Politician-1. SUN also reported that she had had an argument with Politician-2's speechwriter concerning the draft Lunar New Year message. According to SUN, the speechwriter had insisted that Politician-2 mention the "Uyghur situation" in the PRC during the speech. PRC Official-1 commented that the speechwriter likely had never been to the PRC before and did not know the PRC well. SUN agreed that the speechwriter had never been to the PRC and that SUN was starting to lose her temper. PRC Official-1 wrote SUN that U.S.-PRC relations turn sour because of people like the speechwriter. SUN promised that she would figure out how to remedy the situation the following day, adding that she could not let Politician-2 mention the situation.

38.     In fact, in her public Lunar New Year message for 2021, Politician-2 did not refer to the plight of Uyghurs in the PRC. PRC Official-1 posted Politician-2's Lunar New Year message to the PRC Consulate Facebook page.

### iii. SUN Obtains a Proclamation for a PRC Government Official without Authorization

39.     After the defendant LINDA SUN transferred to the Department of Labor in or about September 2022, she continued to act as an agent of PRC Consular officials, even though the activities she undertook on their behalf were outside the scope of her official responsibilities with the Department of Labor.

20

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 22 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116944Filed 06/25/25    Page 21 of 79 PageID #:
1628

40.     In or about January 2023, at the request of PRC government representatives, the defendant LINDA SUN arranged for the Executive Chamber's Office of Correspondence ("Office of Correspondence") to produce a framed gubernatorial proclamation for SUN to present to PRC Official-1, celebrating the Lunar New Year. SUN obtained this proclamation from an Office of Correspondence employee outside ordinary channels and did not follow protocol by seeking supervisory authorization to create such a proclamation; therefore, the proclamation was not logged in the Executive Chamber's online tracking system. SUN sent the Office of Correspondence employee who created the proclamation a personal gift basket and reported to the employee that she had also sent a bottle of wine, but the employee claimed to SUN that she did not receive the wine. Both gifts were addressed to the home address of a relative of the employee. The employee sent the framed proclamation to SUN's personal address in Long Island.

41.     On or about February 14, 2023, the defendant LINDA SUN submitted to a voluntary interview with the NYS Office of the Inspector General. During the interview, SUN claimed to attend Asian community events in her personal capacity and not in her new capacity at the Department of Labor. She falsely claimed that she had not requested any proclamations since transferring to the Department of Labor. Upon further questioning, she admitted that she had requested a proclamation for PRC Official-1, after receiving a request from the PRC Consulate in New York. She further admitted that she attended the Lunar New Year event, which occurred in mid-January 2023, and that PRC Official-1 had called her to the stage to speak and had identified her as the Deputy Commissioner of the Department of Labor. SUN stated that she had not notified the Department of Labor about the proclamation or received permission from the governor's office to provide the proclamation. A photograph of SUN appearing at the event from the PRC Consulate's website is below.

21

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 23 of 80 PageID #:
1945
Case 1:24-cr-00346-BMC    Document 116    Filed 06/25/25    Page 22 of 79 PageID #:
1629



42.    The Department of Labor terminated the defendant LINDA SUN's employment on or about March 2, 2023.

C.    SUN's Political Activities on Behalf of CC-1 and CC-2

43.    In addition to acting as an agent of PRC Consular officials, the defendant LINDA SUN also engaged in political activities at the request of CC-1 and CC-2, whose activities were supervised, directed, and controlled by PRC government officials. These political activities were intended to further the public interests, policies, or relations of the PRC, specifically by fostering a closer economic and political relationship between Henan Province and New York State. SUN's activities included fraudulently obtaining letters that purported to be from the Executive Chamber inviting delegations of PRC government officials to visit New York, which the PRC government officials used to unlawfully obtain visas to enter the United States; arranging for visiting PRC government officials to meet with NYS officials, including Politician-2; obtaining

22

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 24 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116946Filed 06/25/25    Page 23 of 79 PageID #:
1630

a false letter of employment for CC-1; and attempting to facilitate a trip by Politician-2 to the PRC that would include a visit to Henan Province.

44.    The defendant LINDA SUN understood that CC-1 and CC-2 were themselves acting as agents of the PRC government and the CCP when they made requests of SUN. In written communications with SUN, CC-1 made clear that he was acting on behalf of the PRC government. For example, in April 2018, CC-1 informed SUN that CC-1 was then attending a "Belt & Road Initiative" [2] round table meeting in Henan Province, PRC.    In these communications, CC-1 indicated that CC-1's round table meeting in Henan Province was organized by five overseas Chinese affairs offices of the Henan Provincial People's Government, and that CC-1 was the only overseas Chinese person to represent Chinese people from Henan and would be giving remarks at the meeting.

45.    In return for the defendant LINDA SUN's political activities on behalf of Henan Province, CC-1 and CC-2 rewarded her by aiding the defendant CHRIS HU's PRC-based commercial activities.

    i.    *SUN Arranges for Henan Delegation to Enter United States*

46.    In the spring of 2018, CC-1 tasked the defendant LINDA SUN with arranging for a delegation from Henan Province, PRC, to travel to the United States and to meet with Politician-2. On the evening on March 18, 2018—following a dinner event to which CC-1 and SUN were both invited—CC-1 provided SUN a list of delegation members in Chinese and English and an English-language document called "Reference of Invitation Letter" for Politician-2's signature. On or about March 23, 2018, SUN messaged CC-1 and notified him that "the letter

---

[2]    The Belt and Road Initiative was a global infrastructure strategy adopted by the PRC government in 2013 to invest in more than 150 countries and international organizations.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 25 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116947Filed 06/25/25    Page 24 of 79 PageID #:
1631

is done, however [Politician-2] has not signed it yet." On or about March 26, 2018, CC-1 asked

SUN to "send him the original with [Politician-1]'s signature which he will then bring to Henan."

The following day, after CC-1 asked "if there had been any word from [Politician-1]," SUN

responded "not yet" and indicated that she "can ask if she can use [Politician-2]'s signature stamp."

47.    On or about March 29, 2018, the defendant LINDA SUN used her personal

email account to send her NYS government email account a version of the document titled

"Reference of Invitation Letter." The document contained a draft of an invitation letter addressed

to the "Vice-Chairman of the Chinese People's Consultative Conference (CPPCC), Henan

Provincial Committee." The document also included a list of names, dates of birth, and official

titles for each member of the delegation.

48.    On or about March 29 and April 5, 2018, the defendant LINDA SUN

provided CC-1 two versions of an invitation letter from the governor's office that SUN had drafted.

SUN had relied on language from a previously authorized invitation letter for a delegation from

Jiangxi Province. SUN lacked authorization to either issue or sign any new invitation letters.

There is no record of SUN seeking proper authorization to issue the Henan provincial delegation

an invitation letter. Further, the letter drafted by SUN for CC-1 was signed by hand with a falsified

version of Politician-2's signature. SUN did not have authorization to sign documents on

Politician-2's behalf.

49.    On or about June 1, 2018, several members of the Henan Province

delegation successfully applied for U.S. entry visas to enter the United States. These individuals

identified themselves on their visa applications as members of a delegation of Henan provincial

government officials. These individuals listed Politician-2 as the name of their contact person in

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 26 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116948Filed 06/25/25    Page 25 of 79 PageID #:
1632

the U.S. and listed the defendant LINDA SUN's personal cellular telephone number as their contact phone number in the United States.

50.    On or about June 4, 2018, the defendant LINDA SUN informed CC-1 that the Henan Province delegation could not meet with Politician-1 during their visit.  On June 5, 2018, CC-1 asked SUN if meeting with Politician-2 would pose a problem.  SUN informed CC-1 that she had already arranged for the Henan Province delegation to meet with Politician-2 on June 26, 2018.

51.    On or about June 19, 2018, CC-1 wrote the defendant LINDA SUN a list of proposed topics of conversation for the Henan Province delegation's proposed meeting with Politician-2, which included enhancing "cooperation with New York State" in the areas of higher education, cultural exchanges, and "Sister-state relations and mutual high-level visits," among other things.  On or about June 20, 2018, SUN forwarded the list of proposed topics from CC-1 to Executive Chamber staff as "[t]opics that will likely come up" in the meeting with Politician-2, noting that the delegation would also visit two New York City research institutions during their trip.

52.    On or about June 23, 2018, members of the Henan Province delegation entered the United States via San Francisco International Airport in San Francisco, California.

53.    On or about June 26, 2018, the Henan Province delegation met with Politician-2 to discuss economic cooperation between Henan Province and New York State.  Metadata from the below photograph indicates that it was taken on June 26, 2018 at or around the same city block in Manhattan as the Office of the Governor of the State of New York.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 27 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 115-49Filed 06/25/25    Page 26 of 79 PageID #:
1633



The photograph depicts Politician-2 standing with CC-1 (third from left) and members of the Henan Province delegation. In the photograph, Politician-2 holds the gift that was presented to her by members of the delegation. Four days earlier, CC-1 had informed SUN that the delegation would present to Politician-2 an embroidered depiction of a famous Chinese painting.

54.    Later that same day, the defendant LINDA SUN, CC-1, and two officials from the PRC Consulate, as well as various leaders of local Chinese associations, participated in a welcome dinner on behalf of the delegation from Henan Province.

*ii.  SUN Provides CC-1 with an Unauthorized Letter of Employment*

55.    CC-1 and a close associate (the "Associate," an individual whose identity is known to the Grand Jury) lobbied the defendant LINDA SUN to grant CC-1 a New York State

26

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 28 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116950Filed 06/25/25    Page 27 of 79 PageID #:
1634

title, which CC-1 told SUN CC-1 wanted to facilitate his direct communications with principals

of the Henan provincial government, including the provincial governor, regarding economic

cooperation between Henan Province and New York State. On August 28, 2018, CC-1 and the

Associate discussed how to secure a title from SUN. The following day, after speaking with SUN,

the Associate wrote to CC-1 that SUN had instructed that CC-1's title "can only be used to promote

cooperation among the leaders of Henan Province" and "cannot be shared externally when [CC-

1] returns to the United States." CC-1 responded, "Okay." CC-1 and the Associate also discussed

that having a New York State title would help CC-1 personally advance within the UFWD—which

position CC-1 could leverage to further economic cooperation between New York State and Henan

Province.

      56.     On or about August 30, 2018, CC-1 told the defendant LINDA SUN that

CC-1 was planning to travel to Henan Province the following day and asked SUN if she had figured

out CC-1's title. SUN replied, "Asian American Advisory Council." At that time, SUN was

serving as the Deputy Chief Diversity Officer for Politician-1 and was a Co-Director of the

Governor's Asian American Advisory Council, which was established in or around March 2018.

      57.     In the same conversation, CC-1 asked for a paper document reflecting this

position, and the defendant LINDA SUN indicated she would write something to CC-1 on paper

with her office's letterhead. She instructed CC-1 never to let anyone know about what she had

done. CC-1 told SUN that, if SUN were asked questions, she should indicate that Politician-1 had

instructed her to write the letter. CC-1 added that Association-1 and CC-1 appreciated SUN's

help.

      *iii. SUN Attempts to Facilitate Politician-2's Trip to the PRC*

      58.     In late 2018 and 2019, CC-1 tasked the defendant LINDA SUN with

coordinating a trip to Henan Province, PRC for Politician-2, because CC-1 understood that it was

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 29 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116951Filed 06/25/25    Page 28 of 79 PageID #:
1635

in the PRC government's political interest to be seen as having received an important U.S. public official in Henan Province.

59.    On or about November 26, 2018, CC-1 wrote the defendant LINDA SUN that Henan Province was planning to send an invitation letter to Politician-2 and directed SUN to provide Politician-2's resume and a proposed itinerary in the PRC. In subsequent correspondence, CC-1 indicated that "Henan is waiting for it" and that "Henan is urging us" to provide a list of proposed delegation members from the NYS government. In response, SUN ultimately provided a short resume as well as the email address for Politician-2. Thereafter, CC-1 pressed for a more complete resume and a list of proposed delegation members, indicating that, if he did not quickly provide the requested information, Henan Province would blame CC-1 for not working hard enough.

60.    On or about February 11, 2019, CC-1 sent a message to the defendant LINDA SUN in which he boasted about emails he received from the General Office of Henan Provincial People's Government, and the General Office and the Foreign Affairs Office of the Henan CPPCC Provincial Committee, regarding the delegation list for Politician-2's visit that CC-1 had provided to them. CC-1 commented that their interest reflected heightened attention to Politician-2's visit to the PRC. On or about March 21, 2019, CC-1 further indicated that the Henan Foreign Affairs Office was actively handling the matter of the proposed visit and that it had drafted a proposed "MOU." On or about April 23, 2019, CC-1 provided the Chinese text of the invitation.

61.    In subsequent correspondence from April 2019, CC-1 indicated to the defendant LINDA SUN that the proposed activities for Politician-2 would include a meeting with Zhengzhou University, a visit to the PRC's largest electric bus factory, and a visit to the Zhengzhou New Area, which featured numerous commercial occupants. After CC-1 revealed that he was

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 30 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116952Filed 06/25/25    Page 29 of 79 PageID #:
1636

meeting in person with the leaders of Henan Province imminently and needed proposed dates for the trip, SUN indicated that two possibilities were the end of May or in September 2019. Similarly, in contemporaneous communications, the Associate informed SUN that his team had "set up a prearrangement group today. Total 7 members in the group and will do any Paper work and to arrange the schedule and logistics in Henan. For details [CC-1] will tell you when he [is] back [in] New York. . . . Today is a great day and historic day."

62.    In an April 2019 chat titled the "Henan New York State Friendship Liaison" that included the defendant LINDA SUN and multiple officials from the Henan provincial government, CC-1 thanked "Director Fu" and "Chief Wang" for focusing on the importance of Politician-2's proposed visit to Henan Province. On or about April 22, 2019, in the same chat, CC-1 indicated that CC-1 had delivered the official invitation to the Office of the Governor, as well as the document titled "Letter of Intent Between Henan and New York."

63.    In late April 2019, the defendant LINDA SUN indicated that Politician-2 was having difficulty determining her schedule. When SUN further suggested that she could not get a definite answer, CC-1 asked SUN to talk to Politician-1: "[Politician-1] is also the target of our donation. Can we understand each other?" CC-1 indicated that, if the trip did not happen, CC-1 and the Associate would be embarrassed to return to Henan Province. SUN assured CC-1 that they were all a "team" and that she would "definitely work hard" to achieve the result. On or about May 1, 2019, SUN claimed that she had spoken with Politician-2 and specifically mentioned CC-1, and that Politician-2 reportedly was potentially amenable to traveling before the end of the year.

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 31 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 118953Filed 06/25/25   Page 30 of 79 PageID #:
1637

64.     During the fall of 2019, both CC-1 and the Associate continued to press the defendant LINDA SUN to agree to a date for Politician-2's trip.  In late 2019, SUN informed CC-1 that Politician-2 did not want to travel to the PRC that year.

*iv.  SUN Drafts Fraudulent Invitation Letter for Henan Delegation's 2019 Visit*

65.     In the summer and fall of 2019, the defendant LINDA SUN facilitated the travel of another delegation from Henan Province to the United States through another fraudulent invitation letter; this fraudulent letter was submitted by four members of the delegation to the U.S. Department of State in support of their applications for travel visas to enter the United States.  The proposed travel had two purposes: first, to facilitate economic exchange, including joining with two New York-based universities to "join together to build a satellite campus in Henan, China," towards which project the Henan provincial government or Henan private interests would contribute $1 billion; and second, to continue to try to persuade Politician-2 to visit Henan Province.

66.     On or about May 10, 2019, CC-1 wrote the defendant LINDA SUN and asked if she could "spare some time next week" to get the invitation letter for the Director of the "Henan Foreign Affairs Office to visit New York?"  SUN responded, "Yes" and indicated that she would give the letter to CC-1 the following week.

67.     Five days later, CC-1 followed up with the defendant LINDA SUN regarding the timing of the invitation letter.  CC-1 asked, "When do you think it will be ready?" explaining that "it takes a long time to apply for a U.S. visa now," and that the Director of the Henan Foreign Affairs Office (the "Director," an individual whose identity is known to the Grand Jury):

> needs to get an invitation letter to visit New York.  It will take some time to go through the procedures in Henan before the application can be submitted to the U.S. Embassy to apply for a U.S. visa.

30

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 32 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116954Filed 06/25/25    Page 31 of 79 PageID #:
1638

> Henan is very anxious.  When do you think [Politician-2] can sign
> it?

SUN replied that she would give the letter to CC-1 within two days.

68.    On or about May 16, 2019, the defendant LINDA SUN sent CC-1 a file named "Invitation Letter (New York State)."

69.    On or about May 17, 2019, CC-1 wrote the defendant LINDA SUN that CC-1 "sent [the invitation letter] to Henan yesterday," but indicated that the delegation decided to change the date of its visit.  CC-1 explained, "It is difficult to get a U.S. visa . . . It is also the first time for [the Director] to come to the United States."  CC-1 directed SUN to change the date of the delegation's visit on the invitation letter.  On or about June 2, 2019, SUN directed CC-1 to pick up the invitation letter at her parents' house in the Eastern District of New York.

70.    On or about September 16, 2019, CC-1 wrote the defendant LINDA SUN, "Henan has changed the time of the invitation letter and changed the personnel," but "they still hope to meet with [Politician-2]."  CC-1 directed SUN to reissue the letter for the third time and noted, "Henan is waiting for my reply.  When can you get [Politician-2] to sign the invitation letter and send it back to Henan . . . so they can apply for a visa?  Sorry for bothering you."

71.    On or about September 19, 2019, the defendant LINDA SUN used her personal email account to send her government email account a document with a list of names of delegates from the Henan Delegation, including the Director.  The list also identified each delegate's official title in the Henan provincial government, their telephone numbers, and their PRC passport numbers.

72.    At the defendant LINDA SUN's written request, CC-1 personally retrieved the letter that SUN drafted from SUN's office in Manhattan on or about September 19, 2019.  After retrieving the letter, CC-1 accompanied SUN to the PRC Consulate for an event.  On or about

31

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 33 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116955Filed 06/25/25    Page 32 of 79 PageID #:
1639

September 20, 2019, while located in Eastern District of New York, CC-1 electronically conveyed the letter to his contact in the PRC.

73.    The unauthorized invitation letter, dated September 18, 2019, invited the delegation to visit New York State in October 2019. According to the letter, the purpose of the trip was to further greater economic cooperation between Henan Province and New York State. The letter was written on Politician-1's letterhead but was purportedly signed by Politician-2. In fact, the handwritten signature was falsified. Neither Politician-1, Politician-2, nor their respective staffs authorized the defendant LINDA SUN to draft or issue an invitation letter in support of the Henan Province delegation's proposed visit to the United States. As noted above, SUN lacked authorization to issue an invitation letter without necessary approvals.

74.    In addition to seeking to develop opportunities for Henan Province to economically cooperate with New York State, the Henan delegation also sought to use their visit to persuade Politician-2 to visit Henan. For example, CC-1 wrote the defendant LINDA SUN on or about October 12, 2019 that the "main purpose" of the Henan delegation's visit was "to invite [Politician-2] to visit Henan again, so they hope to meet [Politician-2]."

75.    On or about October 15, 2019, the U.S. Department of State approved B1/B2 visas for four members of the Henan Province delegation, including the Director and three other government officials from Henan Province ("Delegate-2," "Delegate-3," and "Delegate-4," all individuals whose identities are known to the Grand Jury); the other members of the delegation already had valid visitor's visas. The letter drafted by the defendant LINDA SUN was appended to the four visa applications. According to U.S. Department of State records, the delegation was "[g]oing to visit [Politician-1] as the . . . delegate[s] from Henan province. Trip aimed at furthering greater economic cooperation between Henan Province and NY State."

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 34 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116956Filed 06/25/25    Page 33 of 79 PageID #:
1640

76.     On or about November 4, 2019, the Director, Delegate-2, Delegate-3, and Delegate-4 entered the United States at JFK Airport in Queens, New York pursuant to the B1/B2 visas that had been fraudulently obtained through the defendant LINDA SUN's assistance. During their trip, SUN arranged for them to meet with a principal of Global NY, a department of the NYS government charged with facilitating foreign investment in New York State.

77.     As noted above, in late fall 2019, the defendant LINDA SUN informed CC-1 that Politician-2 did not want to travel to the PRC that year. On November 5, 2019, the Associate commented to CC-1, "[Politician-2] doesn't understand politics. Missed an opportunity!"

*v.  CC-1 and CC-2 Provide Benefits to HU's PRC-Based Commercial Activities*

78.     In return for the defendant LINDA SUN's political activities on behalf of Henan Province, CC-1 and CC-2 rewarded her by aiding the defendant CHRIS HU's PRC-based commercial activities.

79.     As early as 2016, CC-1 and the defendant LINDA SUN discussed how to expand the defendant CHRIS HU's seafood exporting business into the PRC. In or about May 2016, CC-1 shared a news article with SUN about the first shipment of live lobsters from a United States city to Zhengzhou, a city in Henan Province, PRC. In response, SUN asked CC-1 if "we [SUN and HU] still have the chance to do [this business]." CC-1 replied that [SUN and HU] surely have the opportunity of [selling live seafood to the PRC]." In June 2016, CC-1 sent SUN a message indicating that he was in Henan Province and reiterated that "[his associates] hope that [SUN and HU] can export [live] lobsters to [Henan]."

80.     In or about February and March 2017, CC-1 arranged for the defendant LINDA SUN to attend and speak at the "China Henan International Investment & Trade Fair," taking place in Zhengzhou, Henan Province at the end of March 2017. As noted above, in March 2017, SUN was employed by Global NY. CC-1 asked SUN to speak on behalf of New York State

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 35 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116957Filed 06/25/25    Page 34 of 79 PageID #:
1641

regarding economic trade relations between the PRC and New York State, in the context of the Henan Province Free Trade Zone. In response, SUN forwarded CC-1 a purported Global NY PowerPoint presentation that she planned to deliver. However, SUN did not have authorization to speak on behalf of Global NY at that event.

81.    CC-1's organization handled the defendant LINDA SUN's registration for the event. CC-1 also agreed to make local travel arrangements, including hotel accommodations, for SUN, the defendant CHRIS HU, SUN's parents, HU's PRC-based business partner (the "Business Partner," an individual whose identity is known to the Grand Jury), and several representatives of Company-1, including Company-1 Owner. On or about February 1, 2017, amid planning discussions with CC-1, SUN wrote her parents that representatives of the Henan provincial government had given a red envelope containing $200 to SUN's young son.

82.    The defendant LINDA SUN was aware that the PRC government had organized and partially funded the trip. In written communications with Company-1 Owner on or about March 3, 2017, SUN commented, "I think the Henan government pays for everything." Five days later, she wrote Company-1 Owner that the "main dinner is set by the Henan government" and clarified that "the Henan government is setting up a special itinerary for you and [the defendant] Chris [HU]." On or about March 28, 2017, the Associate wrote to SUN that the Overseas Chinese Affairs Office—a PRC government body which, after 2018, became directly managed by the UFWD—had booked two rooms for SUN's party.

83.    While coordinating travel logistics, CC-1 and the defendant LINDA SUN discussed CC-1's efforts to help the defendant CHRIS HU's business in the PRC, including the viability of importing frozen seafood from the United States to Henan Province. In messages to SUN, CC-1 agreed to make efforts to personally intervene as to PRC customs issues and arranged

34

Case 1:24-cr-00346-BMC     Document 143     Filed 08/04/25     Page 36 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 116958Filed 06/25/25     Page 35 of 79 PageID #:
1642

a business meeting for HU with an entity SUN referred to as the "Commercial Department" to discuss the importation of lobsters into the PRC. According to written correspondence, CC-1 ultimately arranged multiple business meetings for HU in Henan Province. In or about March 2017, the Associate wrote that "several appointments" had been scheduled for HU to meet with "officials from the Airport Free Trade Zone and the Wholesale Market" during HU's visit to Henan Province. Writing to Company-1 Owner, SUN commented, "[CC-1] wants to make sure he sets up special meetings" for Company-1 Owner and HU. In response, Company-1 Owner agreed that Association-1 (of which CC-1 was president) "is somewhat useful to do business in [C]hina."

84.     On or about March 26, 2017, the defendant LINDA SUN and her parents flew from JFK Airport in Queens, New York to Shanghai Pudong International Airport, with an ultimate destination of Zhengzhou Xinzheng International Airport in Zhengzhou, Henan Province. The defendant CHRIS HU arrived in Zhengzhou on or about March 29, 2017 on a trip that originated from JFK Airport. After their arrival, CC-1 agreed to arrange for HU and the representatives from Company-1 to attend the fair's symposium on e-commerce.

85.     Later in 2017, CC-1 and CC-2—who was the principal of Association-2 and a close contact of CC-1—continued to help the defendant CHRIS HU cultivate business in the PRC. In communications from November 2017, CC-1 and CC-2 discussed a business proposal by HU, apparently for a project in the PRC. CC-1 and CC-2 discussed ways to improve the proposal, including the possibility of traveling to Shandong, PRC with HU. In a follow up message, CC-1 "recommend[ed]" that "[CC-2] try to finalize [HU]'s project" before leaving the PRC; CC-2 responded, "Ok." Later, in December 2017, CC-2 invited HU to visit Qingdao, Weihai, and Yantai—three cities in Shandong Province, PRC. CC-2 stated that the vice president of one of CC-2's organizations would accompany HU in Qingdao, and CC-2 would meet HU in Yantai.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 37 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116959Filed 06/25/25    Page 36 of 79 PageID #:
1643

CC-2 further indicated that he had contacted government leaders in Qingdao, Weihai, and Yantai on behalf of HU.

86.    On January 5, 2018, the defendant CHRIS HU flew from JFK Airport in Queens, New York to Guangzhou Baiyun International Airport in Guangzhou, PRC.

87.    In early 2018, CC-1 and CC-2 helped arrange for the defendant LINDA SUN to travel to the PRC in 2018 to speak at a conference sponsored by the All-China Federation of Returned Overseas Chinese ("ACFROC"), which was a UFWD agency. As contemplated, SUN would be accompanied by CC-2 and representatives from the Overseas Chinese Affairs Office. In written correspondence, CC-1 indicated that CC-2 would book SUN's hotel in the PRC and asked for SUN's resume. SUN sent CC-1 English- and Chinese-language versions of the resume, and CC-1 asked her to make sure to include her current position in the resume. SUN asked CC-1 to help the defendant CHRIS HU, indicating that it would be HU's first investment in the PRC and that HU did not understand much. Using coded language for an economic benefit to be conferred by CC-1 to HU, SUN further indicated that the "loan" would be HU's first. CC-1 agreed to help and indicated that CC-2 would give a maximum effort.

88.    The defendant LINDA SUN traveled between New York City and Beijing, PRC, leaving from JFK Airport in Queens, New York on January 30, 2018 and returning on February 3, 2018. According to written correspondence, CC-2 made travel arrangements for SUN, including reserving a presidential suite previously used by First Lady Michelle Obama during her stay in Beijing.

89.    A February 2018 press clipping from a PRC news agency reported on a meeting between a delegation of Association-2 members and ACFROC members. The article featured a photograph of the defendant LINDA SUN (fourth from left) and CC-2 (third from left)

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 38 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116960Filed 06/25/25    Page 37 of 79 PageID #:
1644

standing together with various ACFROC members, including the Chairman and CCP Party Secretary of ACFROC. Notably, in an electronic communication from February 2018, SUN sent her parents a link to a news article about a delegation of the U.S. Federation of Chinese-American Entrepreneurs visiting the Deputy Director of the Overseas Chinese Affairs Office.



90. In written correspondence from 2018, CC-1 and CC-2 continued to assist the defendant CHRIS HU's PRC business affairs, as SUN had requested in return for her participation in the ACFROC meeting conference. In May 2018, in response to a solicitation from CC-2 to HU and the Business Partner for an update on the project's progress, HU provided a document titled "The Lobster Project Entry Agreement."

D.  SUN's Political Activities on Behalf of Jiangsu Province

91. While employed with Global NY, the defendant LINDA SUN traveled with a work colleague on official business to Jiangsu Province. There, she received undisclosed and

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 39 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116-1 Filed 06/25/25    Page 38 of 79 PageID #:
1645

unapproved benefits from Jiangsu provincial officials, including the provision of a job in the PRC

for SUN's cousin, as discussed in greater detail below.  These benefits were not reported to Global

NY as outside compensation.  As with the governmental delegations from Henan Province, SUN

helped a delegation from Jiangsu Province enter into a memorandum of understanding with

Politician-2 during the delegation's visit to New York State.

92.    On or about April 22, 2016, a bank account held by the defendants LINDA

SUN and CHRIS HU received an incoming wire transfer in the amount of $47,895.00 from a PRC-

based bank account.  The notation on the wire transfer read, "Payment for Travelling."  The

payment occurred less than a month before SUN's travel to Jiangsu Province.

93.    On or about May 14, 2016, the defendant LINDA SUN departed the United

States from JFK Airport in Queens, New York and landed in Shanghai Pudong International

Airport, PRC, for her trip to Jiangsu Province.  SUN returned to JFK Airport on or about May 24,

2016.

94.    On or about May 20, 2016, the defendant LINDA SUN wrote that she had

met with the president of the Jiangsu Council for the Promotion of International Trade.  SUN

reported that, after hearing that SUN's cousin was looking for work, the president of the Jiangsu

Council for the Promotion of International Trade told SUN that her cousin could come work for

him.  In later correspondence, SUN confirmed that her contact at the Jiangsu Council for the

Promotion of International Trade had helped her cousin secure a 10-year employment contract.

95.    In or about 2019, the defendant LINDA SUN helped draft a memorandum

of understanding between Jiangsu Province and New York State.  According to one provision of

the memorandum of understanding,

> The Parties shall encourage inter-governmental exchanges and mechanism on
> science, technology and innovation, include higher learning institutes, R&D

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 40 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116962Filed 06/25/25    Page 39 of 79 PageID #:
1646

facilities, enterprises and other key stakeholders, and promote cooperation on basic
research, technology innovation and commercialization of research results.

According to another provision, "A mechanism for exchange and cooperation between the State

University of New York and the universities in Jiangsu is expected to be established."

96.    On October 29, 2019, Politician-2 and the Vice Governor of Jiangsu

Province signed the memorandum of understanding at a Manhattan hotel.  The event was hosted

by the Foreign Affairs Office of Jiangsu Provincial People's Government.

97.    On or about December 20, 2023—more than half a year after she had

separated from New York State government—the defendant LINDA SUN wrote an email to the

Director of Constituency Affairs at the New York State Governor's Office (the "Director of

Constituency Affairs," an individual whose identity is known to the Grand Jury) and to a newly

arrived consul at the PRC Consulate (the "Consul," an individual whose identity is known to the

Grand Jury).  SUN advised the counterparties of each other's respective roles and advised, "The

consulate is looking for a point of contact for events and representation for the Governor's office."

On or about February 8, 2024, the Director of Constituency Affairs received an email from a

representative of the "Jiangsu Provincial Affairs Office, responsible for affairs between Jiangsu

and New York State."  The email, which copied the Consul, sought to reinitiate contact between

New York State and Jiangsu Province, referring to and attaching the memorandum of

understanding between New York State and Jiangsu Province executed in 2019 by Politician-2.

## VI.    SUN Attends CCP Event in the PRC and Misrepresents the Trip's Purpose in FBI Interview

98.    In September 2019, CC-1 arranged for the defendant LINDA SUN to visit

the PRC to attend UFWD meetings.  During the course of the September 16, 2019 conversations

in which CC-1 directed SUN to issue invitation letters to a Henan Province delegation, CC-1 and

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 41 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 1963 Filed 06/25/25   Page 40 of 79 PageID #:
1647

SUN discussed SUN's plan to travel to the PRC—including SUN's arrival date in the PRC, CC-2's arrival date in Beijing, and whether SUN would attend a PRC military parade.

99.     The defendant LINDA SUN traveled to Beijing, PRC on or about September 26, 2019, and returned to the United States through South Korea on or about October 17, 2019.  CC-2 paid for SUN's lodging in the PRC and coordinated her travel within the PRC. This travel coincided with receptions in Beijing celebrating the 70th anniversary of the PRC's founding, some of which SUN attended.  SUN never disclosed the gifts of lodging and event tickets to New York State as she was required to do under NYS ethics rules.

100.     One of the defendant LINDA SUN's electronic accounts contained the images below of invitations to events hosted by national-level PRC government organizations. The first photograph depicts the invitation to an event titled "Celebrating the 70th Anniversary of the founding of the People's Republic of China" hosted on or about September 28, 2019 in Beijing. According to the invitation, the host organizations were the General Office of the Chinese People's Political Consultative Conference; the UFWD of the CCP Central Committee; the Overseas Chinese Affairs Office of the State Council; the Hong Kong and Macao Affairs Office of the State Council; the Taiwan Affairs Office of the State Council; and ACFROC.  The second photograph depicts an invitation to a similar event occurring on or about September 29, 2019 in Beijing.



Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 42 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 116964 Filed 06/25/25   Page 41 of 79 PageID #:
1648



101. According to her August 15, 2019 registration for the event, the defendant LINDA SUN listed her title as "Chairman of the Youth Committee of [Association-2]"—the organization of which CC-2 served as principal—and her position as "New York State Deputy Chief Diversity Officer."

102. According to written correspondence and contemporaneous photographs, the defendant LINDA SUN attended the 70th anniversary event held in Beijing in September of 2019. SUN is pictured in the center of the below photograph, with CC-1 and CC-2 pictured on her right and left, respectively.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 43 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118965 Filed 06/25/25    Page 42 of 79 PageID #:
1649



103.     On or about September 29, 2019—while the defendant LINDA SUN was

in the PRC—CC-1 wrote SUN to inform her that she had been hired as a committee member for

ACFROC.  CC-1 instructed SUN to fill out the registration form and attend the meetings.  On or

about October 11, 2019, because SUN had not yet prepared the registration form, SUN requested

that CC-1 find someone to prepare the form on her behalf.  On or about October 29, 2019, CC-2

wrote to a representative of ACFROC that SUN's title was "Chairman of the Youth Committee"

of Association-2.  SUN never disclosed the fact that she had a position with either ACFROC or

Association-2 to New York State, as she was required to do under NYS ethics rules.

104.     On July 15, 2020, an agent from the FBI interviewed the defendant LINDA

SUN in the Eastern District of New York.  During the interview, SUN stated that her job was to

liaise with the Asian-American community on behalf of Politician-1.  SUN stated that she was

responsible for handling the Chinese and Taiwanese communities.  SUN admitted that she spoke

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 44 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116966 Filed 06/25/25    Page 43 of 79 PageID #:
1650

directly with PRC Official-1 and PRC Official-4 but claimed to have contact with the PRC Consulate on no more than a weekly basis.

105.    When shown a photograph from an article titled "Overseas Chinese Representatives Invited to Reception in Celebration of the 70th Anniversary of the Establishment of PRC, at the Great Hall of the People," the defendant LINDA SUN acknowledged that she was in the photograph and claimed that she was already in the PRC for a family visit and that a real estate developer from Long Island procured her a ticket for the event. However, as noted above, CC-1 had arranged for SUN to attend UFWD events in 2019, and CC-2 had made travel arrangements, including hotel accommodations.

## VII.    SUN and HU Receive Gifts and Benefits from SUN's Foreign Principals

106.    The defendants LINDA SUN and CHRIS HU and SUN's family received numerous gifts and benefits from CC-1, CC-2, and associated provincial governments in the PRC for whom CC-1 and CC-2 were working. Among those benefits were:

a.    The assistance CC-1 and CC-2 provided to HU's PRC-based business activities;

b.    Travel expenditures incurred by Henan provincial government and associated organizations for SUN's repeated trips to the PRC, including the March 2017 trip to Henan Province by SUN, HU, Company-1 employees, and SUN's family members;

c.    Travel expenditures incurred by the Jiangsu provincial government and associated organizations on SUN's behalf in 2018; and

d.    The employment for SUN's cousin.

Despite her ethics training discussed below, SUN did not disclose any of these gifts and benefits in her annual financial disclosures to NYS government.

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 45 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 11967Filed 06/25/25   Page 44 of 79 PageID #:
1651

107.   The defendant LINDA SUN and her family also received numerous other gifts and benefits from other PRC representatives and agents, including members of the PRC Consulate.  SUN did not disclose any of these gifts and benefits in her annual financial disclosures to NYS government.  According to written correspondence, gifts from the PRC Consulate to SUN and her family included:

a.   Tickets to the Chinese National Traditional Orchestra concert at Carnegie Hall on or about December 18, 2015;

b.   Five tickets, each of which had a value of $37 or greater, to an unspecified event occurring on or about January 9, 2017;

c.   Three tickets to an unspecified concert for SUN and her family;

d.   Tickets to an unspecified show from PRC Official-3 on or about January 2, 2018;

e.   Six tickets to the Guangzhou Ballet performance at Lincoln Center on August 17, 2019;

f.   Six salted ducks from PRC Official-1 on or about July 28, 2021;

g.   Six salted ducks from PRC Official-1 on or about November 23, 2021;

h.   Salted ducks from PRC Official-1 on or about March 15, 2022;

i.   Six tickets with VIP suite access from PRC Official-2 for an unspecified sporting event on or about August 6, 2022;

j.   Salted ducks from PRC Official-1 and PRC Official-2 on or about November 23, 2022; and

44

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 46 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116968Filed 06/25/25    Page 45 of 79 PageID #:
1652

   k.  Dinner for SUN's family at PRC Official-1's house on or about February 8, 2023.

   108.  The defendant CHRIS HU's PRC-based business activities generated millions of dollars in the PRC, which he and the defendant LINDA SUN used to purchase real estate properties and luxury automobiles, including a 2024 Ferrari Roma.  HU repatriated this wealth to the United States by, among other measures, (1) using one or more unlicensed money remitting businesses; (2) depositing cash payments into multiple accounts associated with HU's family and businesses, including into an account associated with the Wine Store, and (3) conducting layering activities, that is, moving funds between multiple family and business accounts, to conceal the original provenance of the funds.

   109.  In or about 2021, the defendants LINDA SUN and CHRIS HU purchased real estate in Manhasset, New York, currently valued at approximately $4.05 million, and an ocean-view condominium on the 47th floor of a high rise building in Honolulu, Hawaii, currently valued at approximately $2.1 million.  There were no mortgage loans taken in connection with these acquisitions, and the acquisitions occurred soon after HU received a series of wire transfers totaling more than $2.1 million from a PRC-based account bearing the name of the Business Partner.  SUN did not report the real estate acquisitions on her financial disclosure statements, as she was obligated to do.

   110.  In an electronic communication from 2020, while the defendant LINDA SUN was shopping for a new house in Long Island, the Relative worried that people would wonder how SUN could afford to purchase an expensive property.  SUN replied, "Mortgage."

   111.  Though the defendants LINDA SUN and CHRIS HU made purchases of expensive real estate and multiple luxury automobiles, among other things, their personal and

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 47 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116969Filed 06/25/25    Page 46 of 79 PageID #:
1653

business tax returns reflected little to no income earned.  Moreover, as the charts below illustrate,

SUN and HU and their businesses did not earn income commensurate with their purchases.

| Personal Joint Return | Adjusted Gross Income |
|---|---|
| 2020 | -$665,483 |
| 2021 | -$3,921 |
| 2022 | $87,247 |
| 2023 | $124,326 |

| Ordinary Business Income by Year | Vendor Company | Seafood Company | Wine Store |
|---|---|---|---|
| 2020 | -$1,366,501 | $45,451 | N/A |
| 2021 | -$175,244 | -$53,983 | -$19,391 |
| 2022 | $30,149 | $123,427 | $5,410 |
| 2023 | -$1,010 | $50,734 | $9,342 |

## VIII.    SUN Has Never Registered Under FARA Despite Awareness of Reporting Obligations Regarding Gifts, Outside Activities, and Improper Influence

112.    According to records of the FARA Unit, the defendant LINDA SUN has

never registered as a foreign agent with the Attorney General.

113.    The defendant LINDA SUN was reminded on multiple occasions regarding

the unlawfulness of the types of activity in which she engaged on behalf of and at the request of

the PRC government and the CCP.

114.    Upon her employment as Deputy Chief Diversity Officer for Politician-1 in

or about February 2018, the defendant LINDA SUN became an employee required to file annual

financial disclosure statements with New York State.  Also as a result of her status as a mandatory

filer, SUN was required to complete a "Comprehensive Ethics Training Course" presented by the

NYS Joint Commission on Public Ethics within three months of starting her position, and to retake

the ethics training course every three years.  SUN completed her ethics training course in or about

May 2018 and again on September 23, 2021.

46

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 48 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116970Filed 06/25/25    Page 47 of 79 PageID #:
1654

115.    The Comprehensive Ethics Training Course materials admonished the
defendant LINDA SUN that, among other things:

a.    SUN was prohibited from accepting "gifts," which included but
were not limited to "money, services, loans, travel, lodging, meals, refreshments, entertainment,
forbearance or a promise having a monetary value," from "interested sources." An "interested
source" was defined to include any person or entity that "[a]ttempts to influence you or your
agency in an official action."

b.    SUN was required to disclose to the NYS government, among other
things, any "[o]ffices or any positions of authority held in a business entity or organization,
political party or political organization," as well as "[c]ertain gifts, honoraria, and other payments."

c.    SUN was required to report annually on ownership of certain
investments and financial interests, including real property.

d.    SUN was subject to NYS Public Officers Law, Section 73(5)(a),
which provided, in relevant part, "No . . . state officer or employee . . . shall, directly or indirectly
solicit, accept or receive any gift having more than a nominal value, whether in the form of money,
service, loan, travel, lodging, meals, refreshments, entertainment, discount, forbearance or
promise, or in any other form, under circumstances in which it could reasonably be inferred that
the gift was intended to influence him or her, or could reasonably be expected to influence him or
her, in the performance of his or her official duties or was intended as a reward for any official
action on his or her part," and that "certain violations" of the provision could be "refer[red] . . . to
the appropriate prosecutor."

e.    SUN was subject to NYS Public Officers Law, Section 74(3)(d),
which provided, in relevant part, "No covered person shall use or attempt to use his or her official

47

Case 1:24-cr-00346-BMC     Document 143     Filed 08/04/25     Page 49 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 118971Filed 06/25/25     Page 48 of 79 PageID #:
1655

position to secure unwarranted privileges or exemptions for himself or herself or others, including
but not limited to, the misappropriation to himself, herself or to others of the property, services or
other resources of the state for private business or other compensated non-governmental purposes."

      f.      SUN was subject to NYS Public Officers Law, Section 74(3)(e),
which provided, in relevant part, "No covered person shall engage in any transaction as
representative or agent of the state with any business entity in which he has a direct or indirect
financial interest that might reasonably tend to conflict with the proper discharge of his official
duties."

      g.      SUN was subject to Title 19, New York Codes, Rules and
Regulations, Part 932, which included notification and approval requirements for covered persons
who engaged in certain outside activities, including as an officer of a not-for-profit entity.

      116.      On or about July 15, 2020, during the defendant LINDA SUN's voluntary
interview with the FBI, the interviewing agents advised SUN of the FARA requirements.
Specifically, the agents discussed a report by an American public policy think tank on malign
influence by the PRC government and the CCP.  The agents told SUN, in sum and substance, that
the report stated that (a) the CCP sought to promote views sympathetic to its policies and silence
views critical of the CCP or supportive of Taiwan, (b) the CCP sought to exploit feelings by
Chinese-Americans towards China in order to advance the party's goals, (c) when the CCP
provides things like honors, free travel, and accommodations, it will always seek something in
return, and (d) if someone operated on behalf of the Chinese government without registering as a
foreign agent, they could be in violation of FARA.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 50 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116972Filed 06/25/25    Page 49 of 79 PageID #:
1656

117.    As discussed above, after July 15, 2020, the defendant LINDA SUN took the following actions, among others, at the order, direction, or request of principals of the PRC government:

a.    Repeatedly seeking to influence NYS government officials and the public regarding policy with respect to Taiwan at the request of PRC Consular officials;

b.    Providing access to the PRC Consulate to shape the content of Politician-2's Lunar New Year message for 2021; and

c.    Procuring and presenting a framed proclamation for PRC Official-1.

## IX.    SUN and HU Benefit Financially from PPE Contracts with New York State

118.    During the COVID-19 pandemic and while working with the team of NYS government employees responsible for obtaining PPE, the defendant LINDA SUN used her position of influence with the PRC government to coordinate the NYS government's purchase of PPE from vendors located in the PRC. The PRC government, including the PRC Consulate, recommended many of the PPE vendors that SUN referred to the NYS government for procurement contracts. However, SUN also referred two vendors—the Cousin Company and the Associate Company—that were not recommended by the PRC government but had ties to SUN, while claiming falsely that these, too, were referrals from components of the PRC government. As detailed above, the Cousin Company was operated by one of SUN's second cousins, and the Associate Company was operated by the defendant CHRIS HU and a business associate of HU. With SUN's assistance, the Cousin Company and the Associate Company each entered into multiple contracts with the NYS government worth millions of dollars apiece.

49

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 51 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118-73 Filed 06/25/25    Page 50 of 79 PageID #:
1657

119.    The defendant LINDA SUN, the Associate Company, and the Cousin Company did not disclose to the NYS government (1) the fact that SUN and the defendant CHRIS HU had relationships with the Associate Company and the Cousin Company, or (2) that SUN and HU received a portion of the profits that the Associate Company and the Cousin Company made as a result of their contracts with the NYS government for PPE, including through kickback payments from the Cousin Company.

120.    The Associate Company and the Cousin Company entered into contracts with the NYS government bearing the following dates in the following amounts:

| Date | Entity | Amount of Contract |
|------|--------|-------------------|
| 3/20/2020 | Associate Company | $2,000,000.00 |
| 3/20/2020 | Associate Company | $10,000,000.00 |
| 3/21/2020 | Associate Company | $8,000,000.00 |
| 3/21/2020 | Cousin Company | $2,950,000.00 |
| 4/5/2020 | Cousin Company | $12,000,000.00 |

The NYS Department of Health ("DOH"), an agency that received more than $5,000 in federal funding in both 2019 and 2020, wired funds in the following amounts on the following dates to the Cousin Company and the Associate Company:

| Date | Entity | Amount of Wire |
|------|--------|----------------|
| 3/19/2020 | Associate Company | $7,500,000.00 |
| 3/23/2020 | Associate Company | $4,000,000.00 |
| 3/23/2020 | Associate Company | $1,000,000.00 |
| 3/25/2020 | Cousin Company | $1,475,000.00 |
| 4/7/2020 | Associate Company | $8,100,000.00 |
| 4/7/2020 | Cousin Company | $6,000,000.00 |
| 4/10/2020 | Associate Company | $1,000,000.00 |
| 4/16/2020 | Cousin Company | $1,475,000.00 |
| 5/1/2020 | Associate Company | $8,100,000.00 |
| 5/1/2020 | Associate Company | $6,000,000.00 |
| 6/18/2020[3] | Associate Company | -$4,279,413.02 |
| 6/18/2020 | Associate Company | $4,000,000.00 |
| 6/18/2020 | Associate Company | $24,004.03 |

---

[3]    The Associate Company issued a refund to the NYS government on June 18, 2020, because it was unable to fulfill a portion of a contract.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 52 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116974 Filed 06/25/25    Page 51 of 79 PageID #:
1658

| Date | Entity | Amount of Wire |
|------|--------|----------------|
| 6/18/2020 | Associate Company | $56,598.80 |
| 6/18/2020 | Associate Company | $35,658.87 |
| 6/18/2020 | Associate Company | $163,151.02 |

121. A spreadsheet in one of the defendant CHRIS HU's electronic accounts included a column titled "me." That column detailed the estimated profits that HU expected he and the defendant LINDA SUN would receive from the contracts that the Associate Company and the Cousin Company had with the NYS government (including the kickback payments from the Cousin Company), which totaled $8,029,741.

122. On or about May 13, 2021, the defendant LINDA SUN completed her annual financial disclosure to the NYS government. Despite the requirement to list any income in excess of $1,000 by source for herself and the defendant CHRIS HU, SUN did not disclose any income from either the Associate Company or the Cousin Company.

A.    The Cousin Company Contracts

123. In pertinent part, the contracts between the NYS government and the Cousin Company contained language prohibiting self-dealing involving NYS government employees such as the defendant LINDA SUN, as follows:

> (b)  None of the Seller's principals, owners, officers, directors, employees, or agents (including, to the Seller's knowledge based upon due inquiry, any Manufacturer or subcontractor) is a government official or an instrumentality of a government, except as previously disclosed to and approved by the Buyer. If, at any time during the term of this Contract, any of the Seller's principals, owners, officers, directors, employees, or agents, or to the Seller's knowledge, any Manufacturer or subcontractor, becomes a government official or instrumentality of the government, the Seller shall notify the Buyer immediately so that the Buyer may, and hereby reserves the right to, take whatever precautions and actions may be appropriate to assure compliance with Anti-Corruption Laws;

51

Case 1:24-cr-00346-BMC     Document 143     Filed 08/04/25     Page 53 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 116975Filed 06/25/25     Page 52 of 79 PageID #:
1659

124.    To conceal her relationship with the Cousin Company from procurement authorities at the NYS government, the defendant LINDA SUN falsified a document to suggest that the Jiangsu Department of Commerce had recommended the Cousin Company.  On or about March 20, 2020, SUN and other NYS government officials received an email from the U.S. representative to the Jiangsu Trade & Business Representative Office in Albany, New York suggesting four PRC-based vendors who were able to provide PPE for the NYS government.  On or about March 21, 2020, SUN forwarded herself an altered version of the email in which she replaced the first suggested vendor—a vendor that produced ventilators—with the Cousin Company and wrote that the Cousin Company was recommended by the Jiangsu Department of Commerce.  Images of the original and altered emails are below in Figures 1 and 2, respectively.

### Figure 1 (Original Email)



Hi Everyone,

Here is more information after widely search through the Nanjing Bureau of Commerce and some Chambers of Commerce in Jiangsu.

1▉▉▉▉▉       MEDICAL EQUIPMENT & SUPPLY CO., Ltd. They sent ventilators to Hubei Province in large quantities, only has CE approval. BTW, when I contacted Manager ▉▉▉▉, I learned that Representative ▉▉▉▉ had already ordered thermometers. Since the production could not be arranged without payment, and now the factory runs at full capacity. Please let me know as soon as the payment was made. I'll ask him for the fastest arrangement and delivery. Website: http://www.▉▉▉.com.cn/index_en.php

2.▉▉▉▉       Medical Equipment Co., Ltd. They produce 50 ventilators per week, with SGS certificate. Also, it run at full capacity and the order arrangement to mid-May.

3.▉▉▉▉▉       Medical Co., Ltd. They produce ventilators, with CE certificate. The stock is around 20. Website: http://en.▉▉▉▉▉.com/

4▉▉▉▉       Health Products Manufacture Co., Ltd. NIOSH N95 Mask with FDA approval.

Please see the attached for details.

Best Regards,

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 54 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116976Filed 06/25/25    Page 53 of 79 PageID #:
1660

**Figure 2 (Altered Email)**

Hi Linda,

Here is more information for the surgical mask company [the Cousin Company] based in Jiangsu. [The Cousin
Company] comes highly recommended by the Jiangsu Department of Commerce. As New York State and Jiangsu
Province are sister-states and have been so for 30 years, the Jiangsu Provincial Government wants to help
New York State get through this hard time.

1.

2. ▮▮▮▮▮ Medical Equipment Co., Ltd. They produce 50 ventilators per week, with SGS certificate.
Also, it run at full capacity and the order arrangement to mid-May.

3. ▮▮▮▮▮▮▮Medical Co., Ltd. They produce ventilators, with CE certificate. The stock is around
20. Website: http://en.▮▮▮▮▮▮.com/

4. Draft Contract

Best Regards,

125.    On or about March 24, 2020, in an email with the subject line "Already
VERIFIED by Linda Sun," SUN wrote to NYS procurement officials that the Cousin Company
"came recommended by Jiangsu Chamber of Commerce," that the representative had helped
"screen potential vendors," and that the Cousin Company's surgical mask was the "gold standard."
Below SUN's message was what purported to be quoted text from the Jiangsu Chamber of
Commerce's email recommending vendors.  However, the email in the quoted text was the altered
email in Figure 2, rather than the original email in Figure 1.  The email also included a draft
contract with the Cousin Company.  As a result of the email, the procurement official wrote an
email to the internal procurement function stating, "For approval and expedite[d] purchasing."

126.    In connection with the Cousin Company contracts with the NYS
government, a spreadsheet maintained on SUN and HU's personal computer indicated that the
Cousin provided payments to HU (and SUN) totaling approximately $2.3 million during 2020 and
2021.  These kickbacks from the Cousin Company represented taxable income.  HU did not report
these payments as income to the U.S. government, as required, or pay taxes on this income in
Forms 1040 for 2020 and 2021 that he filed on behalf of himself and SUN.

Case 1:24-cr-00346-BMC     Document 143    Filed 08/04/25    Page 55 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 116977Filed 06/25/25    Page 54 of 79 PageID #:
1661

127.    In part, the defendant CHRIS HU laundered the income from the Cousin
Company by having the Cousin make $1.5 million in payments in three $500,000 increments from
another entity that the Cousin owned ("Cousin Entity," an entity the identity of which is known to
the Grand Jury) to U.S. accounts at a financial institution ("Financial Institution-1," an entity the
identity of which is known to the Grand Jury). HU created these accounts in the Relative's name,
rather than his own. HU created the accounts on April 29, 2020—two days before the final $6
million payment from the DOH to the Cousin Company. HU then transferred these funds to a
Financial Consultancy account that was also under HU's control.

B.    The Associate Company Contracts

128.    The defendant LINDA SUN also arranged for the Associate Company to be
a vendor for NYS government contracts. On March 14, 2020, SUN wrote an email with the subject
"Mask suppliers" to other members of the NYS government PPE task force with procurement
authority and listed the Associate Company as a potential supplier.    SUN subsequently
communicated with the Associate Company by email to obtain a price quote for the contract and
provided a status update to the NYS government about the contracts with the Associate Company.

129.    In a NYS internal document found in the computer owned by the defendants
LINDA SUN and CHRIS HU, the answer to the question "why did we do business with this
vendor?" was listed as "referred by Chinese chamber of commerce" for the Associate Company.
However, there was no such referral for the Associate Company.

X.    **HU Willfully Underreported Gross Receipts from the Vendor Company**

130.    The defendant CHRIS HU also willfully underreported gross receipts in the
2020 Form 1120-S the Vendor Company, his own PPE business (discussed above in paragraph 2).
HU maintained QuickBooks records for the Vendor Company to track its receipts and expenses,

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 56 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116978Filed 06/25/25    Page 55 of 79 PageID #:
1662

and he falsely coded hundreds of thousands of dollars in payments received for PPE and other household goods in 2020 as "owners investments." HU then provided the false QuickBooks records to his tax return preparer for use in preparing the 2020 Form 1120-S. The unreported gross receipts, which included gross income derived from business, constituted taxable income, which resulted in the substantial underreporting of income in HU's Schedule E of his Form 1040 for 2020.

## COUNT ONE
(Conspiracy to Violate the Foreign Agents Registration Act)

131.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

132.    In or about and between January 2015 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," together with others, did knowingly conspire to commit an offense against the United States, to wit, to knowingly and willfully act as an agent of a foreign principal, namely, the Government of the People's Republic of China and the Chinese Communist Party, without registering with the Attorney General, as required by law, in violation of Title 22, United States Code, Sections 612 and 618.

133.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," together with others, did commit and cause the commission of, among others, the following:

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 57 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118979 Filed 06/25/25    Page 56 of 79 PageID #:
1663

## OVERT ACTS

a.    On or about August 30, 2018, SUN drafted a fake employment letter for CC-1.

b.    On or about August 7, 2019, in a message to PRC Official-1, SUN explained, "[a]s you know, I have successfully blocked all formal and informal meetings between [Politician-1, Politician-2,] and TECO.  I myself have maintained a bare minimum of a relationship with them."  In the same message, SUN also asked for direction as to how to address a request from TECO.

c.    In or about 2019, SUN drafted an invitation letter dated September 18, 2019 in support of a visit by a delegation from Henan Province to New York State.

d.    On or about March 6, 2020, SUN arranged for PRC Official-4 to listen to a non-public New York State government conference call.

e.    In or about January 2021, SUN removed references to the plight of the Uyghur people from Politician-2's Lunar New Year message.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
(Failure to Register Under the Foreign Agents Registration Act)

134.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

135.    In or about and between August 2019 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," together with others, knowingly and willfully acted and caused others to act as an agent of a foreign principal, namely,

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 58 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 116980Filed 06/25/25   Page 57 of 79 PageID #:
1664

the Government of the People's Republic of China and the Chinese Communist Party, without registering with the Attorney General, as required by law.

(Title 22, United States Code, Sections 612(a) and 618(a)(1); Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT THREE
### (Visa Fraud)

136. The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

137. In or about and between August 2019 and October 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," together with others, did knowingly and intentionally present one or more applications and other documents required by the immigration laws and regulations prescribed thereunder which contained one or more false statements with respect to one or more material facts, to wit: a falsified invitation letter for a delegation from Henan Province, PRC, purportedly signed by Politician-2.

(Title 18, United States Code, Sections 1546(a), 2 and 3551 et seq.)

## COUNTS FOUR THROUGH SEVEN
### (Bringing in Aliens)

138. The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

139. In or about and between August 2019 and November 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," together with others, encouraged and induced the aliens listed below to come to and enter the United States, knowing

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 59 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116981Filed 06/25/25    Page 58 of 79 PageID #:
1665

and in reckless disregard of the fact that such coming to and entry was and would be in violation

of law, for the purpose of commercial advantage and private financial gain:

| COUNT | ALIEN |
|-------|-------|
| FOUR | Director |
| FIVE | Delegate-2 |
| SIX | Delegate-3 |
| SEVEN | Delegate-4 |

(Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(i); Title

18, United States Code, Sections 2 and 3551 et seq.)

## COUNT EIGHT
(Conspiracy to Commit Honest Services Wire Fraud)

140.    The allegations contained in paragraphs one through 130 are realleged and

incorporated as if fully set forth in this paragraph.

141.    In or about and between March 2020 and August 2020, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU, together

with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the

NYS government of its intangible right to the honest services of SUN through kickbacks, to wit:

payments to HU through bank accounts held at Financial Institution-1 in the name of the Relative,

contrary to Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT NINE
(Honest Services Wire Fraud)

142.    The allegations contained in paragraphs one through 130 are realleged and

incorporated as if fully set forth in this paragraph.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 60 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116982Filed 06/25/25    Page 59 of 79 PageID #:
1666

143.    In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the NYS government of its intangible right to the honest services of SUN through kickbacks, to wit: payments to HU through bank accounts held at Financial Institution-1 in the name of the Relative.

(Title 18, United States Code, Sections 1343, 1346, 2 and 3551 et seq.)

COUNT TEN
(Federal Program Bribery)

144.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

145.    In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU, with SUN being an agent of the NYS government, together with others, did knowingly, intentionally, and corruptly solicit and demand for the benefit of SUN and HU, and accept and agree to accept, one or more things of value, to wit: United States currency, from one or more persons, to wit: the Cousin, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the DOH involving things of value of $5,000 or more, while the DOH was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of federal assistance.

(Title 18, United States Code, Sections 666(a)(1)(B), 2 and 3551 et seq.)

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 61 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116983Filed 06/25/25    Page 60 of 79 PageID #:
1667

## COUNT ELEVEN
(Conspiracy to Commit Offenses Against the United States)

146.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

147.    In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU, together with others, did knowingly and intentionally conspire:

a.    SUN, being an agent of the NYS government, to embezzle, steal, obtain by fraud, misapply and otherwise without authority convert to the use of a person other than the rightful owner property of DOH, which received, in one or more one-year periods, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance, which property was valued at $5,000 or more, and was owned by, and was under the care, custody and control of, DOH, to wit: United States currency, contrary to Title 18, United States Code, Section 666(a)(1)(A); and

b.    SUN, being an agent of the NYS government, to corruptly solicit and demand for the benefit of SUN and HU, and accept and agree to accept, one or more things of value, to wit: United States currency, from one or more persons, to wit: the Cousin, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the DOH involving things of value of $5,000 or more, while the DOH was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of federal assistance, contrary to Title 18, United States Code, Section 666(a)(1)(B).

60

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 62 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116984Filed 06/25/25    Page 61 of 79 PageID #:
1668

148.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU, together with others, did commit and cause the commission of, among others, the following:

OVERT ACTS

a.    On or about March 21, 2020, SUN forwarded herself an altered email containing text suggesting that the Cousin Company was recommended by the Jiangsu Department of Commerce.

b.    On or about March 24, 2020, in an email with the subject line "Already VERIFIED by Linda Sun," SUN wrote to NYS procurement officials that the Cousin Company "came recommended by Jiangsu Chamber of Commerce," that the representative had helped "screen potential vendors," and that the Cousin Company's surgical mask was the "gold standard."

c.    On or about April 7, 2020, at approximately 10:29 a.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to the Cousin Company.

d.    On or about April 7, 2020, at approximately 4:32 p.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to the Cousin Company.

e.    On or about April 7, 2020, at approximately 6:13 p.m., SUN wrote an email to NYS accounts payable personnel regarding the status of payment to the Cousin Company.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 63 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116985Filed 06/25/25    Page 62 of 79 PageID #:
1669

f.      On or about April 8, 2020, at approximately 10:36 a.m., SUN wrote an email to NYS accounts payable personnel, indicating that the Cousin Company had "mentioned the payment due to them from the existing contract."

g.      On or about April 9, 2020, at approximately 3:51 p.m., SUN wrote an email to NYS accounts payable personnel and indicated that she would "check in on delivery dates," which was information from the Cousin Company that NYS accounts payable needed to process payment.

h.      On or about April 10, 2020 at approximately 5:10 p.m., SUN wrote an email to NYS accounts payable personnel, asking if she could "expect the process to be smoother" for payment to the Cousin Company.

i.      On or about April 13, 2020, at approximately 1:04 p.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to the Cousin Company.

j.      On or about April 13, 2020, at approximately 4:57 p.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to the Cousin Company.

k.      On or about April 13, 2020, at approximately 5:27 p.m., SUN wrote an email to NYS accounts payable personnel providing an update on deliveries of masks by the Cousin Company, commenting, "Hopefully this will make it easier for everyone to calculate."

l.      On or about April 14, 2020, at approximately 4:24 p.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to the Cousin Company.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 64 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116    Filed 06/25/25    Page 63 of 79 PageID #:
1698
1670

m.      On or about April 15, 2020, at approximately 12:57 p.m., SUN wrote an email to DOH personnel seeking an update on the status of payment to the Cousin Company.

n.      On or about April 15, 2020, at approximately 2:19 p.m., SUN forwarded the response from DOH personnel to NYS accounts payable personnel regarding the status of payment to the Cousin Company.

o.      On or about April 16, 2020, at approximately 2:08 p.m., SUN wrote an email to NYS accounts payable personnel asking whether payment to the Cousin Company "went out this morning without any more issues" and asking to see a "screenshot of the wire."

p.      On or about April 29, 2020, HU opened two accounts at Financial Institution-1 in the name of the Relative.

q.      On or about April 30, 2020 at approximately 3:32 p.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to the Cousin Company.

r.      On or about April 30, 2020 at approximately 5:30 p.m., SUN wrote an email to NYS accounts payable personnel verifying whether payment to the Cousin Company would be made the next day.

s.      On or about July 16, 2020, a bank account associated with the Cousin Entity wired $500,000 to a nominee account at Financial Institution-1 HU opened in the name of the Relative.

t.      On or about July 23, 2020, a bank account associated with the Cousin Entity wired $500,000 to a nominee account at Financial Institution-1 HU opened in the name of the Relative.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 65 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116987Filed 06/25/25    Page 64 of 79 PageID #:
1671

u.      On or about August 4, 2020, a bank account associated with the Cousin Entity wired $500,000 to a nominee account at Financial Institution-1 HU opened in the name of the Relative.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWELVE
### (Conspiracy to Commit Bank Fraud)

149.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

150.    In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CHRIS HU, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud Financial Institution-1, and to obtain moneys, funds, credits and other property owned by and under the custody and control of Financial Institution-1, by means of one or more materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THIRTEEN
### (Misuse of Means of Identification)

151.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

152.    In or about and between April 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CHRIS HU, together with others, did knowingly and intentionally transfer, possess and use, without lawful authority and in and affecting interstate and foreign commerce, one or more means

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 66 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116988Filed 06/25/25    Page 65 of 79 PageID #:
1672

of identification of another person, to wit: the Relative's name and driver's license, with the intent

to commit, and aid and abet, and in connection with, unlawful activity that constituted one or more

violations of Federal law, to wit: the crimes charged in Counts Eight through Twelve.

(Title 18, United States Code, Sections 1028(a)(7), 1028(b)(2)(B), 1028(c)(3)(A),

2 and 3551 et seq.)

COUNT FOURTEEN
(Money Laundering Conspiracy)

153.    The allegations contained in paragraphs one through 130 are realleged and

incorporated as if fully set forth in this paragraph.

154.    In or about and between January 2016 and August 2024, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU,

together with others, did knowingly and intentionally conspire to transport, transmit and transfer

monetary instruments and funds, to wit: wire transfers, to a place in the United States from and

through a place outside the United States, knowing that the monetary instruments and funds

involved in the transportation, transmission and transfer represented the proceeds of some form of

unlawful activity and knowing that such transportation, transmission and transfer was designed in

whole and in part to conceal or disguise the nature, the location, the source, the ownership and the

control of the proceeds of specified unlawful activity, to wit: the Foreign Agents Registration Act,

in violation of Title 22, United States Code, Section 612; Bribery in the Third Degree, in violation

of New York Penal Law, Section 200.00; and Bribe Receiving in the Third Degree, in violation of

New York Penal Law, Section 200.10, all contrary to Title 18, United States Code, Section

1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

65

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 67 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 116 89 Filed 06/25/25   Page 66 of 79 PageID #:
1673

## COUNTS FIFTEEN THROUGH SEVENTEEN
(Money Laundering)

155.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

156.    On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant CHRIS HU, together with others, did knowingly and intentionally engage in monetary transactions in the United States, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000, in the approximate amounts set forth below, and that was derived from one or more specified unlawful activities, to wit: theft or bribery concerning programs receiving federal funds, in violation of Title 18, United States Code, Section 666; bank fraud, in violation of Title 18, United States Code, Section 1344; honest services fraud, in violation of Title 18, United States Code, Section 1346; and misuse of means of identification, in violation of Title 18, United States Code, Sections 1028(a)(7) and 1028(c)(3)(A), knowing that the funds and monetary instruments were the proceeds of some unlawful activity:

| COUNT | APPROXIMATE DATE | AMOUNT |
|---|---|---|
| FIFTEEN | July 16, 2020 | $500,000 |
| SIXTEEN | July 23, 2020 | $500,000 |
| SEVENTEEN | August 4, 2020 | $500,000 |

(Title 18, United States Code, Sections 1957(a), 1957(b), 1957(d)(1), 2 and 3551 et seq.)

## COUNTS EIGHTEEN AND NINETEEN
(Tax Evasion)

157.    The allegations contained in paragraphs one through 130 are realleged and incorporated as if fully set forth in this paragraph.

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 68 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116990 Filed 06/25/25    Page 67 of 79 PageID #:
1674

158.    In or about and between 2020 and 2022, within the Eastern District of New York and elsewhere, the defendant CHRIS HU, together with others, did willfully and knowingly attempt to evade and defeat a substantial personal income tax due and owing by him to the United States for the tax years 2020 and 2021, by, among other affirmative acts, (a) using a nominee, to wit: the Relative, and bank accounts held at Financial Institution-1 held in the name of the Relative; (b) transferring funds from the Cousin's bank accounts to the nominee's bank accounts; (c) making false entries on QuickBooks for the Vendor Company; and (d) the signing and filing of Forms 1040 on or about the dates listed below:

| COUNT | TAX YEAR | APPROXIMATE DATE OF FILING |
|---|---|---|
| EIGHTEEN | 2020 | 2/15/2022 |
| NINETEEN | 2021 | 7/27/2022 |

(Title 26, United States Code, Section 7201; Title 18, United States Code, Sections 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE, TWO, AND EIGHT THROUGH ELEVEN

159.    The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One, Two, and Eight through Eleven, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses, including but not limited to:

a.    all right, title and interest in the real property and premises located at ███████████████ New York 11030, together with its appurtenances, improvements,

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 69 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 118991Filed 06/25/25   Page 68 of 79 PageID #:
1675

fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits

therefrom, and all proceeds traceable thereto;

b.      all right, title and interest in the real property and premises located

at  Honolulu, Hawaii 96814, together with its

appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well

as all leases, rents and profits therefrom, and all proceeds traceable thereto;

c.      all right, title and interest in the real property and premises located

at ▬▬▬▬▬ Forest Hills, New York 11375, together with its appurtenances,

improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents

and profits therefrom, and all proceeds traceable thereto;

d.      approximately $2,615.34 seized on or about July 22, 2024 from

Bank of America account number ending in 3645, held in the name of ▬▬▬▬▬

and all proceeds traceable thereto;

e.      approximately $13,972.36 seized on or about July 22, 2024 from

Bank of America account number ending in 6999, held in the name of ▬▬▬▬▬

▬▬▬ and all proceeds traceable thereto;

f.      approximately $5,639.40 seized on or about July 22, 2024 from

Bank of America account number ending in 4999, held in the name of ▬▬▬▬▬

▬▬▬ and all proceeds traceable thereto;

g.      approximately $1,001.30 seized on or about July 22, 2024 from

Citibank N.A. account number ending in 6888, held in the name of "Chris Hu, Linda Hu," and all

proceeds traceable thereto;

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 70 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 116992 Filed 06/25/25   Page 69 of 79 PageID #:
1676

h.      approximately $13,420.36 seized on or about July 22, 2024 from Citibank N.A. account number ending in 1165, held in the name of "Chris Hu, ITF Linda Hu," and all proceeds traceable thereto;

i.      approximately $46,269.00 seized on or about July 22, 2024 from Merrill Lynch account number ending in 8X72, held in the name of "Chris Hu," and all proceeds traceable thereto;

j.      one 2024 Ferrari Roma, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, from Manhasset, New York;

k.      one 2024 Range Rover/L460, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮▮▮▮ , seized by law enforcement on or about July 22, 2024, from Manhasset, New York;

l.      one 2022 Mercedes GLB250W4, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, from Manhasset, New York;

m.      approximately $10,015.00 in United States currency, seized by law enforcement on or about July 22, 2024, from Manhasset, New York; and

n.      approximately $130,100.00 in United States currency, seized by law enforcement on or about July 22, 2024, from safe deposit box number 8786, maintained at the TD Bank located at ▮▮▮▮▮▮▮▮ Flushing, New York.

160.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

Case 1:24-cr-00346-BMC     Document 143     Filed 08/04/25     Page 71 of 80 PageID #:
Case 1:24-cr-00346-BMC     Document 116993 Filed 06/25/25     Page 70 of 79 PageID #:
1677

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT THREE

161.    The United States hereby gives notice to the defendant charged in Count

Three that, upon her conviction of such offense, the government will seek forfeiture in accordance

with Title 18, United States Code, Section 982(a)(6)(A), which requires the forfeiture of: (a) any

conveyance, including any vessel, vehicle, or aircraft used in the commission of such offense; and

(b) any property, real or personal (i) that constitutes, or is derived from or is traceable to the

proceeds obtained directly or indirectly from the commission of such offense; or (ii) that is used

to facilitate, or is intended to be used to facilitate, the commission of such offense.

162.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 72 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116994 Filed 06/25/25    Page 71 of 79 PageID #:
1678

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(6)(A) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS FOUR THROUGH SEVEN

163.    The United States hereby gives notice to the defendant charged in Counts Four through Seven that, upon her conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(6)(A), Title 8, United States Code, Section 1324(b) and Title 28, United States Code, Section 2461(c), which require the forfeiture of: (a) any conveyance, including any vessel, vehicle or aircraft used in the commission of such offenses; (b) any property, real or personal: (i) that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of such offenses; or (ii) that is used to facilitate, or is intended to be used to facilitate, the commission of such offenses; and (c) the gross proceeds of such offenses, and any property traceable to such proceeds.

164.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

71

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 73 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116995Filed 06/25/25    Page 72 of 79 PageID #:
1679

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendant up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 8, United States Code, Section 1324(b); Title 18, United States Code,

Sections 982(a)(6)(A) and 982(b)(1); Title 21, United States Code, Section 853(p); Title 28, United

States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT TWELVE

165.    The United States hereby gives notice to the defendant charged in Count

Twelve that, upon his conviction of such offense, the government will seek forfeiture in accordance

with Title 18, United States Code, Section 982(a)(2)(A), which requires any person convicted of

such offense, to forfeit any property constituting, or derived from, proceeds obtained directly or

indirectly as a result of any such offense, including but not limited to:

a.      all right, title and interest in the real property and premises located

at █████████ Manhasset, New York 11030, together with its appurtenances, improvements,

fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits

therefrom, and all proceeds traceable thereto;

b.      all right, title and interest in the real property and premises located

at ███████████████████ Honolulu, Hawaii 96814, together with its

72

Case 1:24-cr-00346-BMC   Document 143   Filed 08/04/25   Page 74 of 80 PageID #:
Case 1:24-cr-00346-BMC   Document 116-96 Filed 06/25/25   Page 73 of 79 PageID #:
1680

appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well
as all leases, rents and profits therefrom, and all proceeds traceable thereto;

        c.    all right, title and interest in the real property and premises located
at ███████████ Forest Hills, New York 11375, together with its appurtenances,
improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents
and profits therefrom, and all proceeds traceable thereto;

        d.    approximately $2,615.34 seized on or about July 22, 2024 from
Bank of America account number ending in 3645, held in the name of █████████████
and all proceeds traceable thereto;

        e.    approximately $13,972.36 seized on or about July 22, 2024 from
Bank of America account number ending in 6999, held in the name of █████████████
███ and all proceeds traceable thereto;

        f.    approximately $5,639.40 seized on or about July 22, 2024 from
Bank of America account number ending in 4999, held in the name of █████████████
███ and all proceeds traceable thereto;

        g.    approximately $1,001.30 seized on or about July 22, 2024 from
Citibank N.A. account number ending in 6888, held in the name of "Chris Hu, Linda Hu," and all
proceeds traceable thereto;

        h.    approximately $13,420.36 seized on or about July 22, 2024 from
Citibank N.A. account number ending in 1165, held in the name of "Chris Hu, ITF Linda Hu," and
all proceeds traceable thereto;

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 75 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116997Filed 06/25/25    Page 74 of 79 PageID #:
1681

      i.     approximately $46,269.00 seized on or about July 22, 2024 from Merrill Lynch account number ending in 8X72, held in the name of "Chris Hu," and all proceeds traceable thereto;

      j.     one 2024 Ferrari Roma, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, from Manhasset, New York;

      k.     one 2024 Range Rover/L460, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, from Manhasset, New York;

      l.     one 2022 Mercedes GLB250W4, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, from Manhasset, New York;

      m.     approximately $10,015.00 in United States currency, seized by law enforcement on or about July 22, 2024, from Manhasset, New York; and

      n.     approximately $130,100.00 in United States currency, seized by law enforcement on or about July 22, 2024, from safe deposit box number 8786, maintained at the TD Bank located at ▮▮▮▮▮▮▮▮▮ Flushing, New York.

      166.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 76 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116998 Filed 06/25/25    Page 75 of 79 PageID #:
1682

e.      has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(2)(A) and 982(b)(1); Title 21, United

States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT THIRTEEN

167.    The United States hereby gives notice to the defendant charged in Count

Thirteen that, upon his conviction of such offense, the government will seek forfeiture in

accordance with: (a) Title 18, United States Code, Section 982(a)(2)(B), which requires any person

convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained

directly or indirectly as a result of such offense; and (b) Title 18, United States Code, Section

1028(b)(5), which requires any person convicted of such offense to forfeit any personal property

used or intended to be used to commit the offense.

168.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 77 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116999Filed 06/25/25    Page 76 of 79 PageID #:
1683

e.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2)(B), 982(b)(1) and 1028(b)(5); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS FOURTEEN THROUGH SEVENTEEN

169.    The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts Fourteen through Seventeen, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of either such offense to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to:

a.      all right, title and interest in the real property and premises located at ▮▮▮▮▮▮▮▮ Manhasset, New York 11030, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto;

b.      all right, title and interest in the real property and premises located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Honolulu, Hawaii 96814, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto;

76

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 78 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 116    Filed 06/25/25    Page 77 of 79 PageID #:
1684
1690

      c.     all right, title and interest in the real property and premises located

at ███████████████ Forest Hills, New York 11375, together with its appurtenances,

improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents

and profits therefrom, and all proceeds traceable thereto;

      d.     approximately $2,615.34 seized on or about July 22, 2024 from

Bank of America account number ending in 3645, held in the name of ██████████████

and all proceeds traceable thereto;

      e.     approximately $13,972.36 seized on or about July 22, 2024 from

Bank of America account number ending in 6999, held in the name of ███████████████

████ and all proceeds traceable thereto;

      f.     approximately $5,639.40 seized on or about July 22, 2024 from

Bank of America account number ending in 4999, held in the name of ███████████████

████ and all proceeds traceable thereto;

      g.     approximately $1,001.30 seized on or about July 22, 2024 from

Citibank N.A. account number ending in 6888, held in the name of "Chris Hu, Linda Hu," and all

proceeds traceable thereto;

      h.     approximately $13,420.36 seized on or about July 22, 2024 from

Citibank N.A. account number ending in 1165, held in the name of "Chris Hu, ITF Linda Hu," and

all proceeds traceable thereto;

      i.     approximately $46,269.00 seized on or about July 22, 2024 from

Merrill Lynch account number ending in 8X72, held in the name of "Chris Hu," and all proceeds

traceable thereto;

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 79 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 112-001 Filed 06/25/25    Page 78 of 79 PageID #:
1685

j.    one 2024 Ferrari Roma, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, in Manhasset, New York;

k.    one 2024 Range Rover/L460, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, in Manhasset, New York;

l.    one 2022 Mercedes GLB250W4, bearing Vehicle Identification Number ▮▮▮▮▮▮▮▮ seized by law enforcement on or about July 22, 2024, in Manhasset, New York;

m.    approximately $10,015.00 in United States currency, seized by law enforcement on or about July 22, 2024, from Manhasset, New York; and

n.    approximately $130,100.00 in United States currency, seized by law enforcement on or about July 22, 2024, from safe deposit box number 8786, maintained at the TD Bank located at ▮▮▮▮▮▮▮▮ Flushing, New York.

170.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

Case 1:24-cr-00346-BMC    Document 143    Filed 08/04/25    Page 80 of 80 PageID #:
Case 1:24-cr-00346-BMC    Document 118-002 Filed 06/25/25    Page 79 of 79 PageID #:
1686

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

FOREPERSON

by Alejandra Smith, Assistant U.S. Attorney
JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

79