AFM:AAS/RMP/ADR/AS
F. #2021R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

 UNITED STATES OF AMERICA                    Cr. No. 24-346 (BMC)

        - against -

 LINDA SUN and CHRIS HU,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
PRETRIAL MOTIONS *IN LIMINE*


                                JOSEPH NOCELLA, JR.
                                United States Attorney
                                Eastern District of New York


Alexander A. Solomon
Robert M. Pollack
Andrew D. Reich
Amanda Shami
Assistant U.S. Attorneys

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

 I.  Evidence of Sun's Activities in the PRC Is Relevant and Admissible ................... 1

 II.  Activity Intended to "in any way influence . . . any section of the public within the United States" Includes Public and Nonpublic Acts Directed Toward State Lawmakers ................................................................................................... 5

 III.  Evidence About CC-1 and Association-1 Is Relevant and Admissible ................. 7

 IV.  Evidence of Gifts and Benefits from the PRC Government and the CCP Is Admissible ............................................................................................................. 8

 V.  Coconspirator Statements by PRC Consular Officials Are Admissible .............. 10

 VI.  Evidence of Wealth and Luxury Goods Is Admissible........................................ 12

 VII.  Sun's Violations of FARA Constituted a National Security Threat ..................... 16

 VIII.  Professor Ku's Testimony Is Admissible ............................................................ 17

   A.  Background ............................................................................................... 17

   B.  Legal Standard ......................................................................................... 18

   C.  Argument ................................................................................................. 19

     1.  Professor Ku's Testimony Is Appropriate Under Rule 702 .......... 19

     2.  Professor Ku's Methodology Is Sound ......................................... 23

     3.  The Proposed Expert Testimony Passes Muster Under Rule 403 Balancing ...................................................................................... 25

 CONCLUSION.................................................................................................................... 26

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

18-CR-0578 (JS),
    2023 WL 3092915 (S.D.N.Y. Apr. 26, 2023) ......................................................... 14

21-CR-446 (VSB),
    2025 WL 1094496 (S.D.N.Y. Apr. 11, 2025) ......................................... 13, 14, 15, 16

*Andrews v. Metro N. Commuter R. Co.*,
    882 F.2d 705 (2d Cir. 1989) ................................................................................... 18

*Attorney General of United States v. Irish Northern Aid Committee*,
    668 F.2d 159 (2d Cir. 1982) ................................................................................... 10

*Attorney General of United States v. Wynn*,
    636 F. Supp. 3d 96 (D.D.C. 2022) ...................................................................... 5, 6

*Corley v. United States*,
    556 U.S. 303 (2009) ................................................................................................. 5

*Elsaca*,
    927 F.3d 108 (2d Cir. 2019) ..................................................................................... 3

*Gebardi v. United States*,
    287 U.S. 112 (1932) ............................................................................................... 10

*Katt v. City of New York*,
    151 F. Supp. 2d 313 (S.D.N.Y. 2001) ................................................................... 24

*Levinson v. Islamic Republic of Iran*,
    443 F. Supp. 3d ..................................................................................................... 24

*RJR Nabisco, Inc. v. European Community*,
    579 U.S.  (2016) ....................................................................................................... 2

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
    362 F. Supp. 2d 168 (D.D.C. 2005) ................................................................. 23, 24

*United States v. Adelglass*,
    2024 WL 5087519 (2d Cir. Dec. 12, 2024) ........................................................... 14

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994) ................................................................................... 19

*United States v. Ayers*,
 No. 20 Cr. 239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) .................................. 13

*United States v. Carboni*,
 204 F.3d 39 (2d Cir. 2000) ....................................................................................................... 3

*United States v. Castillo*,
 924 F.2d 1227 (2d Cir. 1991) .................................................................................................. 20

*United States v. Craig*,
 401 F. Supp. 3d 49 (D.D.C. 2019) .................................................................................... 16, 17

*United States v. Eng*,
 997 F.2d 987 (2d Cir. 1993) ................................................................................................... 14

*United States v. Harris*,
 838 F.3d 98 (2d Cir. 2016) ....................................................................................................... 5

*United States v. Hoskins*,
 902 F.3d 69 (2d Cir. 2018) ..................................................................................................... 11

*United States v. James*,
 607 F. Supp. 3d 246 (E.D.N.Y. 2022) ................................................................ 13, 14, 15, 16

*United States v. Maldonado-Rivera*,
 922 F.2d 934 (2d Cir. 1990) ................................................................................................... 12

*United States v. McGoff*,
 831 F.2d 1071 (D.C. Cir. 1987) .......................................................................................... 2, 16

*United States v. Pascarella*,
 84 F.3d 61 (2d Cir. 1996) ......................................................................................................... 3

*United States v. Paulino*,
 445 F.3d 211 (2d Cir. 2006) ..................................................................................................... 4

*United States v. Pollok*,
 139 F.4th 126 (2d Cir. 2025) .................................................................................................. 20

*United States v. Quattrone*,
 441 F.3d 153 (2d Cir. 2006) ................................................................................................... 13

*United States v. Rafiekian*,
 991 F.3d 529 (4th Cir. 2021) ............................................................................................... 6, 9

*United States v. Ray*,
 20-cr-110 (LJL), 2022 WL 558146 .................................................................................. 22, 25

*United States v. Tao*,
   No. 19-20052-JAR, 2022 WL 252019 (D. Kan. Jan. 27, 2022) ............................................... 16

*United States v. Zhong*,
   26 F.4th 536 (2d Cir. 2022) .......................................................................................................... 18

<u>Statutes</u>

22 U.S.C. § 611(c)(1) ...................................................................................................................... 2, 8

22 U.S.C. § 611(c)(1)(i) ...................................................................................................................... 2

22 U.S.C. 614(e) ................................................................................................................................... 6

U.S.C. § 611(o) .................................................................................................................................... 6

<u>Rules</u>

Fed. R. Evid. 702(a) .................................................................................................................. 18, 19

Fed. R. Evid. 703 ................................................................................................................................ 23

PRELIMINARY STATEMENT

In their motions *in limine* ("Def. Br.") (ECF No. 171), the defendants reprise the erroneous statutory arguments about the Foreign Agents Registration Act ("FARA") that they first raised—and which the Court rejected—on their pretrial motion to dismiss, this time seeking to eviscerate the same FARA charges by precluding evidence of the crimes and expert testimony that properly contextualizes the underlying conduct. The Court should not countenance the defendants' strained statutory readings or exceedingly narrow interpretation of relevance. The defendants' motions *in limine* should be denied in their entirety.

I.      Evidence of Sun's Activities in the PRC Is Relevant and Admissible

As outlined in the government's pretrial motions *in limine*,[1] evidence of the defendant Linda Sun's activities in the People's Republic of China ("PRC") is admissible at trial both as direct evidence of the charged FARA violations and, in the alternative, under Rule 404(b) of the Federal Rules of Evidence. (*See* ECF No. 172 at 51-58. Sun's actions during these trips are direct evidence of the background of the conspiracy; her relationship of trust with the coconspirators identified in the Third Superseding Indictment ("S-3") as CC-1 and CC-2; CC-1 and CC-2's status as principals of the PRC government or the Chinese Communist Party ("CCP"); and the undisclosed benefits Sun and her family received from CC-1, CC-2, the PRC government, and the CCP.

The defendants' contrary argument as to relevance relies on a gross distortion of the statutory language.[2] While it is true that FARA defines "agent of a foreign principal" to include

---

[1]     The government is not alleging, and will not argue, that Sun's activities outside the United States constituted FARA-registerable conduct, but, instead, are evidence of the FARA agency relationship, an element of the charged FARA violations.

[2]     In a footnote, the defense also contends that the government has waived an argument on the use of foreign activity to show FARA violations by not responding to an assertion

1

a person who "engages within the United States in political activities for or in the interests of [a] foreign principal," 22 U.S.C. § 611(c)(1)(i), thereby lacking extraterritorial application, nothing in the statute limits *the relevance* or admissibility of evidence regarding foreign-based activity by a criminal defendant. Rather, the statute specifies that only an agent's activities "within the Unites States" constitute registerable conduct and require disclosure. 22 U.S.C. §§ 611(c)(1)(i)-(iv).

The defendants' suggestion that admissible facts in a FARA prosecution are limited uniquely to domestic activities defies common sense and relevant case authority. Foreign principals often cultivate relationships with their agents while on foreign soil, including through the provision of benefits that are conveyed or received outside the United States. Under the defendants' proposed reading, the government could only introduce evidence of the relationship of trust—or the fact that coconspirators' "activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal," 22 U.S.C. § 611(c)(1)—if all the background evidence, including evidence of improper benefits, is entirely domestic. That absurd result is antithetical to the statute's intended purpose: to assist "government officials and the public generally . . . to identify those who act on behalf of a foreign principal." *United States v. McGoff*, 831 F.2d 1071, 1074 (D.C. Cir. 1987).

The defendants' reliance on the Supreme Court's holding in *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016), is misplaced. There, the Court held that the Racketeer

_____

Sun first obliquely raised in a single sentence in her unsuccessful pretrial motion to dismiss. (Def. Br. at 4 n.5). In fact, the defense answered that assertion themselves in a footnote to that sentence by speculating (correctly) that "[d]oubtless the government would insist that" the foreign conduct was "relevant to such violations." (ECF No. 46, at 13 n.14). That is exactly right—indeed, the defense seems to concede the point in that footnote (*Id.* ("Fair enough.")). Of course, the defense has not cited any criminal prosecution in which a court has deemed a legal argument waived by the government in a remotely comparable circumstance, especially where the government has affirmatively raised the issue in its own motions *in limine*.

Influenced and Corrupt Organizations Act has extraterritorial reach whenever underlying predicates apply extraterritorially. Most notably, the Court did not rule—and has never ruled—that evidence of any foreign conduct is *per se* inadmissible in actions under statutes with solely domestic application. Indeed, in domestic applications of law involving both domestic and foreign conduct, the Second Circuit has instructed district courts to decide whether domestic or foreign conduct has "primacy for the purposes of the extraterritoriality analysis." *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) (citation omitted). In improper extraterritorial applications of law, the domestic conduct cannot be "merely incidental" or "simply a necessary characteristic" of the statutory violation. *Id.* There is no improper extraterritorial application of FARA here.

As discussed in the government's motions *in limine*, Sun's trips to the PRC sponsored by CC-1 and CC-2 are direct evidence her agency, a necessary element of the charged FARA violations. As a result of her agency relationship with CC-1 and CC-2, Sun and her family received undisclosed benefits from CC-1 and CC-2 on behalf of the PRC government and the CCP, most of which were conferred in the PRC. These benefits included deluxe travel arrangements and assistance to Chris Hu's PRC-based business activities—which is the basis for the laundering of FARA proceeds charged in Count Fourteen. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (direct evidence includes evidence that is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial"). Additionally, evidence of the travel demonstrates the relationship of trust between Sun and her coconspirators. *See United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996). For example, Sun, CC-1, and CC-2 attended the 70th anniversary celebration of the PRC in Beijing; CC-2 paid for Sun's lodging in the PRC and coordinated her travel within the PRC. (S-3 ¶¶ 99-102). Further,

Sun's conduct in the PRC also constitutes evidence of intent, motive, opportunity, and common plan, where such evidence underscores Sun's economic motivations to violate FARA.

       The defense's arguments against relevance ring hollow. Their conclusory claim that Sun's activities in the PRC were in furtherance of her official job functions, (Def. Br. at 5), is belied by the fact that Sun did not disclose to the New York State ("NYS") government her participation in events organized by the PRiC government where she ostensibly acted in her official capacity. Similarly, Sun failed to disclose her appointment by CC-2 to the All-China Federation of Returned Overseas Chinese ("ACFROC"), which is an agency of the United Work Front Department ("UFWD"). (S-3 ¶ 80, 103, 106).

       Also unpersuasive is Sun's argument that the government intends to prove the defendants' guilt through "innuendo" by virtue of "her association with Chinese people." (Def. Br. at 5). Rather, trial proof will establish that Sun acted as an agent of the PRC government and the CCP through CC-1 and CC-2. To prove the agency relationship, in part, the government intends to offer evidence of Sun's attendance at PRC governmental events together with CC-1 and CC-2 during undisclosed trips coordinated by CC-1 and CC-2. Nor is the conduct in the PRC more inflammatory than the other alleged conduct, which includes, among other items, Sun's forgery of two invitation letters on NYS executive chamber letterhead, her boasts to PRC consular officials that she was acting to prevent Taiwanese governmental authorities' meetings with the NYS executive chamber, her efforts to allow a PRC consular official to surreptitiously listen to a nonpublic NYS government call on the COVID-19 pandemic, and her repeated requests for and receipt of benefits from PRC consular officials. *Cf., e.g.*, *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (evidence admissible pursuant to Rule 404(b) should not be excluded on the

ground of unfair prejudice when the evidence does not "involve conduct more inflammatory than the charged crime[s]").

II.   Activity Intended to "in any way influence . . . any section of the public within the United States" Includes Public and Nonpublic Acts Directed Toward State Lawmakers

As discussed in the government's pretrial motions *in limine*, the Court should reject the defense's strained reading of FARA's statutory language to contend that only "public"—rather than nonpublic—activities are covered by FARA and that any of Sun's political activities directed at NYS lawmakers and officials are not covered by FARA. In their motions *in limine*, the defendants offer several new arguments in support of this artificially narrow statutory interpretation. None has merit.[3]

*First*, the defendants argue that "any section of the public within the United States" means the "broader citizenry." (Def. Br. at 8). However, the defendants ignore the phrase's use of the words "any section of," which necessarily modify the phrase to mean *any part* of the population, including NYS lawmakers themselves (and, through them, other parts of the public). Indeed, the defendants' construction of the phrase "any section of the public" to be synonymous with "the public" renders the words "any section of" impermissible surplusage. *Cf. United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (describing well-settled law that courts should interpret statutes "so that no part will be inoperative or superfluous, void or insignificant" (quoting *Corley v. United States,* 556 U.S. 303 (2009)). The commonsense reading that "any section of the public" includes NYS lawmakers is consistent with the court's remarks in *Attorney General of United*

---

[3]    As with their argument regarding admission of foreign-based activities under FARA, the defense again asserts in a footnote—without citing any relevant authority—that the government waived its position, absent a response to Sun's assertion to the contrary in her pretrial motion to dismiss. The Court should decline this unsupported invitation to drastically narrow the direct evidence of the charged crimes. The government has already affirmatively moved to preclude this line of argument in its pretrial motions *in limine*. (*See* ECF No. 172).

*States v. Wynn*, 636 F. Supp. 3d 96 (D.D.C. 2022), that "nearly anyone who represents the political or public relations interests of a foreign principal in the United States is covered under FARA." *Id*. at 98.  Under this straightforward reading of the statute, various NYS lawmakers and officials constitute a "section of the public within the United States" that was targeted by Sun's domestic political activities.

       *Second*, assuming FARA only covers political activities directed at the "influencing the broader public," the defendants nonsensically argue that the only applicable activities are public in nature and that nonpublic communications or actions among NYS officials would therefore be precluded.  (Def. Br. at 9).  Even assuming that "any section of the public of the United States" means the defense's definition of "broader citizenry"—which it does not—common sense dictates that political activities are not limited solely to public communications.  Indeed, the plain statutory language defines "political activities" to include "*[a]ny* activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States."  22 U.S.C. § 611(o) (emphasis added).  Covered activities could thus include, for example, private meetings or communications with lawmakers, donors, or constituents that are intended to influence them directly and others through them.[4]  The defense points to no authority interpreting FARA or analogous statutory language in the creative manner that they urge on the Court.

       *Third*, the defense argues that including NYS lawmakers or officials in "any section of the public" will render superfluous the statutory reference to "any agency or official of the

---

[4]    FARA contemplates this elsewhere as well.  *See* 22 U.S.C. § 614(e) (imposing requirements for disseminating propaganda or making requests of government officials); *see also United States v. Rafiekian*, 991 F.3d 529, 545 (4th Cir. 2021) (holding circumstantial evidence sufficient to establish agency under 18 U.S.C. § 951; "Savvy operatives cover their tracks[.]").

Government of the United States." (Def. Br. at 8-9). That is not so. Just because federal officials or agencies constitute a separately enumerated group does not mean that state lawmakers and officials are implicitly excluded from the broader enumerated group. Indeed, nothing in FARA's statutory language suggests that state lawmakers or officials are not a "section of the public" or that such persons could not be the targets of covered political activity.

III.    Evidence About CC-1 and Association-1 Is Relevant and Admissible

The defense argues that the Court should preclude all evidence about CC-1 and the local Chinese association for which he acted as a principal (Association-1), relying entirely on a self-serving statement by CC-1 to law enforcement officers denying ties to the PRC government and rejecting the allegations in the instant matter. CC-1's conclusory statements to law enforcement—many of which are directly contradicted by his own electronic communications that are quoted in the Third Superseding Indictment—cannot preclude admission of evidence of the charged agency relationship.

As alleged in the Third Superseding Indictment, CC-1 repeatedly made clear to Sun that he was acting on behalf of the PRC government:

> [I]n April 2018, CC-1 informed SUN that CC-1 was then attending a "Belt & Road Initiative" round table meeting in Henan Province, PRC. In these communications, CC-1 indicated that CC-1's round table meeting in Henan Province was organized by five overseas Chinese affairs offices of the Henan Provincial People's Government, and that CC-1 was the only overseas Chinese person to represent Chinese people from Henan and would be giving remarks at the meeting.

(S-3 ¶ 44). As alleged, other electronic communications illustrate CC-1's membership in the UFWD; interlocutors included officials in Henan Province who provided directions to CC-1 regarding the targeting of the NYS executive chamber. (S-3 ¶¶ 55, 62). Further demonstrating CC-1's relationship with the PRC government and the CCP, CC-1 arranged for Sun to travel to

the PRC to attend UFWD events together with CC-1, including a 70th anniversary celebration of the founding of the PRC. (S-3 ¶¶ 98-105).

In short, given the detailed allegations in the Third Superseding Indictment regarding CC-1's activities that were "directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal," 22 U.S.C. § 611(c)(1), the Court should deny the defendants' pretrial motion to exclude evidence regarding CC-1 and Association-1. Moreover, where the Third Superseding Indictment provides an ample pretrial proffer as to evidence implicating CC-1 as a foreign principal, the Court should reject the defendants' conclusory argument—which is unsupported by case law—that Rule 104 of the Federal Rules of Evidence requires pretrial determinations of admissibility concerning evidence regarding CC-1 or Association-1.

IV.    Evidence of Gifts and Benefits from the PRC Government and the CCP Is Admissible

Reasserting another of its argument from the motion to dismiss, the defense contends that evidence of gifts or benefits from the PRC government or the CCP is inadmissible absent proof of a nexus to a specific directive or request. The Court should reject the defendants' efforts to read into the FARA statute unrelated requirements for corruption statutes such as honest services wire fraud or federal program bribery.

As the government argued in opposing Sun's motion to dismiss, the Court should reject the defense's efforts to read into the FARA statute components of public corruption statutes, including the proposed requirements of a *quid pro quo* and specific timing and linkage of any bribe or gratuity. The Supreme Court's recent statutory interpretations of the gratuity, bribery, and honest services wire fraud statutes have no bearing on the scope of agency under FARA—a foreign influence statute which shares none of the elements of these public corruption statutes, none of which require proof of an agency relationship. The agency relationship that is relevant to FARA

8

naturally can be established by direct and circumstantial evidence of a relationship and a flow of benefits. By similar reasoning, the Fourth Circuit has cited the contractual negotiations between a defendant and Turkish officials and the expectation of a follow-on contract as persuasive circumstantial evidence of the agency relationship. *United States v. Rafiekian*, 991 F.3d. 529, 545 (4th Cir. 2021). As alleged in the Third Superseding Indictment, Sun and her family's repeated receipt of undisclosed benefits from the PRC government and the CCP constitutes compelling circumstantial evidence of the charged agency relationship, and it is thus relevant and admissible.

Entirely unpersuasive are the defense's arguments based on the National Security Division's guidance on the scope of FARA. *See* "Scope of Agency," U.S. Dep. of Justice, Nat'l Security Div. (May 2020) ("Scope of Agency"), *available at* https://www.justice.gov/nsd-fara/page/file/1279836/dl. Nowhere does the guidance opine that gifts or benefits are "only relevant insofar as they suggest [Sun] was 'not acting independently.'" (Def. Br. at 14 (quoting Scope of Agency at 3)). And the guidance does not reflect that "benefits are probative of an agency relationship only if they were significant enough grant the PRC a 'level of power over an agent' or impose some 'obligation on the part of an agent to achieve the principal's request.'" (Def. Br. at 14 (quoting Scope of Agency at 3-4) (alterations omitted)).

Rather, the Scope of Agency indicates that when considering whether a "request" gives rise to an agency relationship under FARA, the Department of Justice considers numerous factors to distinguish independently motivated action, including whether the foreign principal's request is compensated. (Scope of Agency at 3). When considered collectively, "these circumstances must evince some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request." (*Id.*). Two of the phrases misleadingly cited by the defense—whether the foreign principal exerts a "level of power . . . over

9

the agent" or imposes an "obligation on the part of an agent to achieve the principal's request"—both emanate from this sentence that speaks to the overall assessment of the factors used to distinguish agency from independent action.  It does not purport to impose any evidentiary limitations or any limitations on the relevance of evidence that supports any single factor.  In other words, the guidance never suggests that benefits or compensation can be considered "only if they were significant enough to grant the PRC" power over Sun, as the defense would have it.  (Def. Br. at 14).  Nor did the Second Circuit, in *Attorney General of United States v. Irish Northern Aid Committee*, 668 F.2d 159 (2d Cir. 1982), create a nexus test between the compensation or benefits and the requested action, as the defense appears to imply.  (Def. Br. at 14).  In sum, evidence of benefits from principal to agent—whether gifts, gratuities, or other compensation—are probative of an agency relationship, and are therefore relevant and admissible, with or without evidence of a particularized *quid pro quo*.

V.    Coconspirator Statements by PRC Consular Officials Are Admissible

        The defendants contend again (as they contended in their motions to dismiss) that PRC consular officials are "excepted from the scope of FARA by an affirmative legislative policy" and therefore "cannot conspire to violate FARA," and that their out-of-court statements therefore cannot be admitted as coconspirator statements under Rule 801(d)(2)(E).  (Def Br. at 15).  Indeed, defendants claim that admitting statements of consular officials as coconspirator statements "would be an impermissible end-run around *Gebardi v. United States*, 287 U.S. 112 (1932)."  (*Id.* at 16).  But again, as explained at greater length in the government's opposition to the motions to dismiss (*see* ECF No. 161 at 5-9), the defendants are wrong about FARA (to which *Gebardi* is totally inapplicable) because they conflate exemption from FARA's individual registration requirements with a grant of criminal immunity.  FARA simply does not confer the latter.  The fact that consular officials need not register as a foreign agents under FARA *themselves*—because

10

their foreign agency is already declared to and recognized by the State Department, and FARA registration would therefore be redundant—does not authorize them to secretly procure the unregistered foreign agency of *others* whose foreign agency is not already declared to the government and the public and who *are* therefore obligated to register under FARA.

In short, an entity or individual unable to violate FARA *as an agent of principal* because it is exempt from the individual registration requirement is not therefore unable to conspire with (or aid and abet) an individual for whom no such exemption applies.[5]  This does not represent an "end-run around *Gebardi*."  The Supreme Court in *Gebardi* ruled that the Mann Act reflects an affirmative legislative policy to treat women who are transported for illegal sex as victims and not as parties to the crime—and thus that they cannot be coconspirators.  *Cf. United States v. Hoskins*, 902 F.3d 69, 78-80 (2d Cir. 2018) (further describing the "affirmative legislative policy to leave some type of participant in a criminal transaction unpunished" with the "classic illustration" of statutory rape).  But consular officials who secretly use (unregistered, non-exempt) cutouts to advance the interests of their foreign principals are not akin to sex trafficking victims who Congress did not wish to punish.  Notwithstanding the defendants' conclusory assertions to the contrary, FARA's exemption of consular officials from FARA registration does not reflect a policy "to leave some type of participant in a criminal transaction unpunished." *Id.* at 80.  It merely reflects a policy of not requiring redundant notice of foreign agency by individuals whose foreign agency is already publicly declared and acknowledged.  FARA confers no criminal immunity

---

[5]       As the government noted in opposition to the motions to dismiss (ECF No. 161 at 6 n.2), there may often be other obstacles to charging those who are exempt from individual registration with conspiring with (or aiding and abetting) others who are not exempt, including diplomatic immunity.  But the defendants concede (ECF No. 145 at 13-14) that individuals who enjoy diplomatic immunity *can* be coconspirators with individuals who do not, and no such immunity arises from FARA itself.

whatsoever, and thus consular officials who need not register under FARA themselves *can* conspire to violate the law with others who are not exempt from registration. The statements of such consular officials can properly be admitted as coconspirator statements under Rule 801(d)(2)(E).

Additionally, the defendants assert that in the absence of a recorded communication that constitutes a direct order or direction, "it is hard to see how any statements by PRC consular officials could be characterized as having been 'made during the course of and in furtherance of' any conspiracy," (Def. Br. 17-18), but this contention reflects a blinkered view of the Rule and is at odds with binding caselaw. The law is clear that "[i]n addition to the more obvious types of communications to implement a conspiratorial operation, statements between coconspirators that may be found to be in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *United States v. Maldonado-Rivera*, 922 F.2d 934, 958–59 (2d Cir. 1990). This is a flexible and common-sense standard, and many statements short of a command can therefore be statements in furtherance of the conspiracy insofar as they tend to foster the relationship of trust among coconspirators.

For all of these reasons, and those stated in the government's opposition to the motions to dismiss, the Court should reject defendants' arguments that the statements of consular officials cannot be admitted as coconspirator statements.

## VI. Evidence of Wealth and Luxury Goods Is Admissible

Contrary to the defendants' suggestion, the government does not contemplate introducing lifestyle evidence to appeal to class resentments. (Def. Br. at 18). Rather, the government intends to admit evidence of the defendants' assets—including their real estate holdings, their luxury automobiles, luxury goods with original packaging, and banking records—

as direct proof of the FARA, money laundering, and personal protective equipment ("PPE") fraud charges, and as evidence of motive and intent under Rule 404(b).

The Second Circuit has instructed that evidence of a defendant's lavish lifestyle and spending is properly admitted as direct proof of the charged crimes and as evidence of motive and intent under Rule 404(b), where the trial court imposes appropriate guardrails. "While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth." *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006).

Courts in this Circuit have repeatedly admitted evidence of opulent lifestyle as direct evidence of charged crimes. *See, e.g.*, *United States v. Franzone*, No. 21-CR-446 (VSB), 2025 WL 1094496, at *6 (S.D.N.Y. Apr. 11, 2025) ("With regard to Defendant's personal spending, evidence that Defendant utilized investor money for personal spending is direct evidence of misappropriation, and thus is admissible."); *United States v. Ayers*, No. 20 Cr. 239 (BMC), 2024 WL 1158686, at *15 (E.D.N.Y. Mar. 18, 2024) ("[P]hotographs and videos indicating unexplained and significant wealth are generally admissible in cases involving alleged narcotics distribution and theft. The Government correctly argues that such evidence is probative of the fact that defendants may have acquired the wealth illicitly."); *United States v. James*, 607 F. Supp. 3d 246, 264 (E.D.N.Y. 2022) ("The evidence may show that Defendant's funding for his personal spending came from a pre-existing, legitimate source of income, or, conversely from his business through which he carried out the alleged scheme. If the latter, then the wealth evidence is relevant to Defendant's motive to commit the alleged offenses.").

Similarly, courts have admitted such evidence under Rule 404(b) when appropriately cabined. For example, in *James*, Judge Seybert found that "evidence of wealth will be relevant to Defendant's motive to commit the fraud, identity theft, and money laundering charges here," but cautioned the government against introducing "'hundreds' of photographs of Defendant's properties and assets" and instructed the parties to propose a limiting instruction for the jury. *Id.* at 265; *see Franzone*, 2025 WL 1094496, at *6 ("I find that evidence of Franzone's spending, even if not directly misappropriated from investor funds, is probative of his motive to commit the fraud, and any potential prejudice can be overcome by a limiting instruction to the jury."); *United States v. Runner*, No. 18-CR-0578 (JS), 2023 WL 3092915, at *4 (S.D.N.Y. Apr. 26, 2023) (rejecting argument that "evidence of a lavish lifestyle is not relevant to motive, intent or any other Rule 404(b) purpose" and directing parties to propose a limiting instruction); *see also United States v. Adelglass*, 2024 WL 5087519, at *2 (2d Cir. Dec. 12, 2024) ("Here, evidence of Adelglass's lavish spending was probative of his motive, while evidence that he concealed income from the IRS was probative of his guilty mind and rebutted his defense that he was acting as a legitimate medical professional."); *United States v. Eng*, 997 F.2d 987, 991 (2d Cir. 1993) ("It is well settled in narcotics prosecutions, a defendant's possession and expenditures of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities.").

Here, the government intends to introduce the following categories of "lifestyle" evidence as direct evidence of the charged crimes and, in the alternative, to prove motive and intent:

- The defendants' real estate holdings, which were acquired or financed through laundered funds;

14

- The defendants' luxury automobiles, including a Ferrari and a Jeep, which were acquired through laundered funds;

- Financial transactions and cash seizures involving laundered funds; and

- Luxury goods in original packaging seized from the defendants' residence, some of which purchases can be traced to laundered funds.

Except for certain luxury goods, all "lifestyle" evidence is directly traceable to laundered funds and thus admissible as direct evidence of the charged crimes. *See Franzone*, 2025 WL 1094496, at \*6. Moreover, luxury goods retained in original packaging are a means of storing wealth, as they can be resold often above initial retail value and thus constitute an instrumentality of money laundering. *See* "Luxury Goods and Financial Crime," *Moody's* (May 31, 2024), *available at* https://www.moodys.com/web/en/us/kyc/resources/insights/intersection-luxury-goods-financial-crime.html (last visited Sept. 23, 2025) ("These items can serve as relatively easily acquired and easily transferrable assets, which can be used for the placement, layering, and integration stages of money laundering schemes."). Admission of evidence of the defendants' wealth is proper and passes muster under Rule 403, where the government will endeavor to limit its proof to certain photographs of the lifestyle evidence, summary charts of bank records, as well as a sampling of the cash and luxury goods seizures themselves, and the government will agree to an appropriate limiting instruction. *See James*, 607 F. Supp. 3d at 265.

Entirely ignoring the Second Circuit's holding in *Quattrone*, the defense relies primarily on out-of-Circuit authority to advance the incorrect proposition that the lifestyle evidence must be directly connected to the defendant's criminal activity to be admissible. As discussed above, courts in this Circuit have repeatedly held that such evidence is admissible under Rule 404(b) to establish motive and intent, even without a direct nexus. And even assuming *arguendo* that the luxury goods must be tied to criminal activity as a precondition for admissibility,

15

the Court should still reject the defendants' bald—and incorrect—assertion that the government "cannot" link any of the luxury items to "any particular offense." (Def. Br. at 19). At bottom, a dispassionate presentation of evidence and an appropriate limiting instruction will mitigate any concern about undue prejudice. *See James*, 607 F. Supp. 3d at 265.

VII.    <u>Sun's Violations of FARA Constituted a National Security Threat</u>

Sun is charged with violating and conspiring to violate FARA—which is a statute promulgated to protect U.S. national security by promoting transparency and public awareness regarding foreign influence in the United States. The statute facilitates the evaluation by the U.S. government and the American people of an agent's activities on behalf of a foreign principal in the United States, which would otherwise oftentimes remain covert. Accordingly, the government appropriately intends to argue that Sun's unregistered political activities targeted at NYS lawmakers and officials deprived her audience within the NYS government and the broader public of the opportunity to identify the linkage between her political acts and her agency relationship with the PRC government and the CCP. *See United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C. 2019) ("The purpose of the Act is to prevent covert influence over U.S. policy by foreign principals. Simply put, the statute ensures that the public is informed of the true source or sponsor behind the information being disseminated for its consideration."); *McGoff*, 831 F.2d at 1074 (purpose of FARA to assist the "government officials and the public generally . . . to identify those who act on behalf of a foreign principal.").

The primary case upon which the defense relies is inapposite. In *United States v. Tao*, No. 19-20052-JAR, 2022 WL 252019 (D. Kan. Jan. 27, 2022), the district court excluded expert testimony on an array of national security topics related to the PRC government, where the defendant was a professor charged with grant fraud. *Id.* at *6 ("But this is not an espionage prosecution, and the Government may not color the trial with national security overtones.").

16

Similarly, the defense misleadingly cites *Craig* to suggest that defendants charged under FARA have engaged in purely legal activity.  (Def. Br. at 21).  However, the next sentence of the opinion highlights the national security harm inherent in a willful failure to register: "But [foreign agents] are required to register, which simply means that they must disclose their activities and who paid for them."  *Craig*, 401 F. Supp. 3d at 52.

So too here.  Much of Sun's political activities would have been legal had she registered and disclosed them publicly, and the harm caused by her conduct is a "section of the public within the United States" unaware that she was taking actions on behalf of the PRC while ostensibly serving the people of the State of New York.  Accordingly, the government should be permitted to argue the plainly evident (and not unfairly prejudicial) national security harm caused by the statute Sun is charged with violating and conspiring to violate.

VIII.    Professor Ku's Testimony Is Admissible

The Court should deny the defense's efforts to exclude relevant expert testimony of Professor Julian Ku that would contextualize critical evidence and conduct underlying the FARA charges with specialized knowledge that would otherwise lie beyond the ken of the average juror.

A.    Background

As alleged, Sun maintained agency relationships with principals of the PRC Consulate and local Chinese associations; the principals of the Chinese associations were themselves members of ACFROC and the UFWD, both of which are components of the CCP.  At the behest of CC-1 and CC-2, Sun coordinated activities for various PRC governmental delegations visiting New York State and herself traveled to the PRC to participate in meetings with various governmental groups, including ACFROC and the UFWD.  Further, many of Sun's actions

17

as an agent of these foreign principals involved advocacy in furtherance of the CCP's official policy on Taiwan.

At trial, the government intends to elicit expert testimony from Professor Julian Ku explaining how the several entities cited above fall within or interact with the PRC government and the CCP, the significance of titles of various persons Sun interacted with in her capacity as an unregistered agent, and the CCP's official national security policy vis-à-vis Taiwan.  None of these issues constitute "lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

While Professor Ku's expert report contains several citations to allegations contained in the First Superseding Indictment, the purpose of the citations was to provide notice to the defense of the relevance of Professor Ku's expert opinion to evidence and areas of dispute in this case and to facilitate evaluation of his proposed testimony under Rule 702 of the Federal Rules of Evidence.  That said, the government does not intend to offer the report itself at trial or to elicit testimony from Professor Ku directly interpreting any of the evidence in this case.  *Cf. United States v. Zhong*, 26 F.4th 536, 556 (2d Cir. 2022) (explaining the appropriate use of an expert witness to, for instance, "explicate an organization's . . . structure" without interpreting the evidence).

B.    Legal Standard

Under Rule 702, an expert may testify if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "For an expert's testimony to be admissible under this Rule, however, it must be directed to matters within the witness'[s] scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

Therefore, "[a] district court may commit manifest error by admitting expert testimony where . . . the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).

      C.    <u>Argument</u>

          1.    <u>Professor Ku's Testimony Is Appropriate Under Rule 702</u>

The defense argues that much of Professor Ku's proposed testimony is irrelevant and improper insofar as it "is a primer on the internal workings of the CCP, including detailed descriptions of the Chinese constitution, the hierarchy of the Politburo, and the PRC's policies towards Taiwan." (Def. Br. at 25). In particular, the defense objects to Professor Ku's proposed testimony regarding the UFWD's partnerships with local Chinese associations in the United States, the PRC government's claim to Taiwan under PRC law and the PRC government's pattern of protesting engagement by U.S. and state officials with Taiwanese officials, and past visits by PRC government delegations organized by the UFWD.

However, as explained below, each of these items "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

*First*, evidence of Sun's activities on behalf of and interactions with PRC governmental officials will consist primarily of her own electronic communications. These communications repeatedly refer to various PRC governmental organizations—such as ACFROC and the UFWD—as well as titles of various government officials. While the government does not intend to elicit testimony from Professor Ku commenting on specific individuals referred to in these communications, his testimony would contextualize the officials' titles and roles within the PRC government. In sum, the testimony would materially assist the jury's effort to comprehend the trial evidence and assess whether Sun participated in the charged agency relationship. *See* Fed. R. Evid. 702(a). Similarly appropriate under Rule 702 is expert testimony regarding the

organizational missions of CCP entities such as ACFROC and the UFWD, including the UFWD's official activities on U.S. soil.  At bottom, the Court should allow expert testimony regarding "internal workings of the CCP, including detailed descriptions of the Chinese constitution, [and] the hierarchy of the Politburo."  (Def. Br. at 25); *see United States v. Pollok*, 139 F.4th 126, 140 (2d Cir. 2025) ("We have previously held in other contexts that this type of expert testimony on general background concepts is permissible under Rule 702 where it helps to explain or put into perspective characteristics and operating practices common to certain criminal conduct, with which a jury may not be familiar.").

*Second*, Professor Ku's testimony regarding the UFWD's cultivation of diaspora populations through local associations of overseas Chinese is reflected in official statements by the PRC government, as well as academic literature, journalistic reports, and governmental studies. (Ku Report ¶¶ 45-49).  Accordingly, testimony linking the UFWD and various organizations would not be, despite the defense's claims, "speculative."  (Def. Br. at 25).  Further, such testimony would be directly relevant to the issues of whether CC-1 and CC-2 were principals of the PRC government and the CCP and whether Sun acted as an agent, where CC-1 and CC-2 were principals of local Chinese associations closely tied with the UFWD, organized Sun's trips to the PRC to participate in official UFWD events, and arranged for visiting UFWD delegations from Henan Province to New York State.  To the extent the defense argues that the government seeks to impugn Sun through the "unrelated bad acts of others," (Def. Br. at 27), the proposed "expert testimony [would be] employed . . . for the permissible purpose of assisting the jury to understand the facts at issue, . . . rather [than] the impermissible purpose of encouraging the inference of . . . guilt from the behavior of unrelated persons," *United States v. Castillo*, 924 F.2d 1227, 1231 (2d Cir. 1991). Indeed, the government would not be impugning the activities of unrelated persons or entities but

rather would be contextualizing Sun's relationship with the UFWD and its members CC-1 and CC-2, based on official CCP statements and proclamations.

*Third*, expert testimony regarding the PRC government's legal claim to Taiwan and its national policy regarding engagement between U.S. or state officials and Taiwanese officials is directly relevant to the foreign principals' repeated requests to Sun on this subject. Professor Ku's explanation of the PRC government's official foreign policy will properly contextualize Sun's actions, including her efforts to limit engagement between the NYS executive chamber and Taiwanese government representatives, including by minimizing contact to a staff level—an issue for which she sought guidance from the PRC consulate. (*See*, *e.g.*, S-3 ¶ 29(h)).

*Finally*, the government responds below to specific concerns regarding each of the paragraphs from the expert report whose contents the defense seeks to exclude. (*See* Def. Br. at 31).

- *Paragraph 4*: The defense appears to object to Professor Ku's review of the First Superseding Indictment and press release, which information provides necessary context for the Court and the defense to evaluate Professor Ku's proposed expert testimony. Nonetheless, the government does not intend to elicit testimony concerning Professor Ku's review of these materials but rather will elicit testimony concerning the primary and secondary sources Professor Ku relied on in preparing the report.

- *Paragraph 10*: The defense appears to object to Professor Ku's linkage between the UFWD and the overseas associations headed by CC-1 and CC-2. The government does not intend to elicit testimony regarding these specific overseas associations. Rather, Professor Ku would testify that the fact that the UFWD provides such funding to such organizations is reflected in official statements by the PRC government, as well as academic literature, journalistic reports, and academic studies. Accordingly, testimony linking the UFWD and various overseas organizations would not be "speculative." (Def. Br. at 25).

- *Paragraphs 11 and 67*: The defense objects to the relevance of the PRC government's claim to Taiwan and its foreign policy as to federal and state officials. (Def. Br. at 25). However, the PRC government's claim to Taiwan underlies much of Sun's political activities on behalf of the PRC government and the CCP, and the proposed expert testimony properly

contextualizes the governmental directives and requests pertaining to Taiwan.

- *Paragraph 37*: The government does not intend to elicit testimony from Professor Ku regarding CC-2's membership in the Chinese People's Political Consultative Conference ("CPPCC") but rather will elicit testimony regarding qualifications for membership in the CPPCC based on Professor Ku's review of academic and journalistic sources. Such testimony would allow jurors to assess whether CC-2 is a foreign principal without direct testimony by Professor Ku regarding CC-2 himself.

- *Paragraph 48*: Professor Ku's proposed testimony regarding the relationship between the UFWD and the Council for Promotion of International Trade ("CPIT") is based on a report from the Central Intelligence Agency. Expert testimony regarding the relationship is necessary to contextualize Sun's meeting in 2016 with the Jiangsu chapter of CPIT. (*See* S-3 ¶ 94).

- *Paragraph 49*: Professor Ku's proposed testimony on the UFWD's targeting of overseas Chinese is based on 2020 CCP regulations and testimony of academics before the U.S. government.

- *Paragraph 51*: Professor Ku's proposed testimony regarding the relationship between the UFWD and the Overseas Chinese Affairs Office ("OCAO") is based on public documents disseminated by the PRC government. The government will not elicit testimony regarding a Canadian judicial finding that the UFWD engages in espionage and intelligence gathering.

- *Paragraph 53*: Professor Ku's proposed testimony regarding gift-giving by governmental authorities is based on various journalistic reports. This proposed testimony does not improperly opine as to an agency relationship involving Sun and is not based on Professor Ku's speculation. (Def. Br. at 27-28).

- *Paragraph 55*: Professor Ku's proposed testimony regarding visits by the UFWD to New York and San Francisco are generalized examples of UFWD activities in the United States that properly contextualize the meetings between the UFWD and Association-1 as part of the UFWD's core activities without improperly opining as to the meetings between the UFWD and Association-1. *See United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 558146, at *22 (S.D.N.Y. Feb. 24, 2022) ("The Court agrees that if Dr. Hughes were not permitted to use generalized examples or refer to limited number of anecdotes and statements that informed her expert opinion, it could be very difficult for her to convey her expert opinion in a manner that the jury will understand."). The government will not elicit any testimony

from Professor Ku regarding the meetings between Association-1 and the UFWD.

- *Paragraph 56*: The government does not intend to elicit testimony from Professor Ku regarding CC-1's interactions with Sun.

- *Paragraph 57*: Professor Ku's proposed testimony regarding the 70th anniversary celebration of the founding of the PRC is not speculative but rather is based on various secondary sources.

- *Paragraph 59*: The government only intends to elicit testimony from Professor Ku regarding qualifications for membership in the CPPCC, an organization CC-2 belonged to.

2.    Professor Ku's Methodology Is Sound

The defense's arguments against Professor Ku's methodology lack merit.  As discussed below, Professor Ku properly relied upon various primary and secondary sources in forming his expert opinion, and he did not fail to account for plausible alternative explanations.[6]

As an initial matter, the Court should reject the defense's assertion that Professor Ku's expert report is somehow infirm because it "summariz[es] information that anyone could obtain from media reports or government white papers rather than specialized expertise."  (Def. Br. at 28).

Courts have held that experts on foreign policy such as Professor Ku may rely on secondary sources where that approach is the industry standard.  In *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168 (D.D.C. 2005), the court found an expert's opinion on Libyan government policies appropriate, where the expert had relied on journalistic sources, among other sources:

> Although some of the documents Mr. Nudell relies on (e.g., newspaper articles) are almost certainly inadmissible, under Federal Rule of Evidence 703 the expert may rely on inadmissible evidence so long as experts in the same field reasonably rely on such evidence.  Fed. R. Evid. 703.  The proper question, then, is whether experts

---

[6]    The government addresses above the defense's argument that Professor Ku's opinion regarding gift-giving and compensation is unfounded.

in Mr. Nudell's field of foreign policy and terrorism analysis reasonably rely on newspaper articles to gather and analyze information on newsworthy events. The court determines that they do.

*Id.* at 177; *see Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 173-74 (D.D.C. 2020) (crediting expert opinion on Iran's practices based on case studies and reports from human rights organizations); *Katt v. City of New York*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (approving an expert report that relied, *inter alia*, on "books and newspaper reports" that the expert "had read in the course of over twenty years of academic research" and noting that "[s]uch data is of a type reasonably relied upon by experts in various disciplines of social science").

As noted above, Professor Ku relied on primary source materials—including official statements and public documents disseminated by the PRC government and the PRC constitution—as well as secondary sources, including newspaper articles and congressional testimony by other experts. Notably, many of these original sources are written in the Chinese language and thus would be relatively inaccessible to an average juror. Where experts in the same field rely on similar sources, the Court should permit Professor Ku's proposed testimony. *See Simpson*, 362 F. Supp. 2d at 177.

Finally, while claiming that Professor Ku fails to properly account for other plausible explanations, the defense fails to specify what in the expert report is purportedly deficient in that regard. Without specifying particulars, the defense simply asserts that Professor Ku's "narrative about wider CCP and UFWD influence operations, drawn from secondary reporting, paints with a broad brush and fails entirely to consider other plausible explanations for the conduct alleged in this case." (Def. Br. at 30). More is needed for the Court to preclude the sole expert testimony offered by the government on the lead charges in this case.

3.    <u>The Proposed Expert Testimony Passes Muster Under Rule 403 Balancing</u>

Pointing to the citations to allegations in Professor Ku's expert report, the defense argues that Professor Ku's testimony would usurp the role of the jury and "offer[] an unfounded an unreliable opinion about cherry-picked allegations from the [Indictment]."  (Def. Br. at 31).  However, as outlined above, the government does not intend to elicit testimony from Professor Ku regarding any specific allegations or evidence in the case.  *Cf. Ray*, 2022 WL 558146, at *23 ("Given that Dr. Hughes will not testify about Ray, his allegedly criminal conduct, or any statements made by the alleged victims, and given the lack of similarity of background (other than the alleged offense conduct) between Ray and the generalized examples that Dr. Hughes may use, there is little, if any, chance that the jury will hold Mr. Ray responsible for these other people and their actions." (citation omitted)).  Accordingly, the defendants' primary concern about unfair prejudice is moot.

To the extent the defense is unnecessarily concerned about stoking of Sinophobia, the proposed testimony is rooted primarily in the PRC government's formalized policies rather than in any examples of the PRC government's malign activities.  Simply put, this is not a case where the government seeks to smear the defendants by unfairly impugning Chinese people or the PRC government.

CONCLUSION

For the reasons set forth above, the Court should deny the defendants' pretrial motions *in limine*.

Dated: Brooklyn, New Yorks
      October 6, 2025

                                 Respectfully submitted,

                                 JOSEPH NOCELLA, JR.
                                 United States Attorney

            By:     /s/ Alexander A. Solomon
                                 Alexander A. Solomon
                                 Robert M. Pollack
                                 Andrew D. Reich
                                 Amanda Shami
                                 Assistant U.S. Attorneys
                                 (718) 254-7000