

**JARROD L. SCHAEFFER**
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

November 7, 2025

**By ECF**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   *United States v. Linda Sun, a/k/a "Wen Sun," "Ling Da Sun," and "Linda Hu," and Chris Hu*, S4 24 Cr. 346 (BMC) (TAM)

Your Honor:

We represent Linda Sun in the above-referenced matter and, on behalf of both defendants, respectfully submit this opposition to the government's motion for reconsideration of the Court's *in limine* rulings. (Dkt. 248.) The decisions challenged by the government were legally correct, reflected a reasoned and careful analysis, and balanced against other rulings in the government's favor that overruled objections by the defendants.

In short, the Court already got it right. Reversing its *in limine* rulings now would not only be legally incorrect, it would be unfairly prejudicial to the defendants. The government is not entitled to offer irrelevant or otherwise improper evidence at trial, no matter how helpful it thinks that evidence may be. The motion for consideration should be rejected.

## LEGAL STANDARD

As this Court recently explained, "to succeed on a motion for reconsideration, the moving party must point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-CV-5394 (BMC), 2025 WL 622546, at *1 (E.D.N.Y. Feb. 26, 2025) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)) (internal citations omitted). Thus, a "motion for reconsideration should be granted only when the moving party identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)) (cleaned up). Such motions "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* (citing *Shrader*, 70 F.3d at 257).

As this Court has also recognized, a more flexible standard sometimes may be appropriate for requests to reconsider *in limine* rulings. (Dkt. 248 at 1–2 (quoting *Funk v. Belneftekhim*, No. 14-CV-376, 2020 WL 5645190, at *6 (E.D.N.Y. Sept. 22, 2020)), *order vacated in part on recons.*, 2020 WL 7642868 (E.D.N.Y. Dec. 23, 2020), *clarified on denial of recons.*, 2020 WL 13891271 (E.D.N.Y. Dec. 30, 2020).)[1]  While that may be true in other circumstances, there is little reason for a more lenient standard here.  Unlike *Funk*, the *in limine* rulings here were not issued months earlier and the government's motion for reconsideration was not filed months before trial.  Nor have the parties in this case submitted a host of new facts that might warrant the Court revisiting its carefully reasoned holdings.  *Compare* 2020 WL 5645190 at *6.  *Funk* did not involve a motion for reconsideration based entirely on a party's disagreement with a recent ruling.

In this case, after receiving and reviewing more than 200 pages of briefing, the Court issued a reasoned decision that resolved the parties' *in limine* arguments according to the law and in a balanced manner consistent with the Court's discretion. A mere 48 hours later, the government moved for reconsideration based on its view that the Court had misunderstood the case, the arguments, the law, or a combination thereof.  The government does not cite any intervening change in law, nor does it identify new facts that the Court overlooked.  Instead, it reargues the same points it made previously.  Where, as here, a party seeks reconsideration based purely on disagreement with the Court's rulings, the defense respectfully submits that the traditional standard for reconsideration—which is intended to foster reliance by the parties and forestall repeat relitigation—should apply.

Regardless of the standard that is applied, however, because the Court's rulings were correct the government's motion for reconsideration should be denied.

## DISCUSSION

The government seeks reversal of three *in limine* rulings on the admissibility of evidence concerning (*i*) legislative acts by other components of the New York State government; (*ii*) alleged but uncharged fraud involving the so-called Associate Company; (*iii*) alleged gifts and benefits absent any factual connection to Ms. Sun's actions.  All of the government's arguments in favor of overturning the Court's rulings are meritless.

Additionally, the government seeks a supplemental *in limine* ruling barring any cross-examination of its witnesses regarding U.S. foreign policy with respect to Taiwan.  And it proffers certain allegations and exhibits in an effort to satisfy the Court's precondition for offering evidence or argument regarding CC-1's conduct or any involvement of Association-1.  Those efforts, too, are unavailing.

---

[1] The defense notes that *Funk* involved a series of decisions on motions for reconsideration, only one of which deals with motions *in limine*.  *See* 2020 WL 5645190 at *6.

### I. The Court Correctly Excluded Evidence of Nonbinding Legislative Resolutions

The Court correctly precluded the government from "offer[ing] evidence or argument about the NY legislature's supposed actions to improve bilateral relations with Taiwan." (Dkt. 238.) Such evidence is wholly irrelevant and poses substantial risks of jury confusion.

As the defense noted in connection with the *in limine* briefing, resolutions passed by the New York State legislature are irrelevant to the alleged offenses. (*See* Dkt. 190 at 23–24.) Ms. Sun was employed in the *executive* branch, views of New York's legislative branch are not indicative of the executive branch's views, and nothing in the government's motion explains its bare assertion that nonbinding legislative resolutions are somehow "relevant to the jury's determination of whether [Ms.] Sun was acting at the request of a foreign principal by blocking Taiwan's access *to the Executive Chamber* . . . ."[2] (Dkt. 248 at 3 (emphasis added).) Rather, as the Court correctly concluded, "none of the resolutions appear to have ever been adopted into legislation" and whether actions of the executive branch—or executive branch employees like Ms. Sun—were consistent with "those resolutions is irrelevant and would likely confuse the jury." (Dkt. 238 at 6–7.)

The government suggests that the Court failed to appreciate why it wants to offer the resolutions, but the reasons it offers are unpersuasive, confusing, or improper. The crux of its argument appears to be that nonbinding legislative resolutions are relevant because they "tend[] to refute that there was any uniform policy [Ms.] Sun was bound to follow," and so her actions related to Taiwan "were not simply dictated by federal or state policy that she was bound to follow . . . ." (Dkt. 248 at 2–3.) But that is a red herring.

Nonbinding legislative resolutions do not establish state policy. And regardless, no one has suggested that some "uniform" policy mandated actions supposedly taken by Ms. Sun. As the Court separately recognized—and the government does not challenge—whether Ms. Sun's "alleged conduct at issue ostensibly conforms with current federal foreign policy . . . is relevant to whether [she] knew she had to register with the Attorney General." (Dkt. 238 at 2 ¶ 3.) The same holds true for alleged conduct that conformed with policies and practices in the executive branch where Ms. Sun was employed. Evidence that elected officials in the legislative branch may have held different views, on the other hand, is irrelevant to Ms. Sun's state of mind or proof of agency. And, as the Court correctly found, allowing the government to introduce evidence of nonbinding legislative resolutions poses grave risks of juror confusion because it may—incorrectly and improperly—suggest that there *was* some binding state policy that Ms. Sun disregarded.

The government's lone example does not demonstrate that the Court erred. Quite the opposite, in fact. Referencing an anticipated email chain that it expects to offer at trial, the government argues that it shows Ms. Sun "direct[ing] others in the Executive Chamber to decline the invitation" to join an Assemblyman and others to recognize "Taiwan Heritage Day." (Dkt. 248 at 2.) But that is not a factually accurate description of the proposed exhibit.

---

[2]  Further reinforcing the irrelevance of such evidence, nothing in the indictment alleges anything at all about legislative resolutions. To the extent there are any allegations about state foreign policy, they focus on the executive branch. (*See* Dkt. 184 ("S-4") ¶ 29.)

The referenced exhibit (GX-2182) reflects an invitation to join an event related to Taiwan, but there were several purposes listed including discussing how to "[c]ombat anti-Asian hate" and "[c]onnect with and mobilize the Chinese/Taiwanese American community." Moreover, the invitation was not sent to Ms. Sun—it was sent to a regional representative for Politician-2 in Suffolk County, who then forwarded it on to the Deputy Secretary to Politician-2. The Deputy Secretary responded that "leg affairs needs to weigh in here" but that he "would not recommend this meeting" for Politician-2. Only after that was the invitation circulated to Ms. Sun and her colleague, seeking their "input as well." And Ms. Sun merely agreed with the response *already* given by the Deputy Secretary, saying "No meeting please. Kindly decline. Do not want her to wade into this China/Taiwan sensitivity. Thanks all!"

Far from showing some error by the Court, the government's example actually reinforces why its ruling was correct. Ms. Sun's response in GX-2182 comes after a different executive branch official already recommended against the meeting that the government faults Ms. Sun for discouraging. Her actions thus were *consistent* with executive branch views but, according to the government, *inconsistent* with a nonbinding legislative resolution that later followed. As the Court correctly concluded, evidence of that resolution "is irrelevant and would likely confuse the jury." (Dkt. 238 at 6–7.)

## II. The Court Correctly Excluded Evidence of Uncharged Fraud Involving the Associate Company

The Court correctly precluded the government from "offer[ing] evidence or argument about the uncharged fraud involving the Associate Company." (Dkt. 238 at 7 ¶ 14(d).) As an initial matter, the S-4 clearly charges *only* offenses pertaining to the Cousin Company. (*See* S-4 ¶¶ 143 (specifically referencing "the Cousin Company"), 145 (same), 147–48 (same).) The Supreme Court has repeatedly emphasized that a defendant has a "substantial right to be tried only on charges presented in an indictment[.]" *Stirone v. United States*, 361 U.S. 212, 217 (1960). And as the Court correctly found, the alleged fraud concerning the Associate Company "involved different parties and different types of transactions" and is "not inextricably linked" with the fraud alleged with respect to the Cousin Company. (Dkt. 238 at 8 ¶ 14(d) (quoting *United States v. Kurland*, No. 20 Cr. 0306, 2022 WL 2669897, *5 (E.D.N.Y. July 11, 2022) (internal quotation marks omitted)). Permitting the government to introduce evidence of a separate, uncharged scheme supposedly involving different transactions, different counterparties, and different alleged actors would be legally improper.

None of the government's arguments reveal any error by the Court. To the contrary, the government's motion contains significant mistakes regarding what the S-4 actually alleges, which bear directly on this issue. Those errors alone undermine all of the government's arguments.

In its ruling, the Court properly differentiated the alleged frauds involving the Cousin Company and the Associate Company by pointing out that "the Cousin Company fraud is based only on an act – doctoring the third party's email – and the Associate Company fraud is also based on a mental state – knowledge that the Associate Company was never referred by the Chinese chamber of commerce." (*Id.*) In its motion, the government claims that the Court "erred in distinguishing" the frauds in that way, because "[a]s alleged in the S-4 Indictment, [Ms.] Sun misrepresented to procurement officials that the Associate Company 'came recommended by

Jiangsu Department of Commerce' when she knew that it had not." (Dkt. 248 at 4 (quoting S-4 ¶¶ 125, 148(b)).) But the allegations the government cites confirm that the Court was right:

> 125. On or about March 24, 2020, . . . SUN wrote to NYS procurement officials that *the Cousin Company* "came recommended by Jiangsu Chamber of Commerce," that the representative had helped "screen potential vendors," and that *the Cousin Company's* surgical mask was the "gold standard." [ . . . ] The email also included a draft contract with *the Cousin Company*. As a result of the email, the procurement official wrote an email to the internal procurement function stating, "For approval and expedite[d] purchasing."
>
> 148. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LINDA SUN, also known as "Wen Sun," "Ling Da Sun," and "Linda Hu," and CHRIS HU, together with others, did commit and cause the commission of, among others, the following:
>
> [ . . . ]
>
> b. On or about March 24, 2020, in an email with the subject line "Already VERIFIED by Linda Sun," SUN wrote to NYS procurement officials that *the Cousin Company* "came recommended by Jiangsu Chamber of Commerce," that the representative had helped "screen potential vendors," and that *the Cousin Company's* surgical mask was the "gold standard."

(S-4 ¶¶ 125 (emphasis added), 148(b) (emphasis added).) Contrary to the government's assertion, there is no reference to the Associate Company anywhere in the cited allegations. And nothing else "alleged in the S-4 Indictment" claims that Ms. Sun made misrepresentations to procurement officials regarding the Associate Company. In sum, the government is mistaken and the Court was correct.

Nor is the government correct that "it would not be possible for the government to present evidence of the Cousin Company fraud without also presenting evidence relating to the Associate Company fraud" or that "[t]he evidence would be nearly impossible to untangle." (Dkt. 248 at 3.) Here, the government claims that it "intends to introduce evidence that, after steering DOH contracts toward both companies, [Ms.] Sun emailed NYS accounts payable personnel repeatedly to ensure payments were made" and "[i]n fact, these emails were charged as overt acts in Count Eleven of the Indictment." (*Id.* (quoting S-4 ¶¶ 148(c)–(o), (q), (r)).) Again, however, the government appears to have misread its own allegations. The cited portions of the S-4 all allege overt acts that *exclusively* mention "the Cousin Company." (*See* S-4 ¶¶ 148(c) ("On or about April 7, 2020, at approximately 10:29 a.m., SUN wrote an email to NYS accounts payable personnel seeking an update on the status of payment to *the Cousin Company*." (emphasis added)); *accord id.* ¶¶ 148(d)–(o), (q), (r).) Not one of the cited overt acts even mentions the Associate Company.

The government is also incorrect that the Associate Company fraud "arose out of the same transaction or series of transactions as the charged offense . . . ."[3] *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)). As the S-4 itself reflects, the Cousin Company and the Associate Company entered into separate contracts with New York, received separate payments for distinct products, were paid different amounts, and received contract payments via separate wires. (*See* S-4 ¶ 120.) There is no evidence—or even an allegation—that the Cousin Company and the Associate Company are somehow associated or related with one another. The sole connection between the two is the government's allegation that the defendants perpetrated schemes involving both companies. But that will *always* be the case where the government seeks to offer evidence of other alleged acts by a defendant; that alone does not justify admission of otherwise inadmissible evidence.

Similarly, the government is wrong that evidence regarding a fraud involving the Associate Company "is admissible to demonstrate 'a pattern of conduct engaged in by defendant and others of which the crime charged was part.'" (Dkt. 248 at 4 (quoting *United States v. Mavashev*, 455 F. App'x 107, 112 (2d Cir. 2012)).[4] Here, the government claims that "the Cousin Company transactions and the Associate Company transactions were part of a single scheme in which [Ms.] Sun used her access and influence . . . to steer COVID procurement contracts toward companies owned and controlled by her inner circle and received financial benefits from the contracts," and that Mr. Hu "did not report in the couple's joint tax returns." (*Id.* at 4.) But proving that fraud occurred with respect to the Associate Company and that it was part of the same scheme will require the government to prove up an entirely different—and uncharged—offense before it can assert a common scheme. Any "minimal probative value" from such an argument is substantially outweighed by a "real risk of distraction" and the necessity for a "trial within a trial" to demonstrate

---

[3] This argument rings hollow from the start because, despite seeking and obtaining five different indictments in this case and including allegations about the Associate Company, the government repeatedly chose *not* to charge any offenses predicated on contracts with the Associate Company. It is the government's prerogative what charges to bring, but the decision to charge one fraud and not the other belies its claim now that fraud involving the Cousin Company and fraud involving the Associate Company arise from the same transactions or are inextricably interwoven. And in any event, the defendants are entitled to be tried only for what was actually charged. *See Stirone*, 361 U.S. at 217.

[4] *Mavashev* is inapposite. In that case the defendant challenged the admission under Rule 404(b) of testimony regarding "allegedly fraudulent transactions that were not among the eleven in which [the defendant] presided over the closings." 455 F. App'x at 112. Putting aside that the court found "much of [the evidence] was proof at least of the conspiracy charges," it found "the uncharged fraudulent transactions demonstrated a pattern of criminal conduct because . . . they were each purportedly brokered by NGF and closed by the Law Office of Roman Mavashev; they were each for primary residences; they were each for 100 percent financing; and a single borrower was purchasing multiple properties and including conflicting information in the applications." *Id.* Here, as noted above and by the Court in its decision, there are clear factual and legal differences between the alleged frauds involving the Cousin Company and the Associate Company.

that the uncharged fraud involving the Associate Company was, in fact, fraud.[5] *United States v. Johnson*, 816 F. App'x 604, 610 (2d Cir. 2020); *cf. United States v. LaFlam*, 369 F.3d 153, 157 (2d Cir. 2004) (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)) ("Other act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."). And any attempt to bootstrap a conviction for offenses involving the Cousin Company to evidence of uncharged fraud involving the separate Associate Company "could 'undermine the fairness of the trial' with 'classic, and powerful, evidence of propensity.'" *United States v. Kahale*, 789 F. Supp. 2d 359, 386 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) (quoting *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009)).

Nor is evidence of an uncharged fraud involving the Associate Company "relevant as background to the crime," because evidence regarding an alleged fraud involving the Associate Company "[i]s not particularly helpful to explain the crime" alleged with respect to the Cousin Company. *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009). As the Court correctly observed, the alleged frauds with respect to the Cousin Company and the Associate Company are predicated on different bases. (Dkt. 238 at 8 ¶ 14(d).) And the two alleged frauds involve different companies, people, contracts, payments, and purported arrangements with the defendants.[6] In other words, explaining the uncharged fraud with respect to the Associate Company does not help to explain the alleged fraud with respect to the Cousin Company. What the government really wants is to argue that the jury should convict the defendants based on an even wider scope of fraud than what the S-4 charges. That is not permissible, as the Court correctly concluded.

The government also claims that excluding evidence and argument about the Associate Company is impossible because "[i]n many of these emails, [Ms.] Sun is not only requesting updates about the Cousin Company payments, but about payments to *both* companies." (Dkt. 248 at 3.) But the Court's order does not preclude the government from offering evidence that mentions both companies—it merely precludes the government from "offer[ing] evidence or argument about *the uncharged fraud* involving the Associate Company." (Dkt. 238 at 7 ¶ 14(d) (emphasis added).) Likewise, the government says that it "intends to introduce evidence of a ledger maintained by [Mr.] Hu tracking payments with respect to the Cousin Company and the Associate Company," which reflects "funds expected by the defendants for contracts in amounts and dates that align with the DOH contracts with the Associate Company."[7] (Dkt. 248 at 4.) Again, however, if otherwise admissible "[t]hose entries" still might be offered to "demonstrat[e]

---

[5]    For this reason, among others, the Court was also right to note that "the Government would also have to prove that it was Sun who represented that the Associate Company was referred by the Chinese chamber of commerce." (Dkt. 238 at 8 n.1.) And the government is wrong that "this should not affect the analysis." (Dkt. 248 at 5.)

[6]    The S-4 does not, for example, allege payments from the Associate Company to the defendants in the same manner as it alleges payments from the Cousin Company to the defendants.

[7]    The defense notes that the referenced spreadsheet has over 13 different tabs and already contains significant amounts of information other than what the government references here.

that the ledger served as a tracker for DOH contract funds" (*id.*), the government simply cannot go further and argue that entries relating to the Associate Company reflect fraudulent payments.[8]

The government next complains that evidence of an uncharged fraud involving the Associate Company is important because its "proof . . . will depend on the fact that [Ms.] Sun was emailing only about contracts from which she secretly benefited, and not about other contracts." (Dkt. 248 at 4.) Thus, the government argues, the jury may "be left with the misimpression that [Ms.] Sun's emails simply reflected her diligent follow-up across multiple workstreams and not evidence of her fraudulent intent" unless the government introduces evidence of an uncharged fraud regarding the Associate Company. (*Id.*) That argument fails for multiple reasons.

First, the government's underlying premise is inconsistent with the evidence. It is not the case that "[Ms.] Sun was emailing *only* about contracts from which she secretly benefited, and *not about other contracts*." (*Id*. (emphasis added).) Rather, material produced in discovery reflects that Ms. Sun also emailed about multiple other companies contracted by New York during the pandemic, as well as other logistics companies contracted to ship goods purchased by the state. So, to the extent the government insists that evidence of an uncharged fraud relating to the Associate Company is necessary to prove that Ms. Sun emailed "only about contracts from which she secretly benefited" (*id*.), it seeks to introduce inadmissible evidence to present a skewed narrative to the jury. That does not justify reversing a correct ruling. Second, even if the government's underlying assumption were correct, its argument goes only to the *weight* that jurors might ascribe to evidence of Ms. Sun's alleged emails. That is not sufficient to overcome the unfair prejudice that would result from admitting evidence and argument regarding a separate uncharged fraud involving the Associate Company.

Finally, even if evidence regarding an uncharged fraud involving the Associate Company were otherwise admissible, the Court still must consider "whether or not its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993). For all of the reasons already articulated, the Court properly excluded such evidence. That ruling was correct and it remains the case that any probative value of evidence regarding the Associate Company "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury . . . ." Fed. R. Evid. 403.

### III. The Court Correctly Required a Factual Connection With Ms. Sun's Alleged Actions to Permit Evidence of Gifts or Benefits

The Court correctly held that "gifts and benefits, without more, are not probative of an agency relationship," and "allegations about gifts and benefits, if offered to prove the agency relationship, must be connected to a fact – one of [Ms.] Sun's actions – supporting the agency relationship." (Dkt. 238 at 10 ¶ 19.) The government's arguments for reconsideration of this ruling are meritless for several reasons.

First, the Court's decision is not "at direct odds with the plain text of" the Foreign Agents Registration Act ("FARA"), nor does it "remove[] a question of fact from the proper domain of

---

[8] Alternatively, the government might redact entries related to the Associate Company in the proposed exhibit if the government believes that would be more appropriate.

the jury." (Dkt. 248 at 7.) Rather, it reflects a proper application of the Rules of Evidence to allegations that may be relevant only under particular circumstances. Such circumstances, as the Court correctly found, require some connection between alleged gifts and benefits and Ms. Sun's alleged actions before they can be probative of agency.

Evidence of a gift or benefit is not relevant unless that gift or benefit is tethered to an act that Ms. Sun allegedly undertook at the behest of a foreign principal, because only then is it relevant to show that she was "not acting independently," Scope of Agency, DEP'T OF JUST. ("DOJ Guidance") (May 2020), at 3, *available at* https://www.justice.gov/nsd-fara/page/file/1279836/dl (last accessed Nov. 6, 2025), with respect to "a particular course of conduct" established by a foreign principal, *Att'y Gen. of United States v. Irish N. Aid Comm.*, 668 F.2d 159, 162 (2d Cir. 1982).[9] The government disagrees, insisting that "[b]ased on the plain statutory language [of FARA], a critical indicium of whether such a relationship exists is whether the principal compensates the agent, irrespective of whether through means formalized contractually or through less formal patterns of gratuities." (Dkt. 248 at 8.) But that argument both misses the point and reinforces the Court's conclusion. Whether a principal "compensates" an agent implies the very connection that the Court's ruling requires—*i.e.* a payment or reward *for* something—and that is true "irrespective of whether [compensation is] through means formalized contractually or through less formal patterns of gratuities," because both a contractual agreement and gratuity likewise assume such a connection.[10] (*Id.*) The government also points out that "compensation covered by the FARA disclosure requirement can take a wide variety of forms, including future-looking benefits and regular salary." (*Id.*) But again, the issue is whether alleged gifts and benefits were "compensation" relevant to show an agency relationship—not what form a gift or benefit took. Inherent in the notion of "compensation" is the very connection that the Court correctly required here. *Cf.* DOJ Guidance at 3 (identifying as a factor relevant to agency "[w]hether *the request* is compensated or coerced" (emphasis added)). Notably, the government cites no authority supporting its view that any gift or benefit is automatically relevant to prove agency under FARA.

The government's sole example of Billy Carter is far afield from this case. For one thing, Mr. Carter was never charged with a crime and so there was no occasion to consider how

---

[9] As the Court correctly observed, the "question here" is not whether gifts or benefits are "probative of bribery or another relationship sounding of *quid pro quo*." (Dkt. 238 at 10 n.2.) Even in that context, however, a "showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise," *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007), still requires that "a particular question or matter must be identified at the time the official makes a promise or accepts a [benefit]." *United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020).

[10] The government's observation that "[a] FARA registration statement *for an agent of a foreign principal* must include 'the nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received within the preceding sixty days from each such foreign principal, either as compensation or for disbursement or otherwise, and the form and time of each such payment and from whom received'" (Dkt. 248 at 8 (quoting 22 U.S.C. § 612(a)(5) (emphasis added)), also misses the mark. The question here is whether certain gifts or benefits are relevant to prove agency—not whether a recognized agent should disclose gifts and benefits received.

evidentiary rules might apply. *See* Inquiry Into the Matter of Billy Carter and Libya ("Carter Rep."), Rep. No. 96-1015, 96th Cong., 2d Sess. (1980), at 57–58, *available at* https://www.intelligence.senate.gov/wp-content/uploads/2024/08/sites-default-files-961015.pdf (last accessed Nov. 6, 2025). For another, a payment of $220,000 from the Libyan government is appreciably different from the gifts alleged in this case, which include things like tickets with "a value of $37 or greater" and "salted ducks."[11] (S-4 ¶¶ 107(b), (f).) Given the vastly different circumstances, the government's speculation about how the Court's ruling in this case might apply "in a hypothetical prosecution of Billy Carter" is unrealistic. (Dkt. 248 at 9.) For what it is worth, however, even that speculation is questionable given that Mr. Carter received $200,000 as a "loan" drawn directly on the Libyan Embassy's bank account. Carter Rep. at 42–43. And even then, the Department of Justice decided to proceed with a civil suit in part based on "the weakness of the case for prosecuting Billy Carter, who could convincingly contend that he never thought of himself as being under Libyan control and thus that his failure to register was not criminally willful." *Id.* at 56.

The Court's ruling properly limits the government to offering evidence of gifts and benefits that may actually be relevant to proving an agency relationship. It does not, as the government claims, "remove from the jury's review key aspects of the relationship between the alleged agent and the foreign principal" and leave only an "artificially narrow slice of relevant evidence about the relationship." (Dkt. 248 at 9.) Indeed, the opposite is true: were the Court to reverse itself, it would allow the government to introduce evidence that is *not* relevant to proving agency, thereby misleading the jury into believing that any gifts and benefits—no matter how minor, remote or unrelated to any request or alleged action by Ms. Sun—may support a conviction under FARA. The Court correctly rejected that course and ruled instead consistent with both FARA and the Rules of Evidence.

Finally, the Court's ruling properly takes into account the unique nature of this case, in which charges have been brought under FARA against a former state public official. Unlike other FARA cases, that additional factor raises the risk here that jurors may improperly base a verdict on assumptions about corruption or their dislike of public servants who receive gifts or benefits rather than an assessment of agency under FARA. The Court's ruling properly guards against that risk as well.

## IV. The Government's Proffer Regarding CC-1 is Insufficient

The Court previously reserved decision on the defense's motion to preclude evidence or argument regarding CC-1's conduct or any involvement of Association-1 unless and until the government proffered evidence that CC-1 was supervised or controlled by the PRC. (Dkt. 238 at 9 ¶ 18.) It further held, however, that the government must first "proffer electronic

---

[11] The government has also alluded to "millions of dollars in transactions" for unspecified (but seemingly legitimate) "PRC-based business activities" that was somehow "facilitate[ed]" by the "the PRC government and the CCP." (S-4 ¶ 16.) But it has never specified what transactions or business that refers to and the recent superseding indictments appear to allege that proceeds the government previously attributed to FARA are now ascribed to the PPE fraud and bribery schemes.

communications and other evidence to support such a finding . . . before offering evidence or argument that CC-1 was supervised or controlled by the PRC." (*Id.*)

In its motion, the government purports to provide a pretrial proffer of evidence regarding CC-1. In doing so, it partly regurgitates allegations from the S-4. (*See* Dkt. 248 at 5–6.) Where it does offer potential evidence, that evidence fails to address whether "CC-1 *was supervised or controlled by the PRC*"—focusing instead merely on some interaction between CC-1 and the PRC or related entities. (Dkt. 238 at 9 ¶ 18 (emphasis added).) And the government does not proffer anything whatsoever regarding Association-1.[12] As such, the government's proffer in its motion is insufficient to permit the introduction of evidence or argument that CC-1 was supervised or controlled by the PRC.

For instance, the government proffers that "[i]n electronic communications from 2019, CC-1 repeatedly asked Sun for Politician-2's resume to coordinate Politician-2's proposed travel to the PRC" and that have communicated with the "Henan Provincial Government, the General Office of CPPCC and the Foreign Affairs Office." (Dkt. 248 at 6.) While that may demonstrate that CC-1 communicated and interacted with PRC-related entities, it does not suggest foreign supervision or control of CC-1. That is especially true given CC-1's prior position as the head of Association-1, which he described to federal agents as a domestic organization that worked to facilitate trade and business between New York State and Henan Province. Given that mission, communication and interaction with the PRC is to be expected. That does not mean that foreign supervision and control may be assumed.

As another example, the government suggests that "[e]lectronic communications between CC-1 and CC-2 reflect actions taken at the direction of the PRC" because, "[i]n one communication, CC-1 told CC-2 that he was reporting a proposal for bilateral cooperation to Henan provincial officials . . . ." (*Id.*) Again, however, that merely shows communication and interaction with the PRC and falls far short of demonstrating foreign supervision and control. Indeed, if discussing a proposal for bilateral cooperation with the PRC is sufficient to render one a foreign agent, many U.S. diplomats and non-governmental organizations would seem to meet the criteria.

Accordingly, the government's proffer is insufficient. The Court should require more before permitting the introduction at trial of evidence or argument that CC-1 was supervised or controlled by the PRC.

V.     **The Court Should Not Unduly Restrict Cross-Examination of Government Witnesses**

The government recognizes and "does not seek reconsideration of" (Dkt. 248 at 2) the Court's ruling that "evidence or argu[ment] . . . [that] the alleged conduct at issue ostensibly conforms with current federal foreign policy . . . is relevant to whether [Ms.] Sun knew she had to register with the Attorney General." (Dkt. 238 at 2 ¶ 3.) Nevertheless, it purports to proffer that "[n]one of the government's witnesses are competent to testify regarding official U.S. foreign

---

[12]     This suggests that CC-1 was correct when he told federal agents in May 2025 that Association-1 is supported through donations from its members and does not receive financial support from New York City, New York State, the Chinese government, or anyone living in China.

policy vis-à-vis Taiwan during the relevant period, nor about whether Sun's activities aligned with such policy." (Dkt. 248 at 2.) Based on that proffer, the government asks the Court to preclude "any cross-examination of the government's witnesses regarding these topics . . . ." (*Id.*)

The government's motion should be denied. As a threshold matter, it is not clear what the government means when it says its witnesses are incompetent. "Every person is competent to be a witness" unless the Rules of Evidence "provide otherwise." Fed. R. Evid. 601. To the extent that government is suggesting all of its witnesses lack personal knowledge regarding the above matters, "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. The proper way to test the scope of such knowledge is on cross-examination. Nor does it really seem likely that all of the government's witnesses will be oblivious to U.S. policy and matters involving Taiwan. (*See, e.g.*, Dkt. 102-1 ¶¶ 61–67 (discussing Taiwan and related U.S. foreign policies).)

Accordingly, the government's request to categorically limit any cross-examination of any government witness about U.S. foreign policy, Taiwan, or Ms. Sun's alleged activities should be denied.

We thank the Court for its attention to this matter.

Respectfully submitted,

*Jarrod L. Schaeffer*

Jarrod L. Schaeffer

ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7339
jschaeffer@aellaw.com

cc:     Counsel of Record (via ECF)