

**JARROD L. SCHAEFFER**
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

December 2, 2025

**By ECF**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

>    Re:    *United States v. Linda Sun, a/k/a "Wen Sun," "Ling Da Sun," and "Linda Hu," and Chris Hu*, S4 24 Cr. 346 (BMC) (TAM)

Your Honor:

We represent Linda Sun in the above-referenced matter and, on behalf of both defendants, respectfully submit this motion to strike certain evidence that the government has been permitted to enter at trial over objection.

## BACKGROUND

On the very first day of trial, the government identified, marked, and elicited testimony regarding GX-108, which was described as "a digital hard drive with the copies of [] extractions" made of CC-1's phones during a border search in 2020. (*See* Trial Tr. at 198:5–6.) To do so, the government called Special Agent Matthew Harris, who testified as follows:

>    Q.    Special Agent Harris, I just handed you what's been pre-marked as Government Exhibit 108. Do you recognize this item?
>
>    A.    I do.
>
>    Q.    What is it?
>
>    A.    This is a digital hard drive with the copies of the extractions.
>
>    Q.    And how do you recognize it as such?
>
>    A.    Because I reviewed it ahead of testifying today, and I signed it, as well.

(Trial Tr. at 197:25–198:9.) Harris made clear, however, that he did not actually extract data from CC-1's device. (*See id.* at 196:17–19; *see also* GX-700.) And on cross-examination, Harris also

admitted that he could not confirm that GX-108 contained the same data extracted from CC-1's device. For instance, Harris testified as follows:

> Q. All right. The device that was just handed to you, you said you reviewed in advance of your testimony today?
>
> A. Uh-hum.
>
> Q. Did you do anything to compare the device that you reviewed with any extraction that was done on the day that -- in 2020, when the extraction was done, any technical processes, any hash comparisons, anything like that?
>
> A. I did not, no.

(Trial Tr. at 199:14–22.) The government offered no additional witnesses, testimony, or evidence to lay a full foundation for GX-108.[1]

Nevertheless, since then the government has offered a number of later exhibits that it says were drawn from GX-108. (*See, e.g., id.* at 400:5–17; 1963:7–11; 1972:25–1973:4; 1984:17–19, 1990:12–13; 1993:2–5; 1994:2–13; 1999:24–2000:3; 2003:19–21; 2008:24–2009:1). All have been identified as data copied from GX-108 and have been offered on that basis.[2] (*See, e.g., id.* at Trial Tr. 399:8–400:7) ("The documents marked for identification as Government Exhibits 108.05-A, 108.05-B, 108.06-A, 108.06-B, 108.06-C, 108.35-A, 108.35-B, and 108.35-C were copied from that extraction on a USAO EDNY computer system, through electronic process or system that produces an accurate result, and stamped for identification . . . . Your Honor, we now offer Government Exhibits 108.35-A, as in "apple," and "B" as in "boy," which are subject to the certification.").

## DISCUSSION

Pursuant to Federal Rule of Criminal Procedure 16, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph" certain materials, including "documents, data, . . . or copies or portions" of such items, "if the item is within the government's possession, custody, or control and," *inter alia*, "the item is material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial . . . ." Fed. R. Crim. P. 16(a)(1)(E)(i)–(ii). "[A] trial court has broad discretion to fashion a remedy for the government's violation of the Rule." *United States v. Thai*, 29 F.3d 785, 804 (2d Cir. 1994).

---

[1]    For that reason, the defense also objected to GX-108 and subsequent exhibits drawn from GX-108 on the grounds that the government had failed to lay a proper foundation, failed to establish the authenticity of GX-108, and failed to establish a complete chain of custody.

[2]    To avoid wasting the Court's time and prolonging the case for the jury, the defense has stipulated that such exhibits were copied from GX-108 or permitted the government to authenticate information copied from GX-108 based on certifications by their paralegal. (*See, e.g.*, Trial Tr. at 399:8–400:7). At no time, however, has the defense waived its underlying objection to GX-108 as the source of those exhibits. Rather, as the Court is aware, the defense has consistently objected to the introduction of the later exhibits. (*See, e.g., id.* at 1768:1–1769:8.)

Among other things, the Court may "order . . . discovery or inspection" of the material, "prohibit" the government "from introducing the undisclosed evidence," or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

For several reasons, the government has violated Rule 16 with respect to GX-108, and the resulting prejudice can be cured only by striking testimony regarding that exhibit, all related exhibits predicated on GX-108, and instructing the jury not to rely upon such evidence.

*First*, the government clearly has "use[d]" GX-108 "in its case-in-chief at trial . . . ." Fed. R. Crim. P. 16(a)(1)(E)(ii). The relevant portion of Rule 16 "has been sensibly interpreted to include not only '[exhibits] which will be marked and offered in evidence by the government,' but also [exhibits] 'which will be relied on or referred to in any way by any witness called by the government during its case in chief.'" *United States v. Turkish*, 458 F. Supp. 874, 882 (S.D.N.Y. 1978) (quoting *United States v. Countryside Farms, Inc.*, 428 F. Supp. 1150, 1154 (D. Utah 1977)). That accords with the traditional definition of "use," which is "to put into action or service" or "avail oneself of" or "employ." *Use*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/use (last accessed Dec. 1, 2025); *see also id.* (providing alternate definitions that include "to benefit from the use of" and "to carry out a purpose or action by means of"). Here, GX-108 was marked as an exhibit at trial by the government. While GX-108 itself was not offered into evidence, Harris identified and referred to GX-108 during his testimony. And the government has expressly relied upon GX-108 as the predicate upon which later exhibits were identified, authenticated, and admitted.

Despite all that, the government has never produced GX-108 to the defense or allowed it to inspect GX-108.[3] That is undisputed; the government has admitted that it only produced responsiveness reports from GX-108 and continues to maintain that the defense is not "entitled" to the receive or examine that exhibit. (*See, e.g.*, Trial Tr. at 1769:13–17 ("It is true that the Government did not provide the full extractions from the devices, nor the full iCloud returns or the full Gmail returns because . . . there is no entitlement to provide the full extent of that, only the responsive report.").) Although the government sometimes marks but does not enter electronic evidence in other cases, typically the government then identifies and authenticates responsiveness reports or extractions through some *other* appropriate method—such as competent witness testimony or substantive stipulations. The government has not done so here.

The anomalous result is that the government has used GX-108 during its case in chief to lay the factual and legal groundwork for other exhibits and to admit those exhibits over the defense's objections. Such use of an exhibit never produced to the defense violates the letter spirit of Rule 16. And it is prejudicial to the defense, which remains limited to only those portions of GX-108 that the government chose to provide—despite the full extraction being marked and used at trial against the defendants.

*Second*, even if the government were somehow deemed not to have "used" GX-108 despite it being identified, marked, and discussed at trial, GX-108 is material to the defense. "[M]ateriality

---

[3]     After the Court overruled the defense's renewed objections on this subject, the defense requested a copy of GX-108 and a similar exhibit, GX-106, which was described as a copy of CC-1's iCloud account. The government has not responded to that request.

means more than that the evidence in question bears some abstract logical relationship to the issues in the case," and "[t]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his [or her] favor." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (quoting *United States v. Ross,* 511 F.2d 757, 762–63 (5th Cir.), *cert. denied*, 423 U.S. 836 (1975)); *but see also United States v. NYNEX Corp.*, 781 F. Supp. 19, 25 (D.D.C. 1991) (cautioning that "the government should interpret the 'material to the preparation of the defendant's defense' language . . . broadly to ensure fairness to the defendant").

That standard is satisfied here. GX-108 purportedly contains communications and other data obtained by the government from devices owned and controlled by CC-1. As part of its investigation, the government reviewed that material at its leisure and later selected items to produce to the defense. During trial, the government has offered certain information excerpted from GX-108. (*See, e.g.*, Trial Tr. at 1962:22–1963:10; 1972:16–1974:17; 1976:7–1980:10.) And the government has offered—and the Court has received—communications excerpted from GX-108 between CC-1 and Ms. Sun pursuant to the hearsay exception for co-conspirator statements. *See* Fed. R. Evid. 801(d)(2)(E). Rules 106 and 806 would permit the defense to offer other communications or information for necessary context or to impeach the offered statements, but in order to offer such material the defense first would need access to and an ability to review it. Again, however, the government has never produced GX-108. Moreover, since CC-1 was named as an unindicted co-conspirator, he unsurprisingly has asserted his Fifth Amendment right against self-incrimination. And, as the Court knows, the government has refused to immunize CC-1.[4]

As a result, GX-108 is a unique source of statements by, and information regarding, CC-1 that the defense might be able to utilize. But the defense remains confined only to what the government has determined to turn over. Throughout this case, the government and the defense have had (and continue to have) very different views on relevance and the nature of exculpatory material.[5] Given the centrality of CC-1 to the government's case, its use of communications and other information drawn from GX-108, and the exculpatory information previously provided by CC-1 during his interview with CBP, there is certainly an "indication that the pretrial disclosure of the disputed evidence would have enabled the defendant[s] significantly to alter the quantum of proof in [their] favor." *Maniktala*, 934 F.2d at 28 (quoting *Ross*, 511 F.2d at 762–63). The government should have realized that long ago while preparing its case, but certainly should have recognized the issue once it effectively precluded the defense from calling CC-1 as a witness.

"Whether sanctions for nondisclosure of material evidence should be imposed involves a case-by-case assessment of the nature of the evidence sought, its bearing upon critical issues in the case, the reason for its nonproduction and the strength of the government's untainted proof."

---

[4]     The Court has declined to permit the defense to introduce the only other statements that it has from CC-1, which were exculpatory answers given during an interview with U.S. Customs and Border Patrol ("CBP") agents in May 2025, concluding that such statements are barred as hearsay.

[5]     The government's view has also differed from the Court's at times. For example, during litigation pursuant to the Classified Information Procedures Act ("CIPA"), the government repeatedly denied that any information was exculpatory, but the Court disagreed. (*See, e.g.*, Dkt. 237 at 9.)

*United States v. Petito*, 671 F.2d 68, 74 (2d Cir. 1982) (citing *United States v. Grammatikos*, 633 F.2d 1013, 1019 (2d Cir. 1980)).  Here, those factors all weigh in favor of sanctioning the government's noncompliance.

The contents of GX-108 clearly bears on critical issues in the case, because the government has repeatedly cited "chats," including those extracted from GX-108, as its best evidence of key offense elements.  Outside of those, the strength of the government's *relevant* untainted proof is weak; though the government has offered other evidence regarding payments, meetings, and conversations, none of it means anything without the crucial linkage that the government has represented comes from material derived largely from GX-108.  Indeed, as the Court recently observed, "I feel like the Government is building one of the great pyramids from the top down, and, you know, we're waiting to see the foundation for the top . . . ." (Trial Tr. 1840:23–25).  And the government's reason for nonproduction is—at best—because it did not *want* to,[6] and—at worst—because the government wanted to limit access to fuller information concerning CC-1.

***

For the foregoing reasons, GX-108 and all exhibits derived therefrom should be stricken from the record, and the jury should be instructed not to rely on that material.

We thank the Court for its attention to this matter.

Respectfully submitted,

*Jarrod L. Schaeffer*

Jarrod L. Schaeffer

ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7339
jschaeffer@aellaw.com

cc:     Counsel of Record (via ECF)

---

[6]     There could not be any reasonable concerns about producing such information, because the protective order in this case adequately safeguards material produced in discovery.